

**Jeremy A. Lieberman**
Managing Partner

February 20, 2017

**VIA ECF AND HAND DELIVERY**

Hon. P. Kevin Castel
United States District Judge
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re:    *In re: SunEdison, Inc. Sec. Litig.*, No. 16-md-02742; 16-mc-2742
>        Response to Defendants' February 6, 2017 Pre-Motion Letter (Dkt. 57) in
>        *Church v. Chatila,* No. 16-cv-07962

Dear Judge Castel:

We represent Lead Plaintiff and the proposed class in *Church v. Chatila,* No. 16-cv-07962 (the "Action"). We respectfully submit this letter in response to Defendants' February 6, 2017 pre-motion letter setting forth contemplated grounds for a motion to dismiss ("Defendants' Pre-Motion Letter").

This is a securities class action on behalf of investors who purchased or held the publicly traded securities of Vivint Solar, Inc. ("Vivint") between July 20, 2015 and April 1, 2016 (the "Class Period").[1] The named Defendants are Ahmad R. Chatila, the president and CEO and a director of SunEdison, and Brian Wuebbels, SunEdison's Chief Financial Officer. During the relevant period, SunEdison embarked on an aggressive strategy of growth by acquisition, including the July 2015 announcement that it was acquiring Vivint Solar in a deal valued at over $2 billion. Defendants misrepresented that SunEdison had a "solid" liquidity position, with

---

[1] In the Amended Complaint, the class period is incorrectly defined as ending on March 7, 2016. *Compare* ¶1 (defining the class period as "between July 20, 2015 and March 7, 2016") *with* ¶¶244-45 (identifying a corrective disclosure on April 3, 2016 and a decline in Vivint's stock price on April 4, 2016). Plaintiffs intend to file a Corrected Amended Complaint addressing this issue.

jalieberman@pomlaw.com

600 Third Avenue, New York, New York 10016   tel: 212.661.1100   www.pomerantzlaw.com

NEW YORK        CHICAGO        LOS ANGELES        WESTON, FL

®325

Hon. P. Kevin Castel
February 20, 2017
Page 2



"greater than $1 billion" available and "appropriate level[s] of cash and liquidity" to fund its acquisitions and growth. ¶¶80, 175.[2] In addition, while SunEdison took out $700 million in financing to pay for its buying spree, the Defendants falsely assured investors that the debt was "non-recourse." ¶258. These statements created the false impression that SunEdison had no significant liquidity concerns and would be able to complete the Vivint deal.

In truth, however, SunEdison's liquidity position was precarious, turning into a full-blown crisis during the relevant period. The Amended Complaint cites numerous former employees who attest to a situation that was so severe that SunEdison was systematically not paying vendors in order to preserve cash. Indeed, SunEdison paid only about 10% of its vendors on time. ¶7.

The Amended Complaint also alleges numerous material internal control deficiencies at SunEdison which belied the Defendants' public representations that they had sound and adequate internal controls over financial reporting. In fact, SunEdison's numerous internal financial systems it had acquired in its buying spree were hopelessly incompatible, rendering it incapable of producing accurate financial statements. V¶10.

Defendants' arguments in the Pre-Motion Letter are misplaced for several reasons.

First, there is no "serious question" as to whether the alleged misrepresentations were made "in connection with" Plaintiffs' purchases of Vivint stock or as to whether Plaintiffs have standing to sue Defendants over losses caused by those misrepresentations. Plaintiffs are investors who purchased Vivint stock after SunEdison announced that it would "acquire Vivint Solar for approximately $2.2 billion, payable in a combination of cash, shares of SunEdison common stock and SunEdison convertible notes." ¶74.[3] "It is well established that information concerning a tender offer or a proposed merger may be material to persons who trade in the securities of the target company." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 177 (3d Cir. 2000) (collecting cases).[4] Here, Defendants' statements about SunEdison's liquidity and internal controls were material to Vivint stockholders not solely because they affected the acquisition's chances, but also because Vivint shares would be converted into securities of SunEdison itself.

---

[2] "¶__" refers to paragraphs in the Amended Complaint.

[3] Specifically, each Vivint stockholder would "receive $16.50 per share, consisting of $9.89 per share in cash, $3.31 per share in SunEdison stock, and $3.30 per share in SunEdison convertible notes." ¶77.

[4] Defendants also argue that the fraud-on-the-market presumption is unavailable because Plaintiffs "nowhere allege that all publicly available information about SunEdison was reflected in Vivint's share price." But this is irrelevant—what matters is that the total mix of information about Vivint included information about SunEdison *insofar as it was material to Vivint*.

# POMERANTZLLP

     *Ont. Pub. Serv. Emples. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004) does not suggest otherwise. As the Second Circuit has since clarified, *Nortel Networks* did not hold that "an action under Rule 10b-5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007). Rather, it held that purchasers of JDS Uniphase stock lacked standing because, given the limited "business relationship" between the two companies, "the connection between Nortel Networks' false statements about itself and the plaintiff's purchase of JDS Uniphase stock was too remote." *Id.* In fact, *Nortel Networks* explicitly noted that "a potential merger might require a different outcome" because "a merger creates a far more significant relationship between two companies" than was present in that case. *Nortel Networks*, 369 F.3d at 34.[5] Thus, this case is far more similar to *Cendant*, which held that investors can pursue claims against potential acquirors and their auditors for statements about the acquirors' own operations, even if the acquisition is not consummated. *Cendant*, 223 F.3d at 176 (requiring plaintiffs to show only that "the misrepresentations in question were disseminated to the public in a medium upon which a reasonable investor would rely, and that they were material when disseminated"); *see Nortel Networks*, 369 F.3d at 34 (distinguishing *Cendant* on the grounds that the proposed Cendant-ABI merger "created a direct link between the value of Cendant's stock and ABI's stock that is not present in this case"); *see also P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 599 (D.N.J. 2001) (upholding claims against acquiror's auditor).

     Second, the Complaint adequately pleads falsity with respect to Defendants' statements about liquidity. Defendants argue there were no disclosable "trends" under item 303, but they ignore that item 303 also requires the identification of "internal and external sources of liquidity" and "deficiencies." ¶315. Here, SunEdison was unable to pay its bills on time and so resorted to delaying payments to vendors—and, in some cases, not paying at all—to such an extent that it only paid about 10% of its bills on time. ¶315. While the Complaint pleads several examples of SunEdison's not being able to pay its bills, and the consequences thereof, one is especially striking: multiple former SunEdison employees reported that SunEdison's projects were so imperiled by its tardy bill payments that its project managers routinely paid SunEdison's vendors with personal credit cards. ¶89. Later, when it stopped even repaying the project managers, they left. *Id.*

     Defendants were well aware of the shortfall, as demonstrated by Defendant Chatila's January 2015 rant to employees that they could either work for a slow-growing company that

---

[5] Moreover, cases since *Nortel Networks* have held that purchasers of securities indexed to another security's price have standing to sue the issuers of the other security. *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 961–62 (N.D. Cal. 2005); *In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV.3288(DLC), 2004 WL 1435356, at *2 (S.D.N.Y. June 28, 2004).

Hon. P. Kevin Castel
February 20, 2017
Page 4



paid its bills, or work for a fast-growth company like SunEdison that could not. ¶104. In other words, SunEdison had a liquidity deficiency—it was unable to pay its vendors— which it failed to disclose. In fact, SEC guidance has specifically identified a company's inability "to make timely payments to its trade and other creditors" as an example of a necessary disclosure under Item 303. ¶322; *see also S.E.C. v. Conaway*, 698 F. Supp. 2d 771, 821 (E.D. Mich. 2010) (company was required to disclose tactic of slow-paying vendors). Further, where, as here, a company uses slow-payments to vendors as a *source* of liquidity, it must disclose as much, though again, SunEdison did not. *Id.* at 817-19.

For the same reason, Defendants had a duty to disclose the August 7, 2015 Margin Call and August 11, 2015 Goldman Sachs Loan because they were "sources of liquidity" under item 303, regardless of whether they were an "extreme departure." Courts have held that if a company conducts an offering, it need only report financial results for the current quarter if they are an "extreme departure" from previous results. *Stadnick v. Vivint Solar, Inc.*, No. 14-CV-9283 (KBF), 2015 WL 8492757, at *11 (S.D.N.Y. Dec. 10, 2015); *In re Coty Inc. Sec. Litig.*, No. 14-CV-919 (RJS), 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016). They reason that "quarterly reports are the mechanism for updating company finances and SEC regulations do not require intra-quarter financial statements." *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 303 (S.D.N.Y. 2010) (Castel, J.). But companies *do* have a duty to disclose "liquidity sources" whenever they file documents subjects to Regulation S-K. Here, Plaintiffs are not claiming that Defendants were required to disclose intra-quarterly results, but rather liquidity events that had recently occurred, which need not be an "extreme departure" from previous results.[6]

Third, while Defendants claim that SunEdison's cash position was accurately set out in its financial statements, they ignore the Complaint's allegations that SunEdison's cash position in its quarterly filings was materially misleading. SunEdison offered financial incentives to counterparties if they paid, funded, or otherwise provided SunEdison with cash on or before the last day of any quarter. ¶6. As a result, SunEdison's cash position on the last day of each quarter—the day reported on financial statements—was grossly unrepresentative of its overall cash position, as it showed far more cash than SunEdison had available on an average day during the quarter. The purpose of the cash manipulation was to mislead investors, lenders, and other counterparties—and it succeeded. The CEO of First Wind, who had reviewed SunEdison's financials in connection with SunEdison's January 2015 acquisition of First Wind for $2.4

---

[6] Defendants assert that only "external" facts need be disclosed. This is nonsensical, since "deficiencies," "sources," and the like are by definition internal facts. Further, the Second Circuit has held that issuers must disclose internal facts. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) (under Item 303, issuer had to disclose fact of product defects).



billion, was bewildered that SunEdison had so little cash for this very reason. *Id.* For the same reason, there is no merit to Defendants' argument that liquidity disclosures in SunEdison's financial statements obviated any false statements they made.

Fourth, to the extent that some of Defendants' statements were couched as opinions, they remain actionable under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), because they were false and were not subjectively believed. The Complaint plainly alleges that Defendant Chatila actually knew that SunEdison's liquidity was not sufficient, because SunEdison was not even able to pay its bills. And Defendants' arguments that their statements were true because SunEdison survived 12 months ignores the fact that it was only able to do so by misappropriating $231 million from TerraForm Global. ¶211.

Fifth, the classification of the Margin Loan as "non-recourse" was materially misleading. Defendants admit that the Q2 2015 10-Q falsely stated that the Margin Loan was non-recourse to SunEdison, but claim that the narrative portion of its filings dispelled the falsity. Not true. The narrative portion says only that the borrower has the right to "demand payment from SunEdison of the obligations under the Margin Loan Agreement then due and payable" – without clarifying that the "obligations" lenders could enforce against SunEdison included *TerraForm Power's*, not just SunEdison's. Given the vagueness of this description, Defendants come nowhere near meeting their burden to show truth-on-the-market—which, in any case, is typically not resolvable on a motion to dismiss. *City of Livonia Employees' Ret. Sys. v. Wyeth*, No. 07 CIV. 10329, 2010 WL 3910265, at *5 (S.D.N.Y. Sept. 29, 2010).

Sixth, Defendants claim that a small number of their statements were puffery, including statements that SunEdison's liquidity was "solid" and that they were "comfortable" with it. In fact, courts have held similar statements actionable. *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) (liquidity is "strong"). Moreover, context matters: even if an off-hand remark that liquidity was "solid" might qualify as puffery, Defendants' statements about liquidity were made constantly, over the course of a year, to reassure investors about *the* crucial point of SunEdison's business model. *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).

Seventh, courts have found misrepresentations about internal controls actionable. *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 232 (S.D.N.Y. 2008) (false statement that internal controls were adequate found actionable); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) (similar). Defendants cite only *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014), which does not hold that statements about internal controls can never be actionable. Rather, it simply found that, under the facts presented, the nature of the specific alleged control deficiencies suggested a mere



"oversight failure of management." *Id.* Nor do Plaintiffs make "general affirmations", instead pointing to specific deficiencies supported by ample reports from former employees.[7]

Eighth, the Complaint adequately pleads scienter. Defendants argue that their lack of insider selling undercuts their motive to engage in securities fraud. However, motive is not required to establish scienter, and is simply one type of evidence that may be probative. Even if there were no other evidence of motive, a plaintiff may allege scienter by pleading either motive and opportunity to commit the fraud" *or* "strong circumstantial evidence of conscious misbehavior or recklessness." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). Moreover, had Chatila or Wuebbels disposed of their stock in the midst of widely-reported merger discussions, they faced the obvious risk that the Justice Department would launch a criminal insider trading investigation. Thus, the lack of insider selling does not undercut an inference of motive.

In fact, the Complaint specifically alleges that "SunEdison's acquisition spree was in large part an attempt to 'grow out of' its problems with liquidity." ¶93. Perhaps Defendants believed that their misrepresentations about liquidity and internal controls were necessary to keep the acquisition spree going for long enough for SunEdison to grow past these deficiencies so that investors would never learn about them, and they did not sell stock because they thought it would all work out. But such a subjective belief in SunEdison's future would not excuse their reckless failure to disclose information that investors had a right to know before they risked their money on Vivint. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014).

Ninth, Defendants attack Plaintiffs' former employees, but ignore the very precise and quantified statements these witnesses make. These include that SunEdison paid 90% of its bills late, ¶7, that SunEdison officials passed out instructions (in easily destroyable paper, not email) to manipulate financial results, ¶152, that SunEdison's project managers were so desperate to have their bills paid that they paid them with personal credit cards, ¶89, and that Chatila himself admitted that SunEdison could not pay its bills on time. ¶104.

Finally, Defendants make a variety of arguments about loss causation and reliance, based largely on speculation about other factors that may have contributed to Vivint's stock price decline. For example, Defendants argue that loss causation is not satisfied because of a purported "industry-wide collapse" that they claim caused both Vivint's and SunEdison's stock prices to decline. However, no such "industry-wide collapse" took place—at most, the solar industry's market value simply retreated following a temporary increase. And in any case, loss causation is

---

[7] In *Barclays*, the plaintiffs claimed that the defendant had misrepresented its controls with respect to LIBOR and EURIBOR submissions, but the defendant never had made any such representations. *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).



satisfied even though a portion of a stock drop may be attributable to forces other than the alleged fraud, because "these facts, if established, hardly foreclose the reasonable inference that some part of the decline was substantially caused by the disclosures about the fraud itself." *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 162 (2d Cir. 2012).

Similarly, Defendants argue that Vivint's statements explicitly attributing its earnings misses to the "distraction" from the Vivint Acquisition were not corrective. However, according to the SunEdison employee in charge of integrating Vivint, the "distraction" arose specifically because SunEdison was slow-walking the Vivint Acquisition. ¶207. And SunEdison's slow-walking was, in turn, the result of its undisclosed liquidity crisis. Investors understood this. *See, e.g., Bleak Future For Vivint Solar After Acquisition Termination*, SeekingAlpha, Mar. 14, 2016 6:19 AM ET, http://seekingalpha.com/article/3958121-bleak-future-vivint-solar-acquisition-termination ("Vivint Solar is now likely worse off than it was before acquisition talks," in part because "Vivint Solar wasted a great deal of time/energy preparing for an acquisition that would ultimately fall through.").

Defendants likewise argue that "any decline in Vivint stock attributable to the merger's unraveling constituted the realization of a known risk that the deal would not be consummated." But Defendants' generalized warning that SunEdison, just like any other company, might not be able to "obtain the funding needed to complete the merger" was meaningless in light of Defendants' failure to disclose that, among other things, that they had no way of knowing exactly how much liquidity was available because SunEdison's internal controls and financial reporting systems were in such poor shape, and that the $1 billion in available cash that Defendants touted was actually overstated by 50%. These facts were extremely material to any investor's ability to evaluate the real risk of SunEdison being unable to finance the merger.

Based on the foregoing, Plaintiffs intend to stand on the Corrected Amended Complaint.

Dated: February 20, 2017
New York, New York

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Murielle J. Steven Walsh
Aatif Iqbal
600 Third Avenue, Floor 20
New York, New York 10016
Phone: 212-661-1100
Fax: 917-463-1044
jalieberman@pomlaw.com
mjsteven@pomlaw.com

Hon. P. Kevin Castel
February 20, 2017
Page 8

# POMERANTZ LLP

aiqbal@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Phone: 312-377-1181
Fax: 312-377-1184
pdahlstrom@pomlaw.com

**THE ROSEN LAW FIRM**
Laurence Rosen
Phillip Kim
Jonathan Horne
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: 212-686-1060
lrosen@rosenlegal.com
pkim@rosenlegal.com
jhorne@rosenlegal.com

***Attorneys for Lead Plaintiffs and the
Proposed Class***