# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SUNEDISON, INC. SECURITIES LITIGATION | Case No.  1:16-md-2742-PKC |
| This Document Applies To: | |
| *Horowitz, et al. v. SunEdison, Inc., et al.*, 1:16-cv-07917-PKC | |

**EXCHANGE ACT DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS SECOND AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ................................................................................................................2

I.    Plaintiffs Fail To Establish Falsity Or Scienter With Respect To Challenged Statements Related To Liquidity. ..........................................................2

II.    Plaintiffs Fail To Establish Falsity Or Scienter With Respect To Challenged Statements Concerning The DevCo's Cash Position...........................5

III.    Plaintiffs Fail To Establish Falsity Or Scienter With Respect To Challenged Statements About The Margin Loan.......................................8

IV.    Plaintiffs Fail To Establish Falsity Or Scienter With Respect To Challenged Statements About Changes At The Yieldcos....................................11

V.    Plaintiffs Fail To Establish Falsity Or Scienter With Respect To Challenged Projections. ..........................................................13

VI.    Plaintiffs' Allegations About the LAP Deal, Loan Classification, Internal Controls And Item 303 Are Similarly Defective. ..................................14

VII.    Plaintiffs Have Not Pled Facts Creating A Cogent Or Compelling Inference Of Scienter. ...........................................................16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**DECISIONS**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)................................................................................................9

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).....................10

*In re BofA Corp. Sec., Deriv., & ERISA Litig.*,
  2011 WL 3211472 (S.D.N.Y. July 29, 2011) ...................................................................17

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013)...............................................................................18

*In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012)...............................................................................12

*In re Lions Gate Entm't Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016) ..................................................................................11

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)...........................................................................................................10

*In re MF Global Holdings Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)............................................................................3, 4

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)............................................................................................17

*RSM Prod. Corp. v. Fridman*,
  643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).....................13

*Santa Fe Indus. v. Green*,
  430 U.S. 462 (1977).........................................................................................................12

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..............................................................................................17

*In re ShengdaTech, Inc. Sec. Litig.*,
  2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014)....................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................................................17

*Thomas v. Shiloh Indus., Inc.*,
    2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) ........................................................................17

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)...........................................................................................................4

*Wyche v. Advanced Drainage Sys., Inc.*,
    2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ...................................................................17

**STATUTES**

15 U.S.C. § 78j(b) (Section 10(b) of the Securities Act)...............................................1, 11, 12, 13

15 U.S.C. § 78u-4(b).........................................................................................................................2

15 U.S.C. § 78u-5(c)(1)(B)..............................................................................................................14

## PRELIMINARY STATEMENT

Plaintiffs' Exchange Act claims rest on a series of anomalies.  Plaintiffs allege that SunEdison concealed a massive liquidity crisis, but do not dispute that the Company accurately conveyed its financial position in virtually unchallenged financial statements.  Plaintiffs claim that an intra-corporate dispute between SunEdison and Yieldco management constituted "fraud on the yieldcos," but cannot change the fact that public statements, and not alleged mismanagement, are the bedrock of a Section 10(b) claim—or that the relevant public statements here, to the extent they touched on the corporate conflict at all, were objectively true.  Plaintiffs also rely heavily on alleged omissions relating to the Margin Loan and Second Lien Loan, but cannot dispute that SunEdison duly disclosed the developments relating to these loans in quarterly filings covering the periods in which the relevant events occurred.  Finally, Plaintiffs maintain that Defendants were working to artificially inflate SunEdison's stock price, but have little to say about the fact that Defendants were *buying* the allegedly overvalued stock.

Plaintiffs seek to reconcile these fatal contradictions in three principal ways.  First, they invite the Court to simply set aside the record of SunEdison's unchallenged financial disclosures, arguing that the Company's financial statements were difficult to read.  This cannot be.  As investors knew, SunEdison was a complex company with complicated financial statements.  This hardly means that Plaintiffs or the Court can just ignore information in the financial statements in determining whether the challenged representations, in context, were false or misleading.  Moreover, Plaintiffs cannot dispute that the critical facts—about operating losses, negative cash flow, burgeoning debt and the need for billions of dollars of cash from external sources—were plainly disclosed in the financial statements and MD&As.

Plaintiffs next argue, in an attempt to span the disconnect between the challenged

1

statements and the often unrelated information they contend should have been disclosed, that a novel and highly demanding standard of completeness applies here.  According to Plaintiffs, issuers must disclose not only relevant transactions and events but also any internal dissenting views about whether those actions were appropriate.  But the law imposes no such unworkable standard, and Plaintiffs' unprecedented omission theory fails as a result.

Finally, in order to deflect attention from the copious record of disclosure and the stock purchases that belie any inference of scienter, Plaintiffs argue that as long as they can show that Defendants knew certain undisclosed facts, the Court may infer scienter—and indeed, that even in the absence of knowledge, access to information is sufficient.  But the law, again, is otherwise.

For these and other reasons set forth below, the Complaint falls short as to both falsity and scienter.  We incorporate by reference the falsity-related and other arguments made in the reply filed in support of the motion to dismiss the Securities Act claims ("Securities Act Reply"), and focus here on those points with respect to which there is a relevant chronological or analytical difference between Plaintiffs' Securities Act and Exchange Act claims.

## ARGUMENT

**I.    Plaintiffs Fail To Establish Falsity Or Scienter With Respect To Challenged Statements Related To Liquidity.**

Plaintiffs' attack on SunEdison's liquidity-related statements is undermined by the fact that the Company issued GAAP-compliant financial statements for every quarter at issue.  Mot. at 8–10.[1]  Plaintiffs' principal response is to quote Chatila's statement that because SunEdison reported financial results on a consolidated basis, its balance sheet was "hard to read."  Opp. at

---

[1] The Securities Act Brief and Reply lay to rest Plaintiffs' sole specific challenge to the financial statements, which relates to a footnote in a table in the 10-Qs for two of the six quarters at issue (Q1 2015 and Q2 2015).  Plaintiffs now add the half-hearted suggestion that the financial statements must also have been unreliable as a whole insofar as confidential witnesses have purportedly said that they lacked confidence in SunEdison's accounting systems.  Opp. at 3.  This is plainly insufficient.  Under the PSLRA, Plaintiffs bear the burden of identifying particular false statements and the ways in which they are false.  15 U.S.C. § 78u-4(b).  Vaguely attacking the financial statements in their entirety is not consistent with this pleading regime, nor, indeed, with *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

10; Com. ¶ 147; Ex. 24 at 4.[2]   But the fact that consolidated financial statements are complicated plainly does not equate to fraud.  If anything, Chatila's acknowledgement put investors on notice that they needed to analyze SunEdison's financial statements with care.

Most importantly, the critical bottom-line facts—including the facts related to liquidity— were not hard to understand at all.  SunEdison's financial statements showed losses every quarter in the class period, a consistently negative cash flow, and a working capital deficit in the hundreds of millions of dollars.  The financial statements also showed the Company consuming cash ever more rapidly, as its debt mushroomed from $7 billion to $10.7 billion over six months.  Mot. at 4–5; Securities Act Reply at 1, 3.   Plaintiffs do not and cannot claim that any of these facts were difficult to discern.  Meanwhile, in the MD&As, SunEdison candidly revealed that the Company could not execute its plans without billions of dollars infused from external sources.  Mot. at 5, 11.  These are the critical facts about liquidity, and they were never hidden.

Defendants have cited numerous decisions dismissing challenges to narrative characterizations of a company's financial position where plaintiffs did not dispute that the financial statements were accurate.  Mot. at 9–10 (citing authorities).   These decisions show that narrative statements must be read in the context provided by financial statements; they also show that accurate disclosures in financial statements undercut any inference that securities defendants intended to defraud investors in discussing a company's financial position.  That analysis applies equally here, whether or not consolidated reporting had the effect of requiring extra care in analyzing SunEdison's financial statements.  Plaintiffs cite no authority to the contrary.

Instead, Plaintiffs cite cases for the proposition that the particular words in the statements they challenge have given rise to successful securities claims in the past.  Thus Plaintiffs cite *MF*

---

[2] Citations to "Ex. _" refer to the exhibits to the Omnibus Declaration of Jaime A. Bartlett filed June 9, 2017. Citations to "Opp." refer to Plaintiffs' brief in opposition to the Exchange Act Defendants' motion to dismiss.  Other capitalized terms have the meanings defined in the Exchange Act Defendants' opening brief ("Mot.").

*Global*, in which the challenged statement that liquidity was "strong" survived a motion to dismiss, and *Vivendi*, where plaintiffs prevailed at trial with a challenge to the company's statement (among more than 50 others) that the company was "confident [in] its capacity to meet its anticipated obligations over the next 12 months."  Opp. at 10, 12 (citing *In re MF Global Holdings Sec. Litig*., 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013), and *In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223 (2d Cir. 2016)).  Even assuming that the statements challenged in those cases were comparable to the statements challenged here—and it is notable that Plaintiffs cite no statement similar to the "confidence" representation in *Vivendi*—the question is not whether particular words can ever give rise to liability.  With respect to the challenged liquidity prediction *in this case*, the question is whether Plaintiffs have pled particularized facts showing that Defendants actually knew that SunEdison would not be able to sustain operations for 12 months.  Plaintiffs have pled no such facts, and *Vivendi*, as previously discussed, contains no analysis of the actual knowledge requirement.  Mot. at 13 n.6.  With respect to oral statements about "strong" liquidity, the question is whether Plaintiffs have pled facts giving rise to a compelling inference of scienter in the context of virtually unchallenged financial statements and copious risk disclosures about liquidity.  Nothing in the analysis from *MF Global* on which Plaintiffs rely—in which scienter was not even at issue—supports the argument that Plaintiffs have pled such facts here.  On the facts of this case, Plaintiffs have not shown that the challenged liquidity opinions and characterizations, read in the context of the financial statements, were materially false or misleading, much less deliberately so.[3]

---

[3] Plaintiffs rely heavily on confidential witnesses who purportedly told them that SunEdison did not make timely payments to vendors on particular projects.  *E.g*., Opp. at 11.  But Plaintiffs never seek to tie the practice of late payments—which by their own estimate was in place nearly two years before SunEdison's bankruptcy—with the purported liquidity crisis that they claim later led to the Company's downfall.  Indeed, as shown in the Securities Act Reply, that practice was *lessening* in 2015.  In any event, both the practice of vendor financing and its attendant risks were disclosed in SunEdison's SEC filings—as was the more fundamental fact that the Company was operating with negative cash flow.  Mot. at 39; Securities Act Br. at 9–10.

## II.   Plaintiffs Fail To Establish Falsity Or Scienter With Respect To Challenged Statements Concerning The DevCo's Cash Position.

Plaintiffs' challenge to the statement that the DevCo had $1.4 billion cash at the end of Q3 2015 fails for a similar reason.  Here too, the bottom-line financial figures were never hidden. Mot. at 27–30.  In neither their complaint nor their opposition do Plaintiffs cite facts showing that total cash at the DevCo at the end of Q3 2015 was less than $1.4 billion.

Rather than marshaling facts showing that the numbers were inaccurate, Plaintiffs continue to play games with words.  In a separate complaint, the Yieldco Plaintiffs allege that the $1.4 billion figure did not reflect cash "*immediately available to satisfy any business need*," and further allege that the DevCo had only $497 million in cash of this sort.  Mot. at 27 (citing Yieldco Plaintiffs' complaint; emphasis added).  Adopting this allegation wholesale, Plaintiffs claim that "[a]s the [Yieldco Plaintiffs] allege . . . SunEdison had only $497 million in *accessible* cash—not the $1.4 billion that the Executive Defendants publicly represented."  Com. ¶ 353 (emphasis added).  But of course SunEdison did not say that the $1.4 billion at the DevCo was "immediately available" or "accessible" for all purposes.  To the contrary, SunEdison repeatedly said that a portion of these funds was available only for purposes of construction.  Mot. at 28–29.

Plaintiffs now suggest that because SunEdison at one point used the term "available," it was somehow signaling that the full $1.4 billion was available for all corporate purposes.  Opp. at 14.  But that is simply not true.  When SunEdison used the term "available," the Company was referring specifically to slides that in turn contained the disclosure that some cash was available only for construction purposes.  Opp. at 14; Com. ¶ 337; Ex. 24 at 4 & Ex. 39 at slide 10.

Plaintiffs also suggest that SunEdison *must* have been referring to cash available for all purposes when it cited the $1.4 billion DevCo figure because otherwise the figure "would make no sense."  Opp. at 16.   But that is plainly not true either.  By Plaintiffs' own reckoning, the

DevCo had, at the end Q3 2015, (1) hundreds of millions of dollars of cash available for all purposes, and (2) hundreds of millions of dollars of additional cash available solely for purposes of construction.  *E.g.*, Com. ¶¶ 339, 353.  Both were relevant; construction was an enormous part of what SunEdison did.  Referring to both components of cash made perfect sense.  As for Plaintiffs' contention that cash committed for construction "should not have been included" in any presentation (Opp. at 4, 18), this is Plaintiffs' own conclusory judgment, unsupported by any reference to external sources.  Plaintiffs are not the arbiters of what should and what should not be included when public companies make representations about their financial position, and Plaintiffs do not contend that including cash committed for construction violated GAAP.  Indeed, Plaintiffs make no suggestion that SunEdison *could* have excluded committed cash and still remained compliant with GAAP.  Nor do they dispute that SunEdison recorded committed cash provided by lenders as a *debt* in its financial statements.  Mot. at 31.[4]

To the extent Plaintiffs seek to challenge the $1.4 billion figure on the basis of numbers rather than semantics, their attack fails because it is both conclusory and self-contradictory. Drawing on the Yieldco Plaintiffs' allegations, Plaintiffs say that in reality the DevCo had only $497 million in "accessible" cash at the end of Q3 2015—but neither they nor the Yieldco Plaintiffs try to justify this figure.  Even crediting the Yieldco Plaintiffs' assertion that $500 million in warehouse funds should have been subtracted from $1.4 billion, this leaves $900 million.  Plaintiffs do not allege particularized facts—or indeed, any facts—showing why the other $403 million was purportedly "unavailable."  And it is clearly Plaintiffs' burden to do so.

---

[4] Plaintiffs argue that both the $1.4 billion DevCo cash figure and Defendants' characterization of liquidity generally were of special importance because SunEdison reported on a consolidated basis; the suggestion seems to be that only by means of such statements did investors have a glimpse into what DevCo financing looked like apart from the Yieldcos.  Opp. at 10.  But critically, Plaintiffs never say that SunEdison inaccurately reported the allocation of cash between the DevCo and the Yieldcos—that with respect to the $1.4 billion figure or anything else, Defendants improperly attributed to the DevCo assets that in fact belonged to the Yieldcos.

It is not Defendants' burden to *disprove* the Yieldco Plaintiffs' $497 million figure.[5]

Finally, Plaintiffs complain that Defendants have not addressed a statement made by an analyst—not Defendants—on November 18, 2015.  Opp. at 19.  The statement—although Plaintiffs omit the critical part of it—was that SunEdison "has roughly $1.35 billion of cash *with about $700 million of that cash held in project companies earmarked for working capital purposes.*"  *Id.*; Com. ¶ 366 (emphasis added).  Assuming this analyst statement could be attributed to Defendants, it *undercuts* Plaintiffs' claims.  It shows that the market was told that of the total amount of the cash at the DevCo, at most $650 million was available for purposes other than specific construction projects.   By means of the analyst report, the market was thus provided with a figure *lower* than the figure that emerges from Plaintiffs' own skeletal calculations—$650 million, rather than Plaintiffs' $900 million.[6]  As for Plaintiffs' claim that "unrestricted" cash had dropped to $74 million by the date of the analyst report—down from an alleged $497 million at the end of Q3—Plaintiffs provide no more factual support for their $74 million figure than for the $497 million figure itself; they once again simply adopt it wholesale from the Yieldco Plaintiffs' complaint, which similarly lacks any supporting facts or figures.

---

[5] Plaintiffs similarly fail to allege facts showing falsity or scienter with respect to the statement that the DevCo had more than $1 billion in cash at the end of *Q2* 2015.  Here, Plaintiffs provide no alternative figure at all; they do not even contend that the Yieldco Plaintiffs have challenged the $1 billion figure.  Plaintiffs suggest that $1 billion cannot have been accurate because it included cash available only through the "inaccessible" warehouse facility, Opp. at 13, but they cannot dispute, with respect to either Q2 or Q3 2015, that SunEdison disclosed that its warehouse financing could be used only for specific projects.  Mot. at 30.

Plaintiffs also challenge Wuebbels' statement, during the Q2 2015 earnings call, that the warehouse facility would "offset" certain construction expenses.  Opp. at 13, 18; Com. ¶ 105.  But Plaintiffs have not shown that this was untrue. Other than saying in conclusory terms that the warehouse was "inaccessible," they have no answer to the point that it was in fact accessed in Q3 2015.  Mot. at 31.  In any event, the omitted context of the challenged statement Plaintiffs have excerpted shows that Wuebbels was talking at a macro level about the matching of sources and uses; Wuebbels did not say that the warehouse facility could be used specifically to satisfy any particular obligation.  Ex. 23 at 5.

[6] Far from introducing a factual dispute into the case, this discrepancy simply confirms that Plaintiffs have failed to provide the required factual support for their attack on the reported $1.4 billion DevCo cash figure, and at the same time have deliberately overlooked SunEdison's repeated statements to investors that only a portion of that cash was available for purposes other than specific construction projects.

Com. ¶ 366.  Plaintiffs' conclusory and contradictory arithmetic does not create the necessary

inference of falsity and scienter any more than their word games do.

### III.    Plaintiffs Fail To Establish Falsity Or Scienter With Respect To Challenged Statements About The Margin Loan.

The Securities Act Reply shows that SunEdison disclosed the material facts related to the

Margin Loan in its 10-Qs for the first two quarters of 2015.  As events concerning the loan and

its repayment continued to unfold in the third and fourth quarters, SunEdison reported these

developments too, in announcements made on October 7, November 9, November 23 and

November 24.  Plaintiffs do not seriously contend that these announcements were false; their

argument instead is that on each date, SunEdison needed to say more.  Plaintiffs are wrong.

***October 7, 2015.***  During an analyst call on October 7, 2015, SunEdison reported that it

had responded to margin calls by posting $152 million cash collateral in the third quarter, and

that it had amended the loan agreement by lowering the trigger points for any future margin

calls.  Mot. at 15.  Plaintiffs fault the Company for not also announcing a margin call that led to a

$91 million payment in Q4 2015.  But as Plaintiffs acknowledge, the purpose of the October 7

presentation was not to deliver complete financial results for Q3 2015—which had ended just a

week before—let alone for Q4 2015.  The purpose of the call was to provide an overview of the

Company's reorganization.  Opp. at 23.  SunEdison had no obligation to describe in detail all

developments relating to the Margin Loan at this time and particularly in this context.

Plaintiffs do not dispute that SunEdison discussed the later margin call and corresponding

$91 million payment in due course on November 9, 2015, when it reported its third-quarter

results.   Plaintiffs suggest that because SunEdison disclosed the payment in connection with its

Q3 announcement notwithstanding the fact that the payment was made in October—and hence

within Q4—this somehow shows that the Defendants committed fraud by not *also* discussing the

payment on October 7.  *Id.* at 23–24.  Plaintiffs are missing the point.  Disclosure at a later date, and in a different context, does not establish that disclosure was also mandated earlier.  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud").[7]

***November 9, 2015.***  Plaintiffs next contend that on November 9, in addition to disclosing the $91 million payment made in October, SunEdison should have announced that the Margin Loan had become "mandatorily prepayable," and that the required payment of $439 million had by this time "drained SunEdison's cash reserves and fundamentally changed its outlook."  Com. ¶¶ 135, 354.  But although Plaintiffs repeat this claim no fewer than eight times in their brief (Opp. at 2, 7, 11, 14, 22–24, 32), their own allegations fundamentally undermine it.  The Margin Loan in fact *remained outstanding* after November 9; it was paid off in two large installments on November 17 and 20.  *Infra* at 10.  Plaintiffs themselves recognize this:  They contend that the need to pay off the loan is what precipitated the November 20 "massacre."  Opp. at 7, 25–26. Plaintiffs cannot have it both ways.  If the unpaid loan triggered a crisis on November 20, then it cannot also be the case SunEdison had already paid it off by November 9 or had been required to do so because the loan had become "mandatorily prepayable" by that time.  Defendants cannot be liable for purportedly failing to disclose on November 9 events that had yet to occur.

Plaintiffs plead no facts showing that SunEdison had already paid off the loan—or was required to do so—before November 9.  Instead, Plaintiffs pluck the terms "mandatorily prepayable" and "fundamentally changed" out of context from a bankruptcy filing describing events related to the loan in September–October 2015.  Com. ¶ 135.  The necessarily compressed

---

[7] Plaintiffs also cannot dispute that SunEdison presented a slide during the October 7 call that disclosed the $91 million payment; Plaintiffs simply quibble that the Company did not link the $91 million payment to the Margin Loan in that slide.  Opp. at 24 n.13.  But again, SunEdison had no obligation to report complete financial information or provide a complete description of events relating to the Margin Loan on October 7.

discussion in that filing did not distinguish—because in that context it was not necessary to distinguish—between those earlier events and the events of late November 2015. But the difference in timing is critical here. Plaintiffs allege that SunEdison misled the market by purportedly failing to disclose on November 9 that it had already made the $439 million payment that "fundamentally changed" its position. At the same time, however, Plaintiffs do not dispute and indeed rely on the fact that payments were not made until late November. Opp. at 7. Plaintiffs' self-contradictory allegations do not establish falsity, let alone scienter. Instead, Plaintiffs' own allegations establish that the "fundamental change" occurred *after* November 9.

*November 23–24, 2015.* On November 23, 2015, SunEdison announced that on November 17, it had made a $307 million payment against the Margin Loan, using $243 million of escrowed cash previously posted as collateral (in the disclosed amounts of $152 million and $91 million) plus an additional $64 million. Ex. 14. SunEdison also announced that it had paid $21 million in fees—leaving a balance of roughly $100 million—and that mandatory prepayment terms had been temporarily waived. *Id.* Plaintiffs do not allege that any of this was false.

On November 24, 2015, SunEdison announced that on November 20, it had made additional payments against the Margin Loan, such that only $5 million remained outstanding. Ex. 15. Plaintiffs do not allege that this was false either.[8]

Instead, Plaintiffs say that SunEdison should also have disclosed the fact that the obligation to repay the loan caused dissension between SunEdison and the Yieldcos. Opp. at 24. But SunEdison had no general duty to disclose all material facts. *E.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Plaintiffs suggest that because SunEdison said *anything* about the Margin Loan, it thereby took on an obligation to say *everything* on the subject. But

---

[8] Plaintiffs challenge a November 24 joint SunEdison/Global press release describing the November 20 sale of Indian assets to Global as "accretive." Opp. at 25. But Plaintiffs have not shown that the description was inaccurate given the alternative they themselves posit—cross-default on $8 billion of SunEdison debt. Mot. at 17 n.8.

this would plainly be an unworkable standard, and unsurprisingly, it is contrary to law. *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 581–82 (S.D.N.Y. 2013) (defendant is "not required to reveal all facts on a subject just because it reveals a single fact"), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).  Nor is Plaintiffs' position supported by authorities suggesting that "complete" disclosure is required.  Both the text of Section 10(b) and decisional law make clear that "completeness" is required only insofar as an omission would render the challenged statement *misleading*. 15 U.S.C. § 78j(b); *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 15 (S.D.N.Y. 2016) (defendants required to reveal only "such [facts], if any, that are needed so that what was revealed would not be so incomplete as to mislead").

Plaintiffs have pled no facts showing that SunEdison's statements about the Margin Loan were misleading by way of omission, much less deliberately so.  Investors had known the critical facts about the loan and triggers since February 2015; investors were then apprised of the margin calls and responsive payments and amendments on October 7 and November 9; finally, investors learned on November 23–24, against the background of further declines in TERP's stock price, that the loan had become prepayable and had within a matter of days been repaid substantially in full.  SunEdison's statements about the loan, margin calls and repayment were factually accurate, and SunEdison was not required to additionally discuss conflict over repayment terms to prevent those statements from being misleading.  The upshot of Plaintiffs' argument to the contrary would be a holding that any company filing an 8-K reporting a transaction must also disclose any dissension over that transaction.  This would be neither workable nor supported by law.

## IV. Plaintiffs Fail To Establish Falsity Or Scienter With Respect To Challenged Statements About Changes At The Yieldcos.

Plaintiffs also seek to capitalize on the conflict between DevCo and Yieldco management by alleging "fraud on the yieldcos" in connection with the events of November 20.  But

allegations of corporate mismanagement have long been held to be outside the scope of Section 10(b). *Santa Fe Indus. v. Green*, 430 U.S. 462 (1977).  The question in this case is not whether SunEdison treated the Yieldcos unfairly.  The question is whether SunEdison made false or misleading statements to the public about any such purported treatment.  Plaintiffs plead no facts suggesting that it did, much less facts creating a strong inference that it did so deliberately. Plaintiffs cannot dispute that SunEdison accurately reported the changes made on November 20.

As with the Margin Loan, Plaintiffs instead contend that the challenged statements about board changes are actionable because they were "incomplete" or "half-truths."  Opp. at 24.  But again, the standard under Section 10(b) is not whether a statement is incomplete but whether it is materially misleading.  *Supra* at 10–11.  And it is not misleading for securities defendants to omit a complete list of purported reasons for transactions or results.  *In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*, 859 F. Supp. 2d 572, 578–79 (S.D.N.Y. 2012).

Plaintiffs nevertheless contend that if a company begins to discuss reasons for its actions, it must disclose all material facts related to those reasons.  Even if this were true as a legal matter—and under the authorities cited above, it is not—it would not show that SunEdison had a duty to disclose.  SunEdison did not purport to set out the reasons for the board changes at the Yieldcos.  Indeed, SunEdison did not discuss Yieldco board changes at all, save as they related to two SunEdison directors—Peter Blackmore, who had resigned from the SunEdison board and joined the Yieldco boards, and Steven Tesoriere, who had resigned from the Yieldco boards. Mot. at 32.  It was the Yieldcos, not SunEdison, that issued statements about the reconstitution of their committees and boards, and Plaintiffs do not challenge the Yieldcos' statements here. Meanwhile, SunEdison's challenged 8-K focused on the primary change relating to *SunEdison's* board—that Emmanuel Hernandez was taking on the role of Executive Chairman, in which he

would work closely with management "as [SunEdison] continues to implement its plans to improve the alignment and effectiveness of its operating structure, drive operations efficiency and focus on its organic development opportunities." Ex. 14A. Even under the most expansive understanding of Plaintiffs' mistaken "completeness" theory, a statement such as this would not trigger a duty to provide the purported reasons behind board changes *at the Yieldcos*.

Plaintiffs finally argue that they have adequately alleged a Section 10(b) claim because in other actions—and in particular *Global v. SUNE*—other plaintiffs have challenged SunEdison's statements. Opp. at 24–26. But allegations in other complaints are entitled to no deference here. Just like Plaintiffs' own allegations, they are untested and unproven statements made by a party to advance its own litigation or business agenda. The fact that SunEdison's "own subsidiary" has alleged fraud is of no more import than the fact that Plaintiffs themselves have chosen to assert fraud claims. Indeed, ample authority holds that allegations in other complaints should not be considered at all. *E.g., RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial . . . ."), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).

## V. Plaintiffs Fail To Establish Falsity Or Scienter With Respect To Challenged Projections.

***September 2015 Cash Flow Projection.*** Plaintiffs next challenge Chatila's statement that SunEdison expected to have positive cash flow by "probably early 2016 or late 2015." According to Plaintiffs, this is contradicted by a *WSJ* article citing unnamed executives who said that a board presentation showed that SunEdison did not expect positive cash flow until the second quarter of 2016. Opp. at 20; Com. ¶ 129. But there is no inconsistency here. April 2016—the beginning of Q2 2016—can fairly be characterized as "early 2016." Chatila's

prediction is also supported by the Yieldco Plaintiffs' contention that SunEdison projected that its cash burn rate would shrink from $425 million in Q4 2015 to $32 million in Q1 2016—a dramatic drop altogether consistent with positive cash flow early in the second quarter. Plaintiffs have no response to the latter point other than the conclusory and unexplained assertion that it is "nonsensical." Opp. at 21. Because the challenged statement and the allegedly contradictory information fall within overlapping ranges, Plaintiffs have not come close to showing actual knowledge of falsity—a safe harbor requirement that applies, contrary to Plaintiffs' suggestion, whether or not forward-looking statements are identified as such. 15 U.S.C. § 78u-5(c)(1)(B).

*December 2015 Services Business Projection.* Plaintiffs also challenge a 2016 revenue projection for one of SunEdison's business units. The projection was made on December 29, 2015, and Plaintiffs claim that it is undercut by an unspecified budget from mid-November. While Plaintiffs now argue that this was "SunEdison's budget," Opp. at 27, there is no allegation that the budget—prepared six weeks or more before year-end—was final or was reviewed or approved by management or the board. Com. ¶ 380. Plaintiffs' vague "budget" reference does not show that Defendants actually knew the December 29 forecast would not turn out to be true.

## VI.    Plaintiffs' Allegations About the LAP Deal, Loan Classification, Internal Controls And Item 303 Are Similarly Defective.

*The LAP Deal.* Plaintiffs contend that Chatila was asked during SunEdison's October 7, 2015 call whether the Company's failure to make a $400 million payment caused the LAP deal to unwind, and that in response Chatila purportedly "specifically . . . denied" that this was the reason the deal dissolved. Opp. at 26. This claim depends on a mischaracterization of the record. As the transcript from the call shows, Chatila was not asked about the $400 million payment at all. Instead, he was asked a completely open-ended question—whether he had any comment on the previous day's *WSJ* article about the failure of the deal. Ex. 24 at 15. Chatila

responded that he was disappointed in the development and that LAP had breached a condition precedent.  *Id*.  Plaintiffs plead no facts showing that this statement was false or misleading.

*Loan Classification.*  The Securities Act Reply shows that the challenged loan classification footnote in SunEdison's 10-Qs for the first and second quarters of 2015 was not materially false or misleading.  SunEdison's voluntary revision of that footnote in its 10-Q for Q3 2015—where it reclassified the Margin Loan and Exchangeable Notes as recourse obligations—also negates any inference of scienter.  Plaintiffs argue otherwise, saying that SunEdison was forced to reclassify its debt because the Margin Loan had become "mandatorily prepayable."  Opp. at 36.  But as explained, Plaintiffs are deliberately confusing the chronology.  Plaintiffs allege no facts showing that SunEdison repaid—or was required to repay—the Margin Loan until *after* it issued its 10-Q on November 9, 2015.  In any event, SunEdison amended not only the footnote related to the Margin Loan but also the footnote related to the Exchangeable Notes, and Plaintiffs do not contend that this second obligation had also become "mandatorily" payable.  Indeed, Plaintiffs plead no facts showing that Defendants had any reason other than good faith for making either of the two footnote revisions—which undercuts any inference of scienter.  And while Plaintiffs continue to assert that SunEdison's explanation of the revision "shifted" over time, they provide no more support for this claim in their brief than they did in their complaint.  Mot. at 40.  Plaintiffs have not come close to establishing scienter here.[9]

*Internal Controls.*  The Securities Act Reply shows why Plaintiffs have failed to establish that SunEdison's Sarbanes-Oxley certifications were materially false or misleading.

---

[9] Any inference of scienter is further negated by the fact that SunEdison accurately represented the critical economic features of the two debt obligations in narrative portions of the Q1 2015 and Q2 2015 financial statements, where it clearly disclosed that SunEdison bore the risk of default as guarantor of the debts.  Mot. at 19.  Plaintiffs claim otherwise, confusingly suggesting that the recourse/non-recourse classification had independent significance in the calculation of debt covenants for a different loan facility.  Opp. at 36; *see also* Com. ¶¶ 37–39.  But even if this were true, SunEdison's disclosure of its role as guarantor in Q1 and Q2 2015, like its revision of the footnotes in Q3 2015, weighs strongly against an inference of scienter.

Here too, Plaintiffs also fall short on scienter. The law is clear that even acknowledged internal control issues do not give rise to an inference of scienter. Mot. at 20–21 (citing authorities). Indeed, a company's acknowledgement of such issues may well undercut any such inference, as it shows appropriate disclosure of known problems. *Id.* Plaintiffs contend that they have nevertheless established scienter because SunEdison disclosed internal control issues only after receiving and investigating whistleblower complaints. Opp. at 28. But even Plaintiffs cannot dispute that an audit committee investigation and subsequent report are *appropriate* responses to whistleblower activity. As to Plaintiffs' claim that Defendants knew their certifications were false before the whistleblower activity occurred, this depends on the purported statements of confidential witnesses up to four levels removed from Defendants. Com. ¶¶ 89–90. The most these witnesses have done is to place Wuebbels at a meeting in which post-acquisition integration issues were discussed. *Id.* ¶ 89. Beyond this, the witnesses offer nothing more than the speculation that "everyone" knew of issues with data entry, spreadsheets and accounting programs with which the witnesses themselves were familiar, and that therefore "it's hard to imagine" that Defendants did not know of the issues too. *Id.* ¶ 90. This is plainly insufficient.

*Item 303.* Plaintiffs fare no better in their effort to establish scienter with respect to trends under Item 303; indeed, they barely touch on scienter. They make no effort to explain why Defendants would truthfully report financial results and disclose growing risks related to the billions of dollars of financing on which SunEdison depended—but then decide to deceive investors by neglecting to identify related trends. Mot. at 4–5, 10–11. Here, as elsewhere, Plaintiffs' theory of fraud is undermined by SunEdison's disclosures.

## VII.   Plaintiffs Have Not Pled Facts Creating A Cogent Or Compelling Inference Of Scienter.

The discussion above shows the fatal shortfall in Plaintiffs' scienter allegations with

respect to each category of challenged statements.  Plaintiffs' allegations are no stronger when viewed holistically.  As a legal matter, Plaintiffs continue to misapply the scienter standard, arguing that knowledge of a given fact or even mere access to information is sufficient.  Opp. at 30–31.  This is wrong.  Scienter is a mental state "embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  Recklessness is actionable only to the extent that it constitutes a "state of mind approximating actual intent, and not merely a heightened form of negligence."  *In re BofA Corp. Sec., Deriv., & ERISA Litig.*, 2011 WL 3211472, at *4 (S.D.N.Y. July 29, 2011).  While allegations of access may at times show negligence, they plainly do not equate to recklessness.  *Thomas v. Shiloh Indus., Inc.*, 2017 WL 1102664, at *6 (S.D.N.Y. Mar. 23, 2017) ("mere access to data is not a stand-in for recklessness"); *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *8 (S.D.N.Y. Aug. 12, 2014) ("mere alleged access to information . . . is insufficient to plead scienter").[10]

As to Plaintiffs' contention that knowledge of particular facts is the same thing as intent to defraud, this is contrary to decisions holding that plaintiffs must show not only that defendants were *aware of* internal information purportedly contradicting their statements but also that defendants *believed* such information rendered their statements false or misleading.  *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *15 (S.D.N.Y. Mar. 10, 2017) (no scienter where plaintiffs do not allege that employees who disputed the truth of the challenged statements had "persuaded the defendants" that the statements were erroneous); Mot. at 22 n.12 (citing additional authorities).  Under these authorities, the fact that Defendants purportedly "knew about" particular loans or loan terms is insufficient.  Opp. at 31–32.  Allegations that the Yieldco

---

[10] Plaintiffs cite *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63 (2d Cir. 2001), but *Scholastic* did not turn on access to information alone.  It turned on insider sales as well as on "detailed allegations as to what defendants knew on a daily, weekly, and monthly basis."  *Id.* at 74–76.  The same is true of *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), which turned on allegedly knowing conduct.  Nowhere did the *Novak* court suggest that access to information alone, without facts "approximating actual intent," would be sufficient.  *Id.* at 312.

Plaintiffs shared their divergent views with Defendants are equally inadequate in the absence of facts showing that Defendants agreed with those views.[11]

Far more relevant to the scienter analysis are the actions Defendants themselves took. These include (1) providing the allegedly concealed information about the Margin Loan and Second Lien Loan in due course in SunEdison's third-quarter 2015 10-Q; (2) revising the challenged loan classification footnotes without prompting in the same 10-Q; (3) issuing virtually unchallenged financial statements each quarter at issue; (4) including detailed risk disclosures in each of the challenged 10-Qs, and amending those and other disclosures to account for new risks and uncertainties;[12] and (5) increasing their holdings of SunEdison stock at the very time Plaintiffs accuse them of inflating its price. *Supra* at 2–3, 9, 15; Mot. at 11–12, 34–35. None of these actions is consistent with an intent to defraud, and each weighs heavily against any inference of such intent. Because Plaintiffs have failed to allege particularized facts creating a compelling inference of scienter and have similarly failed to identify materially false or misleading statements, the Court should dismiss the Exchange Act claims in their entirety.

---

[11] Plaintiffs contend that *Kinross* holds otherwise, but the court in that case *rejected* scienter allegations based on employees' concerns about the truth of challenged statements, given that plaintiffs failed to allege that the employees had persuaded *defendants* that their statements were false. *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013) ("even stark differences" of opinion within a company "do not reveal scienter"). The court denied defendants' motion to dismiss as to certain other statements related to mining schedules, *id*. at 305–08, but in no way suggested that differing views within a company suffice to show scienter.

[12] Plaintiffs invite the Court to disregard SunEdison's risk disclosures in their entirety, arguing that the Company identified as risks events that had already come to pass. Opp. at 11. But Plaintiffs do not plead facts showing that this is true. SunEdison warned, for example, that creditors might in the future cease to lend money on sufficiently favorable terms; Plaintiffs do not allege that this had already happened at the time of the challenged statements. Mot. at 11. SunEdison also warned of risks connected with vendor financing; again, with only one possible exception over the 21-month long class period, Plaintiffs do not show that any vendors had terminated relationships based on financing issues at the relevant time. *See* Securities Act Br. at 25.

DATED:  August 4, 2017                    Respectfully submitted,

By:   *s/ Sara B. Brody*                   

Sara B. Brody
Jaime A. Bartlett
Sarah A. Hemmendinger
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California 94104
Telephone:  (415) 772-1200
sbrody@sidley.com
jbartlett@sidley.com
shemmendinger@sidley.com

Dorothy J. Spenner
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Email: dspenner@sidley.com

Norman J. Blears
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, California 94304
Telephone:  (650) 565-7000
nblears@sidley.com

Robin Wechkin
SIDLEY AUSTIN LLP
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
Telephone:  (206) 262-7680
rwechkin@sidley.com

*Attorneys for the Exchange Act*
*Defendants*