UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re SUNEDISON, INC. SECURITIES LITIGATION | Civil Action No. 1:16-md-02742-PKC<br><br>MDL No. 2742 |
| This Document Relates To:<br><br>*Horowitz et al. v. SunEdison, Inc., et al.*,<br>1:16-cv-07917-PKC | |

### REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' CLAIMS <u>UNDER SECTIONS 11, 12(a)(2), AND 15 OF THE SECURITIES ACT OF 1933</u>

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022-6069
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

*Attorneys for Underwriter Defendants*

SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California 94104
Telephone:  (415) 772-1200
Facsimile:  (415) 772-7400

*Attorneys for Individual Defendants*

WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

*Attorneys for Individual Defendant
Peter Blackmore*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES……………………………...……………………………………...ii

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .............................................................................................................................3

     I.     Plaintiffs Fail To State a Claim Based on SunEdison's Projections and Beliefs Regarding Liquidity and Anticipated Capital Requirements. ....................3

          A.     The Challenged Forward-Looking Statements Are Non-Actionable Under the PSLRA's "Safe Harbor" and the "Bespeaks Caution" Doctrine..................................................................................................................3

          B.     Plaintiffs Fail To Plead a Claim Based On SunEdison's Opinions About Its Liquidity and Capital Requirements. ...........................................4

     II.     Plaintiffs Fail To State a Claim Based on Alleged Omissions Concerning the Margin Call and Second Lien Loan. .................................................................6

          A.     Plaintiffs Identify No Actionable Omission Relating to the Margin Call..................................................................................................................6

          B.     Plaintiffs Identify No Actionable Omission Relating to the Second Lien Loan. ..........................................................................................................7

          C.     Plaintiffs' Other Arguments Purporting To Demonstrate Materiality of the Margin Call and Second Lien Loan Have No Merit........................9

     III.     Plaintiffs Fail To State a Claim Based on Alleged Misstatements Relating To Internal Controls Over Financial Reporting. .........................................................11

     IV.     Plaintiffs Fail To State a Claim Based on Alleged Debt Misclassification. ..........13

     V.     Plaintiffs' Allegations of a Failure to Disclose "Known Trends" Under Item 303 of Regulation S-K Do Not State a Claim.......................................................15

CONCLUSION.........................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
  398 F. Supp. 2d 244 (S.D.N.Y. 2005)......................................................................15

*In re Aegon N.V. Sec. Litig.*,
  2004 WL 1415973 (S.D.N.Y. June 23, 2004) ...........................................................8

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................................15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................2, 8

*Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ............................................................15

*Brown v. Cerberus Cap. Mgmt., L.P.*,
  2017 WL 2954377 (2d Cir. July 11, 2017).............................................................10

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004)......................................................................13

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015)........................................................................11

*Coronel v. Quanta Capital Holdings Ltd.*,
  2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .............................................................4

*DeMaria v. Anderson*,
  318 F.3d 170 (2d Cir. 2003)..............................................................................13, 14

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)......................................................................13

*In re Duke Energy Corp. Sec. Litig.*,
  282 F. Supp. 2d 158 (S.D.N.Y. 2003), *aff'd*, 113 F. App'x 427 (2d Cir. 2004)...............10, 11

*Durgin v. Mon*,
  659 F. Supp. 2d 1240 (S.D. Fla. 2009) ....................................................................15

*In re Fannie Mae 2008 Sec. Litig.*,
  891 F. Supp. 2d 458 (S.D.N.Y. 2012)......................................................................13

*In re GeoPharma, Inc. Sec. Litig.*,
  399 F. Supp. 2d 432 (S.D.N.Y. 2005)......................................................................15

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)....................................................................13

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)..............................................................................11

*In re MF Global Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)..............................................................4, 13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S.Ct. 1318 (2015).................................................................................4, 5, 6

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)..............................................................15

*Parnes v. Gateway 2000, Inc.*,
    122 F.3d 539 (8th Cir. 1997) ............................................................................11

*In re Pretium Res. Inc. Sec. Litig.*,
    2017 WL 2560005 (S.D.N.Y. June 13, 2017) ...................................................7

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)........................................................................3, 5, 13

*Ross v. Lloyds Banking Group PLC*,
    2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012) ...................................................9

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)..............................................................13

*SEC v. Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013)..............................................................15

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)............................................................................9, 10

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991)............................................................................11

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
    672 F. Supp. 2d 596 (S.D.N.Y. 2009)..............................................................13

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016).................................................................................4

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996)................................................................................11

The Underwriter and Individual Defendants respectfully submit this reply memorandum of law in further support of their motion to dismiss the Securities Act claims.[1]

## PRELIMINARY STATEMENT

Plaintiffs' Opposition concedes, as it must, that the Offering Documents for SunEdison's August 2015 Preferred Offering depicted a company with massive liquidity needs that was burning through nearly a billion dollars *per month* in financing.  The Opposition also concedes that analysts were publicly expressing concerns about SunEdison's liquidity at the time of the Preferred Offering and that the market well understood that raising an additional $650 million through the Preferred Offering was intended to help address this challenge.  (Ex. 28.)  Given that Plaintiffs' core theory is that SunEdison kept investors in the dark as to a purported liquidity crisis, it is critical to understand what the Offering Documents (and other publicly available information) *did* disclose about SunEdison's debt and liquidity needs, including that:

- SunEdison's liabilities exceeded its assets by approximately $250 million (Ex. 10 at 6);

- SunEdison's working capital deficit was $252 million (*Id.* at 60);

- SunEdison used $5 billion in external financing over the previous six months to meet operating and project development expenses (*Id.* at 62);

- SunEdison's indebtedness had increased by more than $3.7 billion during the previous six months and exceeded $10.7 billion as of June 30, 2015 (*Id.* at 18);

- SunEdison's vendors were owed $800 million (*Id.* at 6);

- SunEdison projected needing an additional $5 billion in external financing just to fund its existing business plan (*Id.* at 61);

- an inability to continue to access the capital markets could result in SunEdison's bankruptcy (Ex. 2 at 33); and

- the value of SunEdison's equity stake in TERP, which was used as collateral for the margin

---

[1] Terms not defined herein have the meaning given to them in the Underwriter and Individual Defendants' Motion to Dismiss ("Mot.").  Plaintiffs' Opposition is cited as "Opp."  Documents cited as "Ex. ___" were attached to the June 9, 2017 Omnibus Declaration of Jaime A. Bartlett in Support of the Defendants' Motions to Dismiss.  Documents cited as "Reply Ex. ___" are attached to the August 4, 2017 Omnibus Reply Declaration of Jaime A. Bartlett in Further Support of the Defendants' Motions to Dismiss.

loan, had declined precipitously and significantly—from $41.68 per share as of April 24, 2015 to $25.24 per share as of August 7, 2015 (Reply Ex. 55 (Stock Price Chart)).

Having knowingly invested in a company that described its own liquidity position this way in exchange for an attractive yield, Plaintiffs' essential theory—that SunEdison's purported failure to disclose a single loan comprising less than 1.5% of its indebtedness (and an even smaller margin call) masked a gathering liquidity crisis—is simply not plausible and therefore fails to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (internal quotation marks omitted).

Importantly, Plaintiffs concede quantitative immateriality and rely primarily instead on a series of small bore criticisms contradicted by SunEdison's disclosures. For example, Plaintiffs complain that deferred vendor payments were hidden, even though the exact amounts of these deferrals were disclosed. They similarly complain that a footnote in a summary chart led them to believe that certain debt was non-recourse, even though the same SEC filing stated elsewhere that SunEdison had full recourse liability for that same debt as a guarantor, as did many other filings. Plaintiffs also claim they were missing information about the value of the incentive distribution rights ("IDRs") that partially collateralized the margin loan and thus could not determine whether a margin call had been made, even though the disclosed terms of the relevant loan made clear that IDR values were not part of margin call calculations.

In the end, Plaintiffs knowingly invested in a highly leveraged company with massive liquidity needs that later went bankrupt in the context of an energy sector downturn. That was an unfortunate outcome, but it was not a securities law violation. The Complaint, twice amended, should now be dismissed with prejudice.

## ARGUMENT

**I.      Plaintiffs Fail to State a Claim Based on SunEdison's Projections and Beliefs Regarding Liquidity and Anticipated Capital Requirements.**

### A.      The Challenged Forward-Looking Statements Are Non-Actionable Under the PSLRA's "Safe Harbor" and the "Bespeaks Caution" Doctrine.

Plaintiffs concede that SunEdison's stated "belie[f]" and "expect[ation]" that it would have sufficient liquidity and capital to support its project development and operational needs were forward-looking.  They argue, however, that the PSLRA safe harbor and bespeaks caution doctrine do not apply to those statements because, by the time of the Preferred Offering, SunEdison "was already facing a severe liquidity shortfall."  Opp. at 16.

This *entire* argument is premised on the notion that SunEdison's statements and warnings about its future liquidity needs were materially belied by omitted information regarding the margin call and second lien loan.  Opp. at 15, 17.  But this makes no sense in the context of what SunEdison *did* disclose in the Offering Documents, including its $252 million working capital deficit and need for $5 billion in financing (in addition to the $5 billion of external funding it required during the previous six months) to fund its business plan going forward.  (Ex. 10 at 6, 60-62.)  In light of this, Plaintiffs cannot plausibly explain how non-disclosure of a second lien loan comprising less than 1.5% of SunEdison's debt and an associated margin call could so materially undermine SunEdison's forward-looking statements and cautionary statements as to make them legally actionable misrepresentations.  *See Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (disclosures and cautionary language that painted a "sobering picture" of issuer's "financial condition and future plans" not actionable).  Indeed, Plaintiffs themselves assert that it was not until months after the Preferred Offering that the $410 million margin loan became "mandatorily pre-payable" *in full* due to the continued post-Offering decline of TERP's stock price and that SunEdison's financial outlook therefore "fundamentally changed" at this time.

(Compl. ¶¶ 135-37.)  No such "change" is alleged in the pre-Offering period, and this is fatal. *See Coronel v. Quanta Capital Holdings Ltd.*, 2009 WL 174656, at *14 (S.D.N.Y. Jan. 26, 2009) (dismissing Securities Act claims based on post-offering events).

In light of the particulars of SunEdison's on-point, detailed, and concededly accurate disclosures, the cases relied upon by Plaintiffs are inapposite.  *See* Opp. at 14-15 (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) and *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277 (S.D.N.Y. 2013)).  In *Vivendi*, for example, the issuer emphasized its secure financial footing as a result of projected earnings growth that it claimed would help to service its increasing debt.  838 F.3d at 251.  Similarly, in *MF Global*, the company allegedly made statements about its "strong" liquidity position without disclosing the impact a newly undertaken trading strategy could have on that liquidity or that it lacked the liquidity to support an entirely new line of business.  982 F. Supp. 2d at 290.  SunEdison, in contrast, disclosed significant, existing long-term indebtedness and short-term working capital deficits while projecting cash deficits and the continued accumulation of debt for the foreseeable future; it also told investors it required debt to fund both its operational needs and growth strategies and made no promises about strong earnings growth.  The PSLRA's safe harbor and bespeaks caution doctrine thus foreclose Plaintiffs' claims.

### B. Plaintiffs Fail to Plead a Claim Based on SunEdison's Opinions About Its Liquidity and Capital Requirements.

Plaintiffs do not dispute that SunEdison's statements of "belie[f]" and "expect[ation]" regarding the projected sufficiency of its liquidity and capital were genuinely held statements of opinion, but argue that those opinion statements are actionable under *Omnicare* because SunEdison omitted material facts relating to the bases for these opinions.  *See* Opp. at 17.  This argument fails.

Plaintiffs contend SunEdison's opinions were misleading because SunEdison did not disclose that it lacked funds to meet the margin call. *Id.* But SunEdison disclosed its mounting debt, its losses and working capital deficits, and its need for additional and continued financing. The fact that SunEdison allegedly needed financing to cover capital expenses such as the margin call would have been entirely consistent with these disclosures (and the fact that SunEdison was raising $650 million in the Preferred Offering itself). And, more to the point, Plaintiffs fail to explain how SunEdison's opinion that its liquidity needs could be met through continued borrowing did not "fairly align[] with the information in [its] possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S.Ct. 1318, 1329 (2015).[2]

Plaintiffs also argue that SunEdison's opinions are actionable because SunEdison purportedly misstated its cash position by including allegedly inaccessible warehouse funding. Opp. at 17. However, these allegations (which are meritless for the reasons set forth in the briefs filed by the Exchange Act defendants) are based on an investor presentation that was not incorporated into the Offering Documents and thus cannot give rise to liability under the Securities Act. *Rombach*, 355 F.3d at 168 n.2 & 3.[3]

Finally, Plaintiffs argue that SunEdison's opinions are actionable because SunEdison did not disclose its deferral of vendor payments. Opp. at 17. Putting aside that deferral of vendor payments is a form of financing and not itself indicative of a liquidity crisis (*see* Mot. at 11), SunEdison both disclosed this practice to investors (Ex. 2 at 18) and quantified in its SEC filings the *precise amount* of deferred vendor payments on its books. Thus, investors were told that

---

[2] Plaintiffs' footnoted argument that SunEdison's subsequent bankruptcy confirms that SunEdison was experiencing a liquidity crisis at the time of the Preferred Offering, *see* Opp. at 18 n.5, is precisely the sort of hindsight argument flatly rejected in *Omnicare* as a basis to challenge opinion statements. 135 S. Ct. at 1328 ("a statement of opinion is not misleading just because external facts show the opinion to be incorrect").

[3] Apparently recognizing this, Plaintiffs do not challenge statements from that investor presentation in the section of the Complaint dedicated to their Securities Act claims. (Compare Compl. ¶¶ 311–13 with *id.* ¶¶ 456–60.)

SunEdison's accounts payable to its vendors ballooned from $467.3 million as of June 30, 2013 to over $1 billion by June 30, 2014, where it stayed throughout the remainder of 2014.  (Reply Ex. 43 (2Q 2013 10-Q) at 6; Reply Ex. 44 (3Q 2013 10-Q) at 6; Ex. 6 at 6.)  Accounts payable to vendors still totaled more than $1 billion as of March 31, 2015 before it decreased by almost $200 million in the period leading up to the Preferred Offering.  (Ex. 7 at 6; Ex. 8 at 6; Ex. 9 at 6; Ex. 10 at 6.)  At bottom, nothing was omitted with respect to SunEdison's vendor payments, and in any event, even an alleged omission related to deferral of vendor payments would not render misleading the challenged opinion statement about liquidity.  *See Omnicare*, 135 S. Ct. at 1322 (an opinion "is not misleading simply because the issuer knows, but fails to disclose, some fact cutting the other way").

## II.   Plaintiffs Fail to State a Claim Based on Alleged Omissions Concerning the Margin Call and Second Lien Loan.

### A.   Plaintiffs Identify No Actionable Omission Relating to the Margin Call.

Plaintiffs do not dispute that the Complaint's allegations about when the margin call occurred are based solely on information that was public prior to the Preferred Offering, *see* Mot. at 13-14, but protest that they could not calculate the date and amount of the margin call with greater precision until later.  This is simply incorrect.

Plaintiffs insist that they were unaware of (i) the amount of IDRs that partially collateralized the margin loan and (ii) the metric that would be used to determine the share price at which a margin call could occur.  Opp. at 22.  But the margin loan disclosures—unchallenged statements incorporated into the Offering Documents—provided that the IDRs had nothing to do with any margin call.  The sole determinant of the timing and maximum amount of any margin call was the value of SunEdison's TERP Class B shares (determined by the price of TERP's publicly traded Class A shares) that collateralized the loan.  (Ex. 9 at 22; *see* Reply Ex.

45, Ex. 10.1 at 7 (definition of Eligible Equity Market Value based entirely on value of Class A shares of TERP stock) and 38 (§ 2.9(b)(i)); *see also* Reply Ex. 46 (TERP Feb. 17, 2015 Sch. 13G) (explaining that one Class B share of TERP stock and one Class B unit could be converted to a single share of Class A TERP stock); Reply Ex. 47 (Apr. 17, 2015 SUNE Sch. 14A) at 47) (same).)  Also disclosed was the amount of TERP stock that secured the loan (32.2 million shares), the value of the share collateral that needed to be maintained to avoid a margin call ($820 million), and the fact that the collateral value was calculated based on the closing price as of any single trading day.  (Reply Ex. 45 at Ex. 10.1, p. 5 (definition of "Common Stock Price"), Ex. 9 at 22 (disclosure of ratio).)  Given these disclosures, determining when a drop in TERP's stock price would trigger a margin call only required knowledge of TERP's stock price and a calculator.

Investors knew that the TERP stock price was falling at the time of the Preferred Offering and had sufficient information to assess the risk of a margin call and the maximum amount of such a call if they believed that risk was material.  Plaintiffs have not identified any relevant omission here, let alone a materially misleading one.  *See* Mot. at 14 n.9; *In re Pretium Res. Inc. Sec. Litig.*, 2017 WL 2560005, at *9 (S.D.N.Y. June 13, 2017) (motion to dismiss granted where earlier disclosures included allegedly omitted information).

### B.   Plaintiffs Identify No Actionable Omission Relating to the Second Lien Loan.

Plaintiffs do not suggest that the second lien loan was quantitatively material.  Instead, they argue that disclosure of the loan was required because it was qualitatively material.  Opp. at 23-25.  There is no merit to Plaintiffs' arguments.

As a threshold matter, Plaintiffs effectively abandon their allegation that materiality is evidenced by the second lien loan's so-called "effective" interest rate.  *Id*. at 24.  As explained in Defendants' opening submission, Plaintiffs' "effective" interest rate calculation improperly treats

the entirety of the $9 million in financing costs associated with the loan as "origination fees" paid to the lender.  Mot. at 15-16.  Plaintiffs do not deny this.  Nor do they dispute that borrowers incur all sorts of fees in connection with a loan that are not "origination fees" relevant in determining the loan's interest rate.  Instead, Plaintiffs seek to justify their math on the basis that it comes from an analyst at Axiom Capital Management.  Opp. at 8, 24 n.8.  But the fact that Plaintiffs have chosen to repeat an error made by an analyst does not make it any less an error or otherwise impugn the accuracy or sufficiency of SunEdison's disclosures.  *See In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *15 (S.D.N.Y. June 23, 2004) (no general duty to correct analyst reports).  Equally important, Plaintiffs make no effort to show that a 15 percent "effective" interest rate—which would have amounted only to an additional $2.25 million in interest per quarter—was unusual for a second lien loan at the time.  *See* Mot. at 16 n.10.

Plaintiffs nevertheless argue that disclosure was required because the second lien loan was allegedly an "emergency" loan necessary to satisfy the margin call.  Opp. at 23-24.  There is no basis for these wholly conclusory assertions.  *Iqbal*, 556 U.S. at 679 ("flatly pleaded" allegations not sufficient).  There is no allegation, for example, from a SunEdison employee that the second lien loan was taken to satisfy the margin call (as opposed to, for example, providing project financing).  Nor are there any allegations corroborating Plaintiffs' breathless rhetoric that SunEdison was in the throes of a liquidity crisis at the time of the Preferred Offering such that it could not otherwise satisfy the margin call.

In any event, as discussed, SunEdison's disclosures made clear that it expected to rely on borrowings to meet its liquidity and capital needs.  (*See* Ex. 10 at 6, 60-62.)  Therefore, the allegation that SunEdison had to incur a $169 million loan to satisfy a margin call—*i.e.*, borrow money to meet a capital need—was entirely consistent with SunEdison's disclosures regarding

its dependence on external borrowing.  Plaintiffs' argument that the quantitatively immaterial second lien loan was nevertheless qualitatively significant because of what its allegedly high costs signaled about SunEdison's liquidity situation was rejected by this Court in *Ross v. Lloyds Banking Group PLC*, 2012 WL 4891759, at \*\*2, 9 (S.D.N.Y. Oct. 16, 2012) (Castel, J.); Mot. at 16.  That SunEdison agreed to allegedly pay a few million dollars more for a relatively short-term loan would have been entirely consistent with what SunEdison already disclosed about its complete dependence on external sources of capital.  Here, as in *Ross*, disclosure of the quantitatively immaterial second lien loan would thus not have altered the total mix of information available to SunEdison investors.  *Ross*, 2012 WL 4891759, at \*9.

    **C.**    **Plaintiffs' Other Arguments Purporting to Demonstrate Materiality of the Margin Call and Second Lien Loan Have No Merit.**

Plaintiffs' other arguments purporting to establish materiality are equally unpersuasive.

First, Plaintiffs' reliance on the Second Circuit's recent decision in *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31 (2d Cir. 2017) is misplaced.  *Stadnick* affirmed dismissal of Securities Act claims on the basis that the asserted omissions were not material, and in so holding, the Second Circuit admonished that myopically focusing on one or two items is not a "fair" way to assess the need for disclosure.  *Id*. at 38.  Rather, whether an alleged omission is material depends on "context" and requires an evaluation of the total mix of available information.  *Id*.  Here, evaluation of context undermines Plaintiffs' claims.

In the period leading up to the Preferred Offering, SunEdison had a working capital deficit and fast-growing debt load and anticipated needing ***billions*** in additional external financing to continue funding operations and execute its business plan.  Considered in this context, the alleged need for a $169 million loan to cover an additional capital expense was entirely consistent with SunEdison's "normal operation" and "business model."  *Stadnick*, 861

F.3d at 38; *see also Brown v. Cerberus Cap. Mgmt., L.P.*, 2017 WL 2954377, at *2 (2d Cir. July 11, 2017) (omission of merger negotiations immaterial because it "signaled no more than…continued adherence to…announced corporate strategy").

Second, it is irrelevant that SunEdison disclosed other ***material*** transactions in the "Recent Developments" section of the prospectus supplement, some of which included debt financing provided by certain affiliates of the Underwriters. *See* Opp. at 22.  Indeed, these disclosures underscore the immateriality of the second lien loan (particularly when combined with SunEdison's $11 billion of disclosed indebtedness).  All of the disclosed "Recent Developments" were major transactions valued between $650 million on the low end (Ex. 2 at S-3 (joint venture with Dominion)) and $2 billion (*id.* at S-5–S-6 (acquisition of Invenergy Wind LLC)).  That those transactions involved incidental financing components that were disclosed in connection with the larger transactions did not render SunEdison duty-bound to disclose every recent financing transaction without regard to its materiality.  Nor was disclosure of the second lien loan necessary to alert investors to the existence of lending relationships between SunEdison and the Underwriters or their affiliates.  *See* Opp. at 21.  SunEdison already disclosed much larger loans from the same Underwriter affiliate that provided the second lien loan (Ex. 2 at S-68 (disclosing entry into commitment letter for $500 million secured term loan facility and $960 million unsecured bridge facility))—further underscoring the purely speculative nature of Plaintiffs' supposition that the purpose of the Preferred Offering was to ensure repayment of a second lien loan that would mature one year later (Opp. at 21).

Third, Plaintiffs' reliance on the November 2015 decline in SunEdison's stock price to plead materiality is misplaced.  *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) ("bare allegations of stock price declines cannot cure the immateriality of an

overstatement as small as the one here at issue"), *aff'd*, 113 F. App'x 427 (2d Cir. 2004).[4]  The

second lien loan was only one of many items disclosed in the Q3 10-Q that SunEdison filed that

month, which included a $250 million operating loss and $284 million net loss.  (Ex. 12 at 2.)

Plaintiffs offer no basis to infer that the stock price decline following the filing of the 10-Q was

caused by disclosure of the second lien loan as opposed to the myriad other disclosures.  *See*

*Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (price drop following

announcement that contained multiple pieces of news cannot be relied on to plead materiality).[5]

### III.  Plaintiffs Fail to State a Claim Based on Alleged Misstatements Relating to Internal Controls Over Financial Reporting.

Plaintiffs do not dispute that SunEdison's officers' SOX certifications constitute

statements of opinion, but they assert that they were subjectively false.  *See* Opp. at 25.

Plaintiffs appear to argue this based on the alleged existence of material control weaknesses at

SunEdison at the time of the Preferred Offering.  *See* Opp. at 27.  But Plaintiffs do not even try

to identify a fact suggesting that the certifying officers were aware, at the time of the Preferred

Offering, of the supposed weaknesses.  *See City of Westland Police & Fire Ret. Sys. v. MetLife,*

*Inc.*, 129 F. Supp. 3d 48, 76 (S.D.N.Y. 2015) (a challenge to opinion statements must be based

on information possessed "at the time" the opinions were expressed, not on hindsight

allegations).  Plaintiffs' reliance on SunEdison's supposed "admissions" of internal control

weaknesses in the spring of 2016—which were based on investigations that began after the

---

[4] *See also United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (though relevant, "whether a public company's stock price moves up or down or stays the same ... does not establish the materiality of the statements made"); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir. 1996) (1.2% overstatement of assets not material, despite alleged 60% stock price drop); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546-47 (8th Cir. 1997) (similar).

[5] Several analysts, in the wake of the decline in SunEdison's share price following the filing of its Q3 2015 10-Q, attributed that decline to various items in that report *other than* the margin call or second lien loan.  (Reply Ex. 52 (Nov. 11, 2015 UBS analyst report) at 1-2; Reply Ex. 51 (Nov. 10, 2015 Cowen analyst report) at 1.)  Notably, even the Axiom Capital Management note cited in the Opposition lists four disclosures (aside from the second lien loan) as having contributed to SunEdison's stock price decline.  (Reply Ex. 53 (Nov. 18, 2015 ZeroHedge article).)

Preferred Offering—does not aid their cause for that reason, as well as because (i) the issues identified by management resulted primarily from "newly implemented systems" (Compl. ¶ 92), and (ii) not even Plaintiffs suggest that any of the issues affected SunEdison's public financial reporting or the accuracy of its financial statements.[6]  *See* Mot. at 20.

Similarly, there is no merit to Plaintiffs' suggestion that "stark discrepancies" between their allegations and the certifications demonstrates falsity.  *See* Opp. at 27.  The supposed "discrepancies" relate to operational issues that are not alleged to have resulted in misstated financials.  Thus, for all of Plaintiffs' references to the so-called "Brain Damage" spreadsheet that allegedly was used by SunEdison to manage aspects of the Company's financial reporting (Opp. at 9-10), Plaintiffs do *not* allege that the spreadsheet was ever improperly accessed or manipulated or even that the spreadsheet was used in the preparation of SunEdison's financial statements (*see* Mot. at 22 n.13).  And they acknowledge that SunEdison disclosed that it faced challenges integrating the financial systems of acquired companies.  Opp. at 9.

Plaintiffs also refer to their allegations that in 2013 and 2014, employees could open bank accounts without proper authorization.  Opp. at 11.  However, there is no allegation that this remained possible at the time of the Preferred Offering or an attempt to show or explain how this affected SunEdison's financial reporting.  Finally, Plaintiffs point to the alleged manipulation of sales or cancellation information in SunEdison's residential solar business, without addressing whether or to what extent this impacted SunEdison's financial reporting.  Opp. at 11.

---

[6] As discussed in SunEdison's 8-K filed on April 14, 2016, to the extent that SunEdison's Audit Committee conducted an investigation into SunEdison's controls and processes concerning cash and liquidity forecasting, that investigation concluded that "there were no identified material misstatements in [SunEdison]'s historical financial statements."  (Ex. 16 at 1.)  Plaintiffs do not allege otherwise.  Instead, the deficiencies that were identified concerned internal cash and liquidity *forecasts provided to the Board* and not the external financial reporting contained in the Offering Documents that are at issue here.  *See* KPMG Mot. to Dismiss at § I.b; KPMG Reply at § 1.b.  These allegations (as well as alleged deficiencies concerning SunEdison's *cash management*), taken as true for purposes of this Motion, would at most amount to a claim of mismanagement that is not actionable under the securities laws.  *See* Mot. at 21-22 & n.12 (citing cases).

Many companies face operational challenges similar to those that Plaintiffs allege confronted SunEdison, and it is all too easy to assert that such challenges mean that management "knew" its internal controls were "ineffective."  Courts are rightly unwilling to allow thinly veiled criticisms of management, such as are asserted here, to serve as fodder for securities law claims.  *See* Mot. at 21; *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376-77 (S.D.N.Y. 2004); *see also Rombach*, 355 F.3d at 173 (companies are "bound to have problems" and allegations about those problems are insufficient bases for securities law claim).[7]

## IV.    Plaintiffs Fail to State a Claim Based on Alleged Debt Misclassification.

Plaintiffs acknowledge that SunEdison's 10-Qs disclosed SunEdison's guarantees of the margin loan and the exchangeable notes.  Opp. at 19.  They argue, however, that there is a fact issue as to whether the footnote describing the underlying debts as non-recourse was nevertheless misleading because some analysts supposedly characterized the debts as non-recourse.  *Id.* 19-20.  This argument should be rejected.

As a threshold matter, claims that are based on seemingly inconsistent information in offering documents are regularly resolved as a matter of law.  In *DeMaria v. Anderson*, for example, a summary chart in a prospectus included inaccurate data concerning publishing revenues, but comprehensive charts later in the prospectus accurately reported those publishing

---

[7] Most of the cases Plaintiffs cite are distinguishable because they involved restated financial results and additional allegations of systematic control failures or accounting fraud, none of which is alleged to be present here.  *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) (company restated financial results and announced that controls with respect to tax positions that led to restatement were inadequate and that deficiencies had been reported to the audit company but not acted upon); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (alleged misrepresentations related to statements committing to improve controls after restatement); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 232 (S.D.N.Y. 2008) (internal control failure so significant it prompted auditor resignation); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 393 (S.D.N.Y. 2007) (alleged "systemic failure" of claims processing at core of company business).  The other authorities Plaintiffs rely upon are also inapposite.  *In re Fannie Mae 2008 Securities Litigation* involved allegedly inadequate *risk* controls and allegations of accounting fraud.  891 F. Supp. 2d 458, 475 (S.D.N.Y. 2012).  And in *MF Global*, the alleged internal control failures related specifically to the management of, and drains on, liquidity that allegedly led to a liquidity crisis at the company.  982 F. Supp. 2d at 298, 316-18.

revenues.  318 F.3d 170, 172 (2d Cir. 2003).  The Second Circuit affirmed dismissal of a

Securities Act claim based on this alleged inconsistency, holding that "[t]he erroneous

information would not have misled the average investor in light of the accurate information

contained in the prospectus."  *Id.* at 181.

The same is true here.  It defies common sense that a three-word footnote in a summary

chart would mislead a reasonable investor in light of (i) the paragraph-long narrative discussion

of SunEdison's "unconditional[]" guarantees, which provided that in the event of a default, "any

lender may … demand payment from SunEdison," (Ex. 9 at 22-23; Ex. 10 at 25; *see also* Reply

Ex. 45 at 2 (stating that "SunEdison guaranteed all of the Borrower's obligations under the

[Margin] Loan Agreement") and 3 (providing that "[t]he Exchangeable Notes are fully and

unconditionally guaranteed by SunEdison")), and (ii) SunEdison's other disclosures in

connection with the margin loan and exchangeable notes, including the underlying transaction

documents, which were replete with references to SunEdison's guarantee (*see* Reply Ex. 45, Ex.

10.1 (Margin Loan Agreement) at 22 (defining "Parent" as SunEdison, Inc. and "Parent

Guaranty"), 57, 63 ("The Borrower's obligations . . . provide for full recourse to the Parent under

the Parent Guaranty"), 68, 69, and 73; Reply Ex. 45, Ex. 10.2 (Exchangeable Notes Indenture) at

1, 7, 9, 45, 48, 61, 62, 64, 65, 69, 70, 72, 74, 75, 77, 78-80, 83, and A-7).  In the face of this, it

simply does not matter that one or two analysts may have represented the underlying debts

themselves as non-recourse in their own tables, *see, e.g.*, Compl. ¶ 306, without also conveying

(as SunEdison did) that SunEdison fully and unconditionally guaranteed those debts.  Simply

put, SunEdison's disclosures and discussion of the margin loan and exchangeable notes and their

respective guarantees, considered in their entirety, could not have misled a reasonable investor

regarding whether SunEdison could be liable for those guarantees.[8]

## V.  Plaintiffs' Allegations of a Failure to Disclose "Known Trends" Under Item 303 of Regulation S-K Do Not State a Claim.

Plaintiffs argue that the Offering Documents were required to but failed to disclose a worsening liquidity trend at SunEdison.  Opp. at 28.  But SunEdison disclosed its mounting indebtedness, negative cash flows, and deferred vendor payments.  In this way, Plaintiffs' argument ultimately boils down to a contention that SunEdison violated Item 303 by failing to disclose inferences that investors were perfectly capable of drawing themselves from data that was already disclosed.  In that context, one second lien loan that closed after the relevant reporting period does not constitute a new trend requiring disclosure, and Defendants are unaware of any authority holding that Item 303 requires disclosure of a single event occurring on a single day as part of an already disclosed "trend."  *See, e.g.*, *Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) (two month period not a "trend").  Nor are Defendants aware of any authority holding that an issuer is required to make additional disclosures of events that post-date its financial statements as part of a "trend."

**CONCLUSION**

The Underwriter and Individual Defendants respectfully request that the Court dismiss Plaintiffs' Securities Act claims with prejudice.

---

[8] Three of the cases cited by Plaintiffs on this issue involved situations where, unlike here, the issuers did not disclose that they had guaranteed certain of their affiliates' debt obligations *at all*, thereby understating their own potential debt-related liabilities.  *See Durgin v. Mon*, 659 F. Supp. 2d 1240, 1254 (S.D. Fla. 2009); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, 398 F. Supp. 2d 244, 255 (S.D.N.Y. 2005); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 458 (S.D.N.Y. 2005).  In *In re Parmalat Securities Litigation*, unlike here, the issuer materially understated its total indebtedness.  375 F. Supp. 2d 278, 306-7 (S.D.N.Y. 2005).  The decision in *SEC v. Syron* also is inapposite because the issue in that case was how investors should read conflicting narrative and quantitative data.  934 F. Supp. 2d 609, 630 (S.D.N.Y. 2013).  Here, there is no interplay between an ambiguous narrative and data; the underlying debt was non-recourse to SunEdison (as per the footnote), but the fully disclosed guarantee of that debt was not (as per the narrative disclosure).  Finally, this is not like the situation in *In re GeoPharma, Inc. Securities Litigation*, where the district court raised concerns about whether a reasonable investor would understand the difference between a "drug" and a "pharmaceutical product."  399 F. Supp. 2d 432, 447 (S.D.N.Y. 2005).

Dated:  New York, New York
         August 4, 2017

SHEARMAN & STERLING LLP

By:      /s/  Adam S. Hakki
         Adam S. Hakki
         Daniel Lewis
         Adam J. Goldstein
         SHEARMAN & STERLING LLP
         599 Lexington Avenue
         New York, New York 10022-6069
         Telephone:  (212) 848-4000
         Facsimile:  (212) 848-7179

         *Attorneys for Underwriter Defendants*
         *Deutsche Bank Securities Inc., Goldman,*
         *Sachs & Co. LLC (f/k/a Goldman, Sachs &*
         *Co.), J.P. Morgan Securities LLC,*
         *Macquarie Capital (USA) Inc., MCS Capital*
         *Markets LLC, Merrill Lynch, Pierce, Fenner*
         *& Smith Incorporated, and Morgan Stanley*
         *& Co. LLC*

By:      /s/  Sara B. Brody
         Sara B. Brody
         Norman J. Blears
         Jaime A. Bartlett
         SIDLEY AUSTIN LLP
         555 California Street, Suite 2000
         San Francisco, California  94104
         Telephone:  (415) 772-1200
         Facsimile:  (415) 772-7400

         *Attorneys for Individual Defendants*
         *Antonio R. Alvarez, Ahmad Chatila, Clayton*
         *Daley, Jr., Emmanuel Hernandez,*
         *Georganne C. Proctor, Steven Tesoriere,*
         *James B. Williams, Brian Wuebbels, and*
         *Randy H. Zwirn*

By:     */s/  Michael Bongiorno*
        Michael Bongiorno
        Timothy Perla
        WILMER CUTLER PICKERING
        HALE AND DORR LLP
        60 State Street
        Boston, Massachusetts  02109
        Telephone:  (617) 526-6000
        Facsimile:  (617) 526-5000

        *Attorneys for Individual Defendant*
        *Peter Blackmore*