**POMERANTZ LLP**
Jeremy A. Lieberman
Brenda Szydlo
Jennifer Banner Sobers
600 Third Avenue, Floor 20
New York, New York 10016
Phone: 212-661-1100
Fax: 917-463-1044
Email: jalieberman@pomlaw.com
Email: bszydlo@pomlaw.com.
Email: jbsobers@pomlaw.com

*Lead Counsel for Lead Plaintiffs and the proposed Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: SUNEDISON, INC. SECURITIES LITIGATION<br><br>This Document Applies To:<br><br>***Chamblee, et al. v. TerraForm Power, Inc., et al.*, 1:16-cv-08039-PKC** | No. 1:16 MD 2742 (PKC) (AJP) |

**DECLARATION OF JEREMY A. LIEBERMAN IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR: (1) FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT; AND (2) AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD TO LEAD PLAINTIFFS**

I, Jeremy A. Lieberman, declare and state, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:[1]

---

[1] Unless otherwise indicated, all capitalized terms herein shall have the same meanings as set forth in the Stipulation and Agreement of Settlement (the "Stipulation"), filed with the Court on September 1, 2017 (Dkt. No. 107).

1.      Pomerantz LLP is the court-appointed Lead Counsel for Lead Plaintiffs Clemens Schlettwein and Jerome Spindler ("Lead Plaintiffs"), in the above-referenced action. I am Co-Managing Partner at Pomerantz LLP, and I am duly admitted to practice in New York and before this Court. I have personal knowledge of the matters set forth herein and, if called upon, I could and would completely testify thereto.

2.      I submit this Declaration in support of Lead Plaintiffs' Motion for: (1) Final Approval of Proposed Class Action Settlement; and (2) Award of Attorneys' Fees, Reimbursement of Expenses, and Award to Lead Plaintiffs. The motions are filed concurrently herewith.

3.      The purpose of this Declaration is to set forth the nature of the investigation, legal briefing and negotiations that led to the settlement with TerraForm Power, Inc. ("TERP"), Ahmad Chatila ("Chatila"), Carlos Domenech Zornoza ("Domenech"), Alejandro Hernandez ("Hernandez"), Brian Wuebbels ("Wuebbels"), and Francisco Perez Gundin ("Perez" and collectively, "Defendants" and with Lead Plaintiffs, the "Settling Parties"). In my view, this Declaration demonstrates why the Settlement is fair, reasonable, and adequate and should be approved by the Court as well as why Plaintiffs' Counsel's[2] fee and expense request and Award to Lead Plaintiffs are reasonable and should be approved by the Court.

4.      The Stipulation between Lead Plaintiffs and Defendants filed with the Court on September 1, 2017 (Dkt. No. 107) provides for a payment by Defendants of $14,750,000 in cash into an interest-bearing escrow account.

5.      On September 14, 2017, the Court signed an order preliminarily approving the settlement of this action, preliminarily certifying this action as a class action for the purposes of

---

[2] "Plaintiffs' Counsel" is comprised of Lead Counsel, Pomerantz LLP and Additional Plaintiffs' Counsel, The Rosen Law Firm, P.A.

settlement, and approving the form and manner of providing notice to class members (the "Preliminary Approval Order") (Dkt. No. 110).

### I.    SUMMARY

6.    Beginning from Plaintiffs' Counsel's pre-filing investigation of the action in April 2016 and continuing throughout, Lead Plaintiffs and their counsel have litigated this action vigorously. The Settlement was reached only after Plaintiffs' Counsel: (i) conducted an investigation to plead an initial, amended complaint, and the operative Second Amended Securities Class Action Complaint ("SAC") which required both scouring public records and retention of investigators; (ii) moved for lead-plaintiff appointment on behalf of Lead Plaintiffs Schlettwein and Spindler, which entailed researching securities laws; (iii) participated in MDL proceedings; (iv) carefully followed SunEdison's bankruptcy proceedings; (v) engaged in extensive settlement negotiations, including attending four mediation sessions with Judge Layn Phillips (Ret.) of Phillips ADR  and one mediation session with Gregory Lindstrom of Phillips ADR as well as prepared substantial and detailed mediation submissions; (vi) negotiated and drafted the terms of all relevant settlement documents including the Stipulation, Preliminary Approval Order, and the notice documents; (vii) presented those settlement terms to this Court by way of a motion for preliminary approval of the proposed settlement; and (viii) oversaw the provision of Notice to the proposed settlement class and monitoring the work of the selected claims administrator.

7.    By the time the Parties reached the Settlement, Lead Plaintiffs and their counsel had gained a full understanding of the strengths and weaknesses of the case.

8.    Even though the Notice of Pendency and Proposed Settlement of Class Action ("Notice") and the Proof of Claim and Release Form ("Proof of Claim" and collectively, with the Notice, "Notice Packets") were sent to 58,248 potential Class Members, brokers and nominee

holders by the Claims Administrator, JND Legal Administration ("JND"), the Notice Packet was posted on a website about the Settlement established by JND, and Summary Notice was duly disseminated electronically over *GlobeNewswire* and in print in *Investor's Business Daily,* only one class member has objected to the Settlement and there has only been one invalid requested exclusion from the Settlement. *See* Declaration of Robert Cormio Regarding (A) Mailing of Notice and Claim Form; (B) Publication of Summary Notice and (C) Report on Requests for Exclusion Received to Date ("JND Decl."), attached hereto as Exhibit 1 ("JND Decl.") at ¶¶11, 12, 14, 15.

9.     The Settlement was reached after intense, concentrated and good faith negotiations among experienced counsel with the aid of nationally regarded mediators, Hon. Layn Phillips (Ret.) and Gregory Lindstrom of Phillips ADR. Likewise, the negotiation and drafting of the Stipulation and supporting documents were time intensive, difficult, and hard fought.

10.     The Settlement confers an immediate and substantial benefit on the Class. At the same time, the certainty of the settlement eliminates the very serious risk that continued litigation might yield nothing for Lead Plaintiffs and the Class. Defendants have wasting directors' and officers' liability insurance policies that would dwindle down by continuing defense costs if the litigation proceeded to trial. Additionally, there are other related securities actions so funds available to resolve this action were dwindling.

11.     The Settlement also avoids the risk Lead Plaintiffs and the Class would face in order to successfully prevail on the merits of liability and damages.

12.     The $14,750,000 settlement represents a significant percentage of Lead Plaintiffs' maximum class-wide damages. Plaintiffs' Counsel's estimates of class-wide damages using different models ranged from $326.1 million to $357.2 million. As compared to this range of

damages, the Settlement represents an excellent result: 4.5% of estimated damages (using the low end of the estimated damages range) or 4.2% of estimated damages (using the high end of the estimated damages range). This estimate also assumes that Lead Plaintiffs prevail on every claim and defeat all of Defendants' defenses. Defendants disagreed with this estimation of damages. Defendants contended that even if Lead Plaintiffs could establish liability and damages, the maximum damages would be far less than Lead Plaintiffs claim and, that if the matter went to trial and Lead Plaintiffs prevailed, they would only obtain a fraction of their purported maximum damages. This recovery therefore represents an excellent result and is well within the range of typical securities class action settlements.

13.     The Plan of Allocation is fair, reasonable and adequate as it was formulated with the aid of a consultant and distributes the Settlement Fund *pro-rata* to class members pursuant to the principles of *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005). Only those shareholders who purchased and continued to hold after a corrective disclosure during the Class Period are compensated. Shareholders are allocated a recognized per share loss of the stock drop based on the amount of such drop. Net gains made from trades during the Class Period are netted out with net losses. Thus, each shareholder is treated fairly and compensated *pro-rata* based on the loss caused by the alleged misconduct.

14.     The requested attorneys' fees of 25% of the Gross Settlement Fund, or $3,687,500, are reasonable and within the range of those awarded in class litigation of this type. *See* Declaration of Jeremy A. Lieberman on behalf of Pomerantz, LLP Concerning Attorneys' Fees and Expenses ("Pomerantz Fee Decl."), the Declaration of Laurence M. Rosen on behalf of The Rosen Law Firm, P.A. Concerning Attorneys' Fees and Expenses ("Rosen Fee Decl."), Declaration of Daniel S. Sommers on Behalf of Cohen Milstein Sellers & Toll PLLC Concerning Attorneys' Fees and Expenses ("Cohen Fee Decl."), attached hereto as Exhibits 2, 3 and 4,

respectfully. The requested fee award is fair in light of the results achieved, the risks involved in the litigation, and similar awards in this type of litigation. Indeed, when cross-checked with the lodestar method, the reasonableness of the fee request is confirmed by counsel's lodestar multiplier of 2.61 which is in line with multipliers typically awarded in contingent fee class action cases.

15.     The notice to Class members stated that Plaintiffs' Counsel would seek a fee not to exceed 25% of the Settlement Fund or $3,687,500 plus interest. Only one objection was received and it does not object to Plaintiffs' Counsel' fee request. The lack of valid objections to Plaintiffs' Counsel's requested fee also confirms the reasonableness of the requested fee.

16.     Plaintiffs' Counsel's request for reimbursement of case-related expenses of $84,894.02 advanced by Plaintiffs' Counsel is also reasonable, fair and should be approved. These expenses were required and necessary to further the prosecution of this action, and are far less than the $150,000 maximum amount specified in the Notice

17.     For the reasons set forth herein and in the supporting memoranda filed herewith, this Court should find that the Settlement and Plan of Allocation and request for attorneys' fees, reimbursement of expenses, and Award to Lead Plaintiffs are fair, reasonable and adequate and should be approved.

18.     The action meets each of the requirements necessary to certify the Class under Fed. R. Civ. P. 23(a) and 23(b)(3). This Court should, therefore, finally certify the Class for settlement purposes.

## II.      BACKGROUND OF THE LITIGATION

19.      SunEdison, Inc. "SunEdison" is the parent company of TERP as well as another yieldco, TerraForm Global, Inc. ("TerraForm Global"). TerraForm Global, like TERP, was completely controlled by SunEdison. There are several other securities litigations related to the

instant action. These actions include: *In re: SunEdison, Inc., Sec. Litig.*, 16-MD-2742 (PKC) (S.D.N.Y.) (the *"SunEdison* Action")[3] and *Church v. Chatila, et al.,* Case No. 16-cv-07962 (PKC) (S.D.N.Y.) on behalf of shareholders of Vivint Solar Inc. ("Vivint") to recover shareholder losses after a failed merger with SunEdison. (*"Vivint* Action").

20.     Defendant TERP was formed by SunEdison, its controlling shareholder, to own and operate solar wind generation assets acquired by SunEdison. ¶2[4]. TERP began trading after its initial public offering in July 2014. *Id.* TERP's business and growth was dependent on acquiring new solar energy projects from SunEdison as the companies had a symbiotic relationship. ¶6. TERP and SunEdison shared overlapping management and Board members, and TERP's management was completely controlled by and beholden to SunEdison. ¶4. During the Class Period, TERP did not have any employees and SunEdison provided TERP with managerial and administrative services including accounting, audit, information technology, financial back-office and cash management functions pursuant to a Management Services Agreement between TERP and SunEdison. ¶3.

21.     During the Class Period, TERP shares were listed on NASDAQ under the ticker symbol "TERP."

22.     Defendant Chatila was TERP's Chairman of the Board from January 2014 to November 20, 2015 and remained a director until May 26, 2016. He was also President, Chief Executive Officer ("CEO"), and a director of SunEdison and its predecessor from March 2009 to

---

[3] The Judicial Panel on Multidistrict Litigation associated over twenty actions into the SunEdison Action including securities class actions, ERISA actions, and individual shareholder actions filed against TerraForm Power, TerraForm Global, and SunEdison. References to "SunEdison Action Dkt. No. ____" refer to filings in the SunEdison Action.

[4] Citations to "¶__" are to the SAC (Dkt. No. 91).

June 22, 2016. He also served as Chairman of TerraForm Global, an indirect subsidiary of SunEdison, until November 20, 2015, and remained a director until May 26, 2016. ¶49.

23.     Defendant Domenech was TERP's President, CEO, and a director from January 2014 until his termination on November 20, 2015. He also served as an Executive Vice President and President of SunEdison and its predecessor from as early as November 2009. ¶50.

24.     Defendant Hernandez was TERP's Executive Vice President and Chief Financial Officer ("CFO") from September 17, 2014 until his termination on November 20, 2015. Hernandez was also an Executive Vice President and CFO of TerraForm Global. ¶52.

25.     Defendant Wuebbels was a TERP director since January 2014, and the Company's President and CEO from November 20, 2015 until his resignation from the Company on March 30, 2016. Wuebbels also held several high positions at SunEdison including CFO and Executive Vice President from September 17, 2014 until his termination on November 20, 2015. ¶51.

26.     Defendant Perez was a TERP director from January 2014 until November 20, 2015, and served as TERP's Chief Operating Officer ("COO") and Executive Vice President from January 2014 to January 14, 2016. Perez also served as SunEdison's COO and Executive Vice President from April 2015 to January 8, 2016. ¶53.

27.     Chatila, Domenech, Hernandez, Wuebbels, and Perez are referred to herein as the "Individual Defendants."

**Overview of Lead Plaintiffs' Claims**

28.     Lead Plaintiffs allege claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

29.     Lead Plaintiffs allege that during the Class Period, Defendants issued materially false and misleading statements regarding SunEdison's liquidity to fund acquisitions and growth.

During the Class Period, SunEdison undertook an aggressive growth strategy. In July 2015, SunEdison announced it was acquiring Vivint in a deal valued over $2 billion. In August 2015, SunEdison stated it had a good balance sheet liquidity position, and that SunEdison had "greater than $1 billion" available. ¶¶20, 119. These statements created the false impression that SunEdison had no significant liquidity concerns and that SunEdison would be able to easily close on its acquisitions.

30.     Lead Plaintiffs further allege that SunEdison's financial position was the opposite of what was described to the public. SunEdison forced TERP to pay for expenses that SunEdison was obligated to pay and TERP was making millions of dollars of prepayments to SunEdison for drop down acquisitions – or acquisition that would eventually be controlled by TERP even though TERP was not required to do so. ¶21. TERP's prepayments were at no discount or at any consideration for TERP's health. ¶¶21, 23. Lead Plaintiffs further allege that TERP and SunEdison's internal controls were utterly deficient as they did not follow Generally Accepted Account Principles ("GAAP"), did not have the ability to see how assets were performing, and had no coherent system of internal financial reporting thereby making it impossible to know how much money it had and what it owed to creditors. ¶¶10, 89.

31.     Lead Plaintiffs allege further that the truth of the misstatements contained in SunEdison's, and due to their overlapping, symbiotic relationship also TERP's statements such as on shared conference calls, Class Period statements entered the market on November 9, 2015 when SunEdison revealed facts that contradicted its previous rosy assurances about its liquidity including that it had taken out a $169 million one-year loan at an effective rate of interest of 15%. Further SunEdison "reclassified" the $700 million in debt from non-recourse to recourse. ¶¶31,196. On this announcement, TERP's stock fell $3.87, or $21.15% to close at $14.43 on November 10, 2015. ¶¶31, 197.

32.     On February 29, 2016, TERP and SunEdison announced they would be delaying the filing of their Form 10-Ks for the year ended December 31, 2015. ¶201. The reason they gave for this delay was SunEdison's "ongoing inquiries and investigations by the Audit Committee" relating to the accuracy of SunEdison's anticipated financial position. ¶¶200, 203. TERP also revealed that SunEdison identified material weaknesses in its internal controls over financial reporting and TERP itself had identified material weaknesses in its own internal controls over financial reporting primarily due to ineffective controls over its systems and processes for validating revenue recognition. ¶203. On this news, TERP's stock price fell $0.83 or 7.9% per share. ¶204.

33.     Soon after, SunEdison announced that it had identified material weaknesses in its internal controls over financial reporting and that TERP needed to "assess whether [SunEdison's] deficiencies could affect our financial reporting." ¶¶34, 203. TERP also revealed that it had identified material weaknesses in its own internal controls over financial reporting primarily due to ineffective controls over its systems and processes for validating revenue recognition. *Id.* On this news, TerraForm Power stock fell $0.83 or 7.87% to close at $9.72 on March 16, 2016, the last day of the Class Period. ¶¶35, 204.

34.     Shortly after this news, the acquisition of Vivint fell through due to the lack of SunEdison's funds and on April 21, 2016, SunEdison along with 25 related entities filed for bankruptcy under Chapter 11 of the Bankruptcy Code. SunEdison's bankruptcy is pending in the U.S. Bankruptcy Court for the Southern District of New York, styled as *SunEdison, Inc., et al.,* Case No. 16-10992. ¶37. TERP did not file for bankruptcy. *Id.*

**Relevant Background and Procedural History**

35.     This litigation was commenced in the United States District Court for the District of Maryland on April 4, 2016 styled as *Chamblee v. TerraForm Power, Inc., et al.,* 16-cv-00981

(the "*Chamblee* Action"), alleging violations of the Securities Exchange Act of 1934 as against TERP, Domenech, and Hernandez (Dkt. No. 1).

36.     On July 28, 2016, that court appointed Schlettwein and Spindler as Lead Plaintiffs and appointed Pomerantz LLP as Lead Counsel and Cohen Millstein Sellers & Toll, PLLC as Liaison Counsel, pursuant to the Private Securities Litigation Reform Act, as amended (Dkt. No. 50).

37.     On September 26, 2016, Lead Plaintiffs filed the Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint") against TERP, Chatila, Domenech, Wuebbels, and Hernandez (Dkt No. 54).

38.     On October 5, 2016, a Transfer Order by the U.S. Judicial Panel on Multidistrict Litigation (the "JPML") was filed in the *Chamblee* Action (Dkt. No. 55). The Transfer Order directed the *Chamblee* Action to be transferred and associated with an action before the JPML styled as, *In re: SunEdison, Inc., Sec. Litig.*, 16-MD-2742 pending in the Southern District of New York (the "*SunEdison* Action"). On October 14, 2016, the *Chamblee* Action was transferred and associated with the *SunEdison* Action before Judge P. Kevin Castel of the Southern District of New York, along with several other related actions that were previously pending in the Northern District of California, Eastern District of Missouri, and the Southern District of New York (Dkt. No. 56). The *Chamblee* Action was then restyled as, *Chamblee, et al. v. TerraForm Power, Inc. et al.*, 1:16-cv-08039-PKC (S.D.N.Y.).

39.     On October 26, 2016, Judge Castel issued an Order setting an Initial Conference on December 10, 2016 for all actions related to the *SunEdison* Action (Dkt. No. 61). The Order also directed counsel for plaintiffs in any of the securities class actions, including the Chamblee Action, to provide additional information such as statements of existing deadlines, a brief

description of outstanding motions, a brief description of any discovery that had taken place, and a list of all prior settlement discussions.

40.     On November 17, 2016, counsel for the plaintiffs in the five securities and ERISA class action cases pending before Judge Castel in the *SunEdison* Action filed a joint letter in response to the Court's October 26, 2016 Order (Dkt No. 72). In this joint letter, plaintiffs, including Lead Plaintiffs, informed the Court that while they did not oppose early mediation, they did oppose a stay of all proceedings because in their view it would be counterproductive to the settlement process. On December 15, 2016, TERP and TerraForm Global submitted a letter to the Court stating that they supported a global mediation for the *SunEdison* Action as well as a stay of all actions (Dkt. No. 83).

41.     On December 19, 2016, an Initial Conference was held before Judge Castel. The same day, the Court issued an order directing all parties in the *SunEdison* Action, including the *Chamblee* Action, to participate in private mediation and instituting a limited stay of all of the actions that would expire on March 31, 2017 (*SunEdison* Action Dkt. No. 94).

42.     On March 24, 2017, Lead Plaintiffs filed the operative SAC (Dkt. No. 91).

43.     On June 9, 2017, Defendants filed their motion to dismiss the SAC. (Dkt. No. 100).

**Settlement Discussions**

44.     The Settling Parties attended multiple mediation sessions with Judge Layn Phillips (Ret.) of Phillips ADR. Judge Phillips conducted mediation sessions attended by Plaintiffs' Counsel and counsel for other Settling Parties on February 10, 2017, February 27, 2017, March 2, 2017, and March 3, 2017. In anticipation of the mediation sessions, Plaintiffs' Counsel prepared an extensive mediation statement. Plaintiffs' Counsel also reviewed Settling Defendants' mediation statement, as well as the mediation statements prepared by parties in the

related actions, so they were fully prepared to address their arguments to present their case to Judge Phillips. A settlement was not reached at any of these mediation sessions.

45.     With Settling Defendants' motion to dismiss pending, the Settling Parties again attended another mediation session, this time with Gregory Lindstrom of Phillips ADR on June 28, 2017. This mediation was successful and a settlement in principle was reached. On June 30, 2017, the Settling Parties informed the Court of the mediated resolution of the Chamblee Action (Dkt. No. 103).

46.     Not only did Plaintiffs' Counsel have to present their case to Settling Defendants to convince them to settle the action, due to the large number of related actions, Plaintiffs' Counsel had to wrestle the attention away from the other actions participating in some of these mediation sessions – which Plaintiffs' Counsel successfully accomplished.

47.     The mediation sessions were protracted, continuing over several months, and hard-fought. Both Plaintiffs' Counsel and Settling Defendants' Counsel zealously represented their clients' interests which resulted in the need for multiple mediation sessions and extensive settlement discussions. Plaintiffs' Counsel was not willing to underestimate the value of Lead Plaintiffs' claims and take just any offer Settlement Defendants made. Rather, Plaintiffs' Counsel was only willing to compromise to a settlement when it was fair and reasonable.

48.     On September 1, 2017, Lead Plaintiffs filed their Unopposed Motion for Preliminary Approval of Settlement which included the Stipulation and proposed notices to the Class (Dkt. Nos. 107-109). On September 14, 2017, Judge Castel entered the Preliminary Approval Order. (Dkt. No. 110).

### III.  CONTINUED LITIGATION POSED CONSIDERABLE AND SERIOUS RISKS TO THE CLASS

49.     The outcome of any litigation is never a certainty. While Lead Plaintiffs are optimistic that they would be successful in opposing Defendants' motion to dismiss and litigating this case through verdict and appeal against Defendants, Lead Plaintiffs are aware that litigation poses many risks. Even if Lead Plaintiffs prevailed on their motion to dismiss, if Defendants were to file another motion to dismiss that was successful or if they were to move for summary judgment, it is possible that Lead Plaintiffs' case would not proceed.

**Risks of Proving Liability & Damages**

50.     While Lead Plaintiffs were confident that they could be successful at trial, Lead Plaintiffs and counsel recognized the risks associated with protracted litigation and proving their claims at trial. Lead Plaintiffs could face the real possibility of not being able to prove their case if the litigation were to proceed.

51.     Lead Plaintiffs also faced the risk of establishing the proper measure and amount of damages. As estimated by Lead Plaintiffs' damages expert, class-wide damages using different models ranged from $326.1 million to $357.2 million. The Settlement recovers approximately 4.5% of estimated damages (using the low end of the estimated damages range) or 4.2% of estimated damages (using the high end of the estimated damages range). The amount of damages is disputed by Defendants and would be a hotly contested issue that would be time consuming and costly to litigate. Defendants do not believe that Lead Plaintiffs will be able to prove their case and therefore are not entitled to damages.

52.     Although Lead Plaintiffs and counsel remain confident that they could present reliable expert testimony to sustain Lead Plaintiffs' burden on liability and damages, Lead Plaintiffs and counsel cannot predict what the jury's decision would have been when faced with

competing experts. Settlement of this action eliminates the substantial risk posed by these complex and highly technical expert questions.

53.     Lead Plaintiffs also faced the risk and expense of obtaining class certification which requires additional expert reports and testimony. This is a costly and uncertain process. If Lead Plaintiffs did not obtain class certification then Class members would receive no recovery. Accordingly, the Settlement is an excellent, certain result for the Class.

**Complexity, Expense, and Likely Duration of the Litigation**

54.     Although Lead Plaintiffs and Plaintiffs' Counsel strongly believe that the claims asserted in this Action are meritorious and that the evidence will support them, they recognize and acknowledge the substantial expense and duration of continued proceedings that would be necessary to prosecute the Action. Lead Plaintiffs and Plaintiffs' Counsel are also mindful of the inherent difficulty of proving claims under the federal securities laws and the possible defenses to the claims asserted in this Action, as well as the uncertainties presented by complex litigation.

55.     Without the Settlement, Lead Plaintiffs would face a great deal of difficulty, expense, and delay in obtaining and reviewing necessary documents and taking depositions in this Action. An added hurdle will be Defendants' potential defenses to discovery that they do not have possession, custody, or control of key documents as they may be in the control or possession of third parties.

56.     Even if Lead Plaintiffs were able to obtain the necessary discovery, Defendants made clear their intention to vigorously defend this case and file summary-judgment motions if necessary. This would have necessitated further motion practice and further prolonged the Action.

57.     Assuming that Lead Plaintiffs' claims survived Defendants' motion to dismiss and potential summary judgment motions and the Court granted Lead Plaintiffs' potential class-

certification motion, the case would proceed to trial, which would take more time, require substantial further expense, and consume valuable court resources. While Lead Plaintiffs are prepared to prove the complex factual and legal issues in this Action at trial, there is a substantial risk that the jury would not agree with their theory of the case.

58.     While Lead Plaintiffs are confident that a class would be certified, the class would face the risk of Defendants' arguments regarding potential factual dissimilarities of claims asserted by Lead Plaintiffs and putative class members. If successful, the defenses would mandate individual lawsuits, hoping to collect minimal amounts of damages accrued.  Even if a class is certified over Defendants' arguments, it would face multiple risks in proving the class-wide nature of Defendants' securities laws violations at trial.

59.     The resolution of this action required the assessment of many complex issues of fact and law. As demonstrated above, numerous factual and legal questions exist as to liability and damages that would be subject to lengthy and expensive expert discovery, with no assurance that a jury would credit Lead Plaintiffs' experts over that of Defendants' expert.

60.     The further litigation of this action would require the parties to proceed into expensive and time consuming expert discovery.

61.     Lead Plaintiffs and their counsel have aggressively litigated this action. Given the complexity of the factual and legal issues in this case, the expense to be incurred through further pursuit of this action against Defendants would be substantial. Plaintiffs' Counsel has already expended considerable resources investigating the claims and assessing the legal strengths and weaknesses thereof. Considerably more time and money would need to be invested if Lead Plaintiffs were required to obtain class certification and to complete documentary discovery, depositions and expert discovery and, ultimately, to take this action to trial.

62.     The trial that Lead Plaintiffs would face would be lengthy and complicated. On liability alone, the trial would have involved substantial attorney and expert time, voluminous documentary and deposition evidence, vigorously contested motions and the considerable use of judicial resources.

63.     Even assuming that the Class could recover a larger judgment after one or more trials, the delay through the trial(s), post-trial motions and the appellate process would likely deny the Class any recovery for years and the continued costs of prosecution would erode any increased recovery. Moreover, if the case were to go to trial, the insurance policy proceeds would continue to decrease.

**Stage of Proceedings**

64.     Plaintiffs' Counsel has conducted a thorough evaluation of the strengths and weaknesses of the action. Plaintiffs' Counsel's investigation to date and extensive factual and legal research, has assisted Lead Plaintiffs and counsel in evaluating the strengths and weaknesses of the action, the risks of litigation, and the challenges the Class would face at trial. Moreover, Plaintiffs' Counsel was able to marshal the results of their investigation to prepare the operative pleadings and present a compelling analysis of the action to Defendants and the mediators during settlement negotiations.

**Range of Reasonableness/Ability of Defendants to Withstand a Greater Judgment**

65.     Plaintiffs' Counsel has analyzed the range of possible recovery against the probability of success and the determination of a reasonable settlement, and is not susceptible to a mathematical equation yielding a particularized sum.

66.     According to Lead Plaintiffs' expert's damages model, the Settlement affords a recovery of 4.5% of estimated damages (using the low end of the estimated damages range) or 4.2% of estimated damages (using the high end of the estimated damages range). As noted in the

accompanying memoranda, this recovery is an excellent result and well within line of the settlement value for cases of this size. Defendants contended that Lead Plaintiffs' best case scenario of Class-wide damages would be significantly less. As such, the $14,750,000 settlement falls well within the range of reasonableness for approval of a settlement in this action.

67.     Settlement at this time avoids the risks discussed above and further costly litigation, and provides Class Members with the opportunity to receive an immediate, certain, and substantial recovery. It is, therefore the opinion of Plaintiffs' Counsel that the risks involved, balanced against the certainty of the substantial benefits obtained by the Settlement, more than justify approval of this Settlement.

68.     As set forth above, Plaintiffs' Counsel have conducted extensive investigation into their claims. We have consulted a damages expert in connection with the damages alleged by the Class as well as employed private investigators and analyzed the information they marshaled during their investigation and have thoroughly researched the law. Knowing the legal arguments with respect to the claims and the defenses and the risks of continued litigation, Plaintiffs' Counsel has concluded that the Settlement is fair, reasonable, and adequate, and in the best interests of the Class.

**Reaction of the Class**

69.     Pursuant to the Court's Preliminary Approval Order, 58,248 Notice Packets were mailed to Class Members, brokers, and nominee holders, Summary Notice was disseminated electronically over *GlobeNewswire* on September 27, 2017 and published in *Investor's Business Daily* on September 25, 2017, JND added the Notice Packets and relevant information to the website, www.terraformpowersecuritieslitigation.com as well as established a claims call center. *See* Ex. 1, JND Decl. ¶¶11-14.

70.     There has only been one invalid request for exclusion filed by submitted by Claritas Administracao de Recursos Ltda. This request was invalid as it admits that they are not a TERP shareholder and does not, and did not, have any TERP securities during the Class Period. The deadline to request to be excluded from the Settlement is January 5, 2018. *See* Ex., 1 JND Decl. ¶15.

71.     There has been one objection to the Settlement. However that objection appears to be an objection related to the agreement by TERP with Brookfield Asset Management wherein Brookfield acquired a controlling interest in TERP and became TERP's new sponsor. Accordingly, this objection is unrelated to the instant settlement. The deadline to object to any aspect of the Settlement is January 5, 2018.  *See* Ex. 1, JND Decl., Ex. A.

## IV.   THE NOTICE OF THE SETTLEMENT WAS PROPERLY MADE TO THE CLASS

72.     Pursuant to the Preliminary Approval Order, Lead Plaintiffs caused 58,248 copies of the Notice Packets to be mailed to Class Members, brokers, and nominee holders as described in the Claims Administrator's Declaration. *See* Ex. 1 JND Decl. ¶11. Additionally, the Notice Packets were published on JND's website and Summary Notice was disseminated electronically on *GlobeNewswire* on September 27, 2017 and was also published in *Investor's Business Daily* and on September 25, 2017. *Id*. at ¶12. The Claims Administrator also established a website, and a call center regarding the Settlement. *Id*. at ¶¶13-14.

73.     The Court-approved Notice explains the background and terms of the Settlement and provided potential members of the Class with the date of the final approval hearing. The Notice provides Class Members with a full and explicit explanation of the Settlement, the Plan of Allocation, the anticipated fee and expense requests and award to Lead Plaintiffs and the rights and options of Class Members. *See* Ex. 1, JND Decl., Ex. A. This Notice, and the means by

which it was sent, comply with the requirements of the Federal Rules of Civil Procedure, the PSLRA, and due process, and are similar to the content and means of dissemination approved in other cases.

74. The Notice also set forth Plaintiffs' Counsel's estimates of the per share recovery to Class members with and without the requested attorneys' fees and reimbursement of expenses and award to Lead Plaintiffs. These calculations were made in consultation with Lead Plaintiffs' damages expert. *See* Ex. 1, JND Decl., Ex. A.

## V.   THE PLAN OF ALLOCATION SHOULD BE APPROVED AS IT IS FAIR AND REASONABLE

75. The Plan of Allocation was formulated by Plaintiffs' Counsel, in consultation with a well-respected and experienced financial consultant and was designed to ensure distribution of the settlement fund that was fair and consistent with Lead Plaintiffs' theory of the case, which asserted that there were declines in the price of TERP's stock reflecting disclosures of the truth relating to the alleged misconduct; and to ensure the allocation comported with the federal securities laws, including principles of loss causation.

76. The Plan of Allocation does not compensate losses resulting from "in and out" transactions, *i.e.* losses from sales made prior to revelation of truth. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("But if, say, the purchaser sells the shares before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."). The Plan of Allocation requires any gains from Class Period transactions to be netted with losses from Class Period transactions, which is rational and reasonable.

77. Perhaps most importantly, the Plan of Allocation does not discriminate, as each Authorized Claimant will receive a *pro rata* share of the Net Settlement Fund (i.e., Settlement Amount less attorneys' fees and expenses, and Award to Lead Plaintiffs).

78.     Plaintiffs' Counsel and their financial consultant determined this was the fairest method of allocation of the Net Settlement Fund.

## VI.     THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE AND EXPENSES INCURRED WERE NECESSARY TO LITIGATE THIS ACTION

79.     Plaintiffs' Counsel have represented the Settlement Class on a wholly contingent basis for more than year and a half, not receiving any payment for their service or the expenses incurred in prosecuting this Action against Defendants and negotiating the Settlement. Throughout this time, Plaintiffs' Counsel's dedication to recovering a favorable result for the Settlement Class has been expensive and challenging.

80.     The percentage of recovery method for compensating attorneys in common fund cases is preferred and appropriate. First, it is consistent with applicable Second Circuit case law as set forth in the supporting Memorandum of Law in Support of Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses and Award to Lead Plaintiffs ("Fee Brief"). Second, it is consistent with practices of the private marketplace where contingency attorneys are customarily compensated on a percentage of the recovery method. Third, it provides Plaintiffs' Counsel with a strong incentive to achieve the maximum possible recovery in a reasonable amount of time. Fourth, use of the percentage method decreases the burden imposed upon the Court by the "lodestar" method and assures that Class Members do not experience undue delay in receiving their share of the settlement.

81.     The Notice informed Settlement Class Members that Plaintiffs' Counsel would apply for attorneys' fees in the amount of 25% of the Settlement Fund plus interest, reimbursement of expenses up to $150,000, and awards to Lead Plaintiffs up to $4,000 in total ($2,000 for each).

82.     Plaintiffs' Counsel seeks an award of attorneys' fees of 25% of the Settlement Amount, or $3,687,500 plus interest. This percentage is within the range of fees awarded in this Circuit and other federal courts in cases of this type, as set forth in the supporting Fee Brief.

83.     In light of such a favorable Settlement and the reasonableness of the fee requested, it is of no surprise that, as of the date of this writing, not a single person has come forward to object to the requested fee, out of 58,248 Notices that were mailed to potential Class members, brokers and nominee holders. *See* Ex. 1, JND Dec. ¶¶11.

84.     From its inception, Plaintiffs' Counsel has aggressively litigated this action. Plaintiffs' Counsel's experience in securities class action litigation allowed them to identify complex issues involved in this action and to formulate strategies to effectively and efficiently prosecute a litigation of this complexity. Additionally, Plaintiffs' Counsel submits that their reputation as attorneys able and willing to see a meritorious case through trial and appeals assisted in the Settlement negotiations.

85.     As discussed above, Lead Plaintiffs and their counsel faced significant risks in pursuing this action. In fact, this was not an action where any recovery was assured. Adding to these risks, Plaintiffs' Counsel has received no compensation during the time the action has been pending. Their fees are totally contingent and dependent upon a successful result and an award by this Court. Plaintiffs' Counsel respectfully submits that the outstanding Settlement was primarily the result of their persistence, hard work, and skill.

86.     Plaintiffs' Counsel's expertise has been vital to obtaining such a favorable result for the Settlement Class. As set forth in detail in the firm resumes, Pomerantz Fee Decl., Ex. A, Rosen Fee Decl., Ex. A, Pomerantz and Rosen Law are nationally-recognized class-action firms with extensive experience litigating and negotiating settlements as lead or co-lead counsel in complex securities class actions.

87.     The quality of the legal services performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. The Defendants were represented by very able counsel. Indeed, Defendants were represented by Wilmer Cutler Pickering Hale and Dorr LLP, Sidley Austin LLP, O'Melveny & Myers LLP, and Hinckley Allen & Snyder LLP, firms that possess significant experience in complex securities litigation. Defense counsel spared no effort in the defense of its clients. In the face of this opposition Plaintiffs' Counsel were nonetheless able to develop a case that was sufficiently strong to settle the Action on terms that were favorable to the Class.

88.     The fairness and reasonableness of the requested fee is further demonstrated when "cross-checked" with the lodestar/multiplier analysis.

89.     Plaintiffs' Counsel expended a total of 1,964.55 hours of professional time for a total lodestar of $1,411,582. *See* Exs. 2 - 4, Lieberman Fee Decl., Rosen Fee Decl., and Cohen Fee Decl.

90.     As set forth in the time reports in Pomerantz Fee Decl.. Rosen Fee Decl., and Cohen Fee Decl., respectively, Pomerantz has committed approximately 1,401.3 hours to litigating this Action from the initial investigation to its resolution, Rosen Law has committed approximately 458.5 hours to litigating this Action, and Cohen Milstein has committed approximately 104.75 hours to litigating this Action. In total, the three firms have devoted approximately 1,964.55 hours to this Action, which includes time spent having done the following, without limitation: (i) conducted an investigation to plead an initial, amended complaint, and the operative SAC which required both scouring public records and retention of investigators; (ii) moved for lead-plaintiff appointment on behalf of Lead Plaintiffs Schlettwein and Spindler, which entailed researching securities laws; (iii) participated in MDL proceedings; (iv) carefully followed SunEdison's bankruptcy proceedings; (v) engaged in extensive settlement

negotiations, including attending four mediation sessions with Judge Layn Phillips (Ret.) of Phillips ADR and one mediation session with Gregory Lindstrom of Phillips ADR as well as prepared substantial and detailed mediation submissions; (vi) negotiated and drafted the terms of all relevant settlement documents including the Stipulation, Preliminary Approval Order, and the notice documents; (vii) presented those settlement terms to this Court by way of a motion for preliminary approval of the proposed settlement; and (viii) oversaw the provision of Notice to the proposed settlement class and monitoring the work of the selected claims administrator.

91.     Plaintiffs' Counsel's expertise has been vital to obtaining such a favorable result for the Settlement Class. As set forth in detail in the firm resumes, Pomerantz Fee Decl., Ex. A, Rosen Fee Decl., Ex. A, and Cohen Fee Decl, Ex. A. Pomerantz, Rosen Law, and Cohen Milstein are nationally-recognized class-action firms with extensive experience litigating and negotiating settlements as lead or co-lead counsel in complex securities class actions.

92.     Based on the hours expended by Pomerantz, Rosen Law, and Cohen Milstein and the current billing rates for the firms' professionals, the total lodestar is $1,411,582.  The lodestar results in a multiplier of 2.61, which is determined by dividing the $3,687,500 requested fee by the firms' $1,411,582 total lodestar.

93.     The time charts list the amount of time spent by each member of the firms involved in the prosecution of this Action. The firms' time is taken from daily time records regularly prepared and maintained by the firms in the ordinary course of business. The hours expended in preparing this application for fees and reimbursement of expenses has been excluded from the firms' total time.

94.     The number of hours reasonably and necessarily spent by the Pomerantz on this Action is 1,401.3 Pomerantz's hourly billing rates for the professionals working on this Action ranged from $305 to $900. The total lodestar amount for attorney and professional time, based

24

on the firm's current rates, is $1,030,877.00. The hourly rates for attorneys and professional staff at Pomerantz, included in Pomerantz Fee Decl., are the usual and customary rates charged for each individual in non-contingent matters and conform to industry practice.

95.     The number of hours reasonably and necessarily spent by Rosen Law on this Action is approximately 458.5. Rosen Law's hourly billing rates for professionals working on this Action ranged from $225 to $875. The total lodestar amount for attorney time, based on the firm's current rates, is $314,008. The hourly rates for attorney and professional time at Rosen Law, included in Rosen Fee Decl., are the usual and customary rates charged for each individual in non-contingent matters and conform to industry practice.

96.     The number of hours reasonably and necessarily spent by Cohen Milstein on this Action is approximately 104.75. Cohen Milstein's hourly billing rates for professionals working on this Action ranged from $280 to $970. The total lodestar amount for attorney time, based on the firm's current rates, is $66,697.50. The hourly rates for attorney and professional time at Cohen Milstein included in Cohen Fee Decl., are the usual and customary rates charged for each individual in non-contingent matters and conform to industry practice.

97.     The following table provides a summary of the lodestar analysis:

| Firm | Hours | Lodestar |
|---|---|---|
| Pomerantz | 1,401.3 | $1,030,877 |
| Rosen Law | 458.5 | $314,008 |
| Cohen Milstein | 104.75 | $66,697.50 |
| Totals | 1,964.55 | $1,411,582.00 |
| Requested Fee | | $3,687,500 |
| Multiplier | | 2.61 |

98.     As set forth in the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards to Lead Plaintiffs, a multiplier of 2.61 is within the range of a fair and reasonable award.

99.     As set forth in the Fee Brief, a multiplier of 2.61 is in the range of a fair and reasonable award.

100.    Plaintiffs' Counsel incurred $84,894.02 of unreimbursed expenses to prosecute this action. Substantial expenses included investigator fees, mediation fees, and press releases and notice to the Class. The expenses incurred were necessary to prosecute this action effectively and are reflected in the books and records of Plaintiffs' Counsel. *See* Exs. 2 - 4, Lieberman Fee Decl., Rosen Fee Decl., Cohen Fee Decl.

101.    Some large, but necessary, costs incurred during the litigation include mediation fees of $23,568.41, bankruptcy counsel fees of $5,000, expert fees of $32,657, and investigator fees of $13,084.45. These fees were necessary for the prosecution and resolution of the action.

## VIII.  REQUESTED AWARD TO LEAD PLAINTIFFS

102.    Lead Plaintiffs seek a collective award in the amount of $4,000, or $2,000 each. The Notice stated that a collective award of up to $4,000 would be sought on behalf of the Lead Plaintiffs. Attached hereto as Exhibit 5 is the Declaration of Lead Plaintiff Clemens Schlettwein and attached hereto as Exhibit 6 is the Declaration of Lead Plaintiff Jerome Spindler. There have been no objections to date received to the concept of making a modest award to the Lead Plaintiffs for the risks they bore and the contribution they made to the resolution of the action.

103.    This requested award is justified in light of Lead Plaintiffs' efforts and to compensate them for the time they spent working on this case. Lead Plaintiffs read over the pleadings, corresponded with Plaintiffs' Counsel throughout the litigation, and participated in settlement negations.

104.    Given the contributions and the time and effort expended by Lead Plaintiffs, the requested awards are warranted and should be approved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed, this 21st day of December, 2017.

Respectfully submitted,

**POMERANTZ LLP**

/s/ Jeremy A. Lieberman
Jeremy A. Lieberman

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on December 21, 2017, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


                                     <u>/s/Jeremy A. Lieberman</u>