**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SUNEDISON, INC.<br>SECURITIES LITIGATION<br><br><br>This Document Applies to:<br><br>*In re TerraForm Global, Inc. Securities Litigation,*<br>No. 1:16-cv-07967-PKC, and consolidated cases | No. 1:16-md-02742-PKC |

**DECLARATION OF LAWRENCE D. LEVIT**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**FINAL APPROVAL OF THE SETTLEMENT, AWARD OF**
**ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, New York 10119
Tel:    (212) 279-5050
Fax:    (212) 279-3655

*Lead Counsel for Lead Plaintiff and the Class*

I, Lawrence D. Levit, declare as follows:

1.        I am a member of the New York Bar admitted to practice before this Court and of counsel with the firm of Abraham, Fruchter & Twersky, LLP ("AF&T"), Lead Counsel for Lead Plaintiff Pyramid Holdings, Inc. ("Pyramid Holdings"), in the above-referenced action (the "Action").  I submit this Declaration in Support of Plaintiffs' Motion for Final Approval of the Settlement, Award of Attorneys' Fees and Reimbursement of Expenses.  I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of this litigation, my review of Court filings and other documents and consultation with other experienced colleagues at AF&T.  If called upon, I could and would competently testify that the following facts are true and correct.

2.        Plaintiffs have entered into a settlement on behalf of themselves and the other members of the Class with Defendants, which provides a recovery of $57,000,000 in cash to resolve this securities class action against all Defendants (the "Settlement").  The Settlement is contained in the Stipulation and Agreement of Settlement entered into by all parties dated December 14, 2017 (the "Stipulation") and previously filed with the Court.[1]

3.        This Declaration sets forth the nature of claims asserted, the principal proceedings in this Action, the legal services provided by Lead Counsel or others working at our direction, the settlement negotiations, and also demonstrates why the Settlement and Plan of Allocation are fair and in the best interests of the Class, and why the application for attorneys' fees and expenses is reasonable and should be approved by this Court.

---

[1] Terms not defined herein have the same meaning as in the Stipulation.  ECF No. 161.  ECF No." refers to entries of this Action's docket in the SDNY (Case No.1:16-cv-07981-PKC).

## I.    PRELIMINARY STATEMENT

4.    This case was carefully investigated and has been vigorously litigated since its commencement.  Plaintiffs' Counsel reviewed Defendant TerraForm Global, Inc.'s ("Global" or the "Company") and its sponsor, SunEdison, Inc.'s ("SunEdison"), publicly filed documents, financial reports, analysts' reports and press releases.[2]  Plaintiffs' Counsel also reviewed the filings in SunEdison's bankruptcy proceeding and the filings in other litigations involving SunEdison and its related entities.  The documents reviewed provided detailed factual information concerning the allegedly false and misleading statements relating to Global's registration statement and the prospectus incorporated therein (together, the "Offering Documents") filed with the Securities and Exchange Commission (the "SEC") in connection with Global's initial public offering dated July 31, 2015 (the "IPO").  Plaintiffs' Counsel also consulted with an expert in loss causation and damages, and thoroughly researched the law pertinent to the claims and defenses asserted.

5.    This Action was challenging from the start.  While the work undertaken by Plaintiffs' Counsel was extensive, this Action was made even more challenging because most of the relevant events that occurred were events related to SunEdison's actions rather than Global's actions.  This situation was exacerbated by the fact that SunEdison filed for bankruptcy protection while this Action was pending and remained there during the pendency of this Action.  SunEdison's involvement was also the basis for some of Defendants' primary defenses.  Indeed, the fact that it was SunEdison, not Global, which triggered most of the relevant events, was one of the bases

---

[2] References to Plaintiffs' Counsel or Lead Counsel and the activities performed on behalf of the Class include, in addition to AF&T, Plaintiffs' Counsel who represented other plaintiffs in actions that were consolidated with this Action.

supporting Defendants' claims that they had no liability.  Moreover, Defendant Global contended

that even if liability could be established as to it, its financial situation was precarious and it had

limited insurance, which was also being sought by litigants in other SunEdison-related actions.  The

other Defendants, particularly the Underwriter Defendants, claimed that they had good faith/due

diligence defenses, which would result in a finding of no liability as to them.  In addition,

Defendants claimed that even if liability were found, damages were not as great as Plaintiffs claimed

because of negative causation (or loss causation) issues.  In the face of these obstacles, the parties

engaged in mediation before retired United States District Court Judge Layn Phillips of Phillips

ADR, a well-regarded and experienced mediator.  The parties held three sessions that involved

litigants in some of the other actions against SunEdison and related parties and then engaged in

multiple telephone negotiations conducted through mediator Gregory Lindstrom from Phillips ADR,

who was working with Judge Phillips.  On October 31, 2017, the parties held another face-to-face

mediation session and after multiple back-and-forth negotiations, reached agreement to resolve the

Action.

6.     The proposed $57,000,000 Settlement is a notable achievement derived from the

substantial efforts of Plaintiffs' Counsel who zealously litigated this case.  The proposed Settlement

is a superb result for the Class, particularly under the circumstances of this litigation, and is

eminently fair, reasonable and adequate based on the numerous impediments to recovery, the legal

hurdles and risks involved in proving liability and damages as well as the further risk, delay and

expense had this case continued through motion practice, including summary judgment, and/or trial

against the Defendants.  Plaintiffs and Defendants do not agree on the average amount of damages

per share that would be recoverable if Plaintiffs were to have prevailed on the claims asserted, nor

that Plaintiffs would have prevailed at all.  Indeed, the Defendants continue to assert that the Class

suffered little or no damages as a result of the securities law claims that are alleged in the Second Amended Complaint.  In light of such adamant opposition, a recovery of $57 million to be distributed to the Class, derived solely from Plaintiffs' efforts, represents a highly successful result.

7.      The Settlement was negotiated on all sides by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses.  The Settlement confers substantial and immediate benefits to the Class while eliminating the risk of little or no recovery against the Defendants.  Lead Counsel respectfully submit that under these circumstances, the Settlement is in the best interests of the Class and should be approved as fair, reasonable and adequate.  The Court should also approve the Plan of Allocation of Settlement proceeds and award attorneys' fees in the amount of twenty-five percent of the Settlement Fund, plus expenses incurred in the prosecution of this litigation in the amount of $209,650.28, which have been incurred or advanced by Plaintiffs' Counsel in connection with this litigation, plus interest thereon, as a result of Plaintiffs' Counsel's considerable efforts in creating this substantial benefit on behalf of the Class, and as recognition for the risks faced and overcome.

8.      The Class appears to overwhelmingly approve the Settlement.  Pursuant to the Court's Order Preliminarily Approving Settlement dated December 19, 2017 (the "Notice Order"), a Notice of Pendency and Proposed Settlement of Class Action (the "Notice") was mailed to more than 18,759 Class Members or representatives.  Additionally, a Summary Notice was published in the *Investor's Business Daily* on January 15, 2018 and the Summary Notice was issued over *PR Newswire* on January 15, 2018.  The Notice apprised Class Members of their right to object to the Settlement, the Plan of Allocation or to Plaintiffs' Counsel's application for attorneys' fees of up to twenty-five percent of the total Settlement Fund plus expenses of up to $350,000.  The time to file objections to the proposed Settlement expires on March 30, 2018.  To date, there have been no

objections to the Settlement, Plan of Allocation or counsel's request for an award of attorneys' fees and expenses from any Class Member.  In this era of heightened shareholder activism, the complete lack of objection is noteworthy.

9.      Plaintiffs' Counsel has litigated this case since October 2015 on a wholly-contingent basis.  The fee application for twenty-five percent of the total recovery is fair, reasonable and adequate and warrants Court approval.  This fee request is well within the range of fees typically awarded in actions of this type and is wholly justified in light of the benefits obtained, the substantial risks undertaken, and the quality, nature and extent of the services rendered, as more fully set forth in Plaintiffs' Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, submitted herewith.

10.     In sum, the Settlement is the product of hard-fought litigation and protracted arm's-length negotiations and takes into consideration the risks specific to this case.  Plaintiffs' Counsel respectfully submit that under these circumstances the Settlement is in the best interests of the Class and should be approved as fair, reasonable and adequate.

11.     The following sets forth the principal proceedings in this matter and the major legal services provided by Plaintiffs' Counsel, the negotiations of the Settlement, the terms of the Settlement, why the Settlement and the Plan of Allocation are fair and in the best interests of the Class, and the reasonableness of Plaintiffs' Counsels' fee and reimbursement of expense request.

## II.    STATEMENT OF FACTS[3]

12.     This securities class action was brought against Global, certain of its former officers and/or directors and the Underwriters for Global's IPO.[4]  Plaintiffs allege that Defendants violated

---

[3] This section is based on allegations made in the SAC.

the Securities Act of 1933 ("Securities Act") in connection with Global's IPO.  In the IPO, dated July 31, 2015, Global sold 45 million shares of common stock at $15.00 per share.  Those shares were sold pursuant to allegedly materially false and misleading Offering Documents, which highlighted Global's close connection and dependence on SunEdison, but failed to reveal that SunEdison was experiencing massive liquidity and financial setbacks, which necessitated the abandonment of its core strategy, upon which Global was dependent, shortly after the IPO.  As the truth about SunEdison began to be disclosed, Global's stock price declined precipitously on several occasions in the ensuing weeks and months.  This Action is brought on behalf of a class (the "Class") of all persons who purchased shares of Global common stock pursuant to or traceable to the IPO until December 15, 2017, inclusive (the "Class Period"), and who incurred a loss, other than Defendants and certain related parties.

---

[4] Defendants are: Global, individual defendants Ahmad Chatila ("Chatila"), Carlos Domenech Zornoza ("Domenech"), Jeremy Avenier ("Avenier"), Martin Truong ("Truong") and Brian Wuebbels ("Wuebbels") (collectively, the "Individual Defendants"), and underwriter defendants J.P. Morgan Securities LLC ("J.P. Morgan"), Barclays Capital Inc. ("Barclays"), Citigroup Capital Markets, Inc. ("Citigroup"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman Sachs & Co. ("Goldman Sachs"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Deutsche Bank Securities Inc. ("Deutsche Bank"), BTG Pactual US Capital LLC ("BTG US"), Itau BBA USA Securities, Inc. ("Itau"), SMBC Nikko Securities America, Inc. ("SMBC Nikko"), SG Americas Securities, LLC ("SG Americas") and Kotak Mahindra Inc. ("Kotak") (collectively, the "Underwriter Defendants").  Global, the Individual Defendants and the Underwriter Defendants, collectively, are the "Defendants").  All of the Individual Defendants signed, or authorized the signing of, the allegedly false and misleading Registration Statement.  The Underwriter Defendants assisted Global in planning the IPO and, as such, allegedly had access to non-public information concerning Global and SunEdison's businesses and finances.

13.     Global owns and operates clean power generation assets in emerging market countries.  It was structured as a "YieldCo," which is an entity designed to generate dividends and grow by acquiring power generation assets from its sponsor.  Here, non-party SunEdison was at all relevant times Global's sponsor and controlling parent company.  Global was SunEdison's second YieldCo spinoff, as it had spun off its first YieldCo, TerraForm Power, Inc. ("TERP" and together with Global, the "YieldCos"), approximately one year earlier in 2014.

14.     As the sponsor of its two YieldCos, SunEdison took on the risk of underwriting and developing new renewable energy project construction.  It negotiated long-term power purchase agreements ("PPAs") with utility companies to provide electricity generated from the projects.  Once constructed, a project would be dropped down to a YieldCo, which would then receive the stable cash flows from the long-term PPAs, benefiting the YieldCo's shareholders with consistent dividend payouts.  SunEdison controlled Global (as well as TERP) by owning more than 90% of its voting power.  Pursuant to the terms of management services agreements, SunEdison was responsible for carrying out all day-to-day management, accounting, banking, treasury, administrative and regulatory functions and obligations of Global.  Global's primary executive officers and/or directors were also executive officers and/or directors at SunEdison.

15.     In the IPO, Global raised approximately $675 million.  The final prospectus (the "Prospectus") incorporated with the Registration Statement (the "Registration Statement," and with the Prospectus, collectively, the "Offering Documents") was filed with the SEC on August 4, 2015.  In describing Global's business model and future prospects, the Offering Documents explained, *inter alia*, that Global would rapidly conduct asset acquisitions "projected to generate an aggregate of at least $1.4 billion of cash available for distribution during their respective first twelve months of commercial operations" through its priority purchase rights from SunEdison.  Defendants painted

- 7 -

SunEdison as a globally-established energy powerhouse with a long track record of completing asset acquisitions, which would benefit Global.[5]  Accordingly, Global was heavily dependent upon its sponsor SunEdison for its business model to succeed.

16.     However, by the time of the IPO, and allegedly undisclosed to investors, SunEdison's rapidly increasing debt and on-going liquidity problems doomed the YieldCo strategy. The Offering Documents were allegedly materially false and misleading because they failed to disclose SunEdison's precarious financial situation.  Instead of being a reliable source of future projects, SunEdison was allegedly drowning in unsustainable levels of debt, hemorrhaging cash, and barely able to pay its vendors to sustain critical functions much less to continue its acquisition spree, all of which would significantly hamper its ability to acquire and sell assets to Global or in any way allow Global to succeed in its business model.

17.     One of SunEdison's acquisitions, among several costing hundreds of millions or billions, was of First Wind LLC ("First Wind"), which it purchased along with TERP for $2.4 billion, as announced on November 18, 2014.  SunEdison funded its share of a required $1 billion upfront payment through the sale of its $337 million 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes") and a $410 million two-year loan (the "Margin Loan").

18.     The Margin Loan contained provisions requiring prepayment or additional collateral to be posted under several circumstances that were dependent on the price of TERP common stock (the "Margin Loan Agreement").  First, if TERP's common stock price fell below a certain undisclosed price, SunEdison would be required to prepay, in full, all outstanding indebtedness due

---

[5] For a complete listing of the allegedly materially false and misleading statements in the Offering Documents, *see* the SAC, ¶¶51, 53-71.  ECF No. 149.

on the loan the next business day.  Second, if the loan-to-value ratio of the collateral SunEdison offered as collateral relative to the total borrowings fell below an undisclosed level (the "Loan-To-Value Trigger"), SunEdison was required to either prepay the loan in full or provide additional cash collateral to bring the Loan-To-Value Trigger down to the permitted level by 5 p.m. on the second business day after the limit was exceeded.  According to the Margin Loan Agreement, SunEdison provided 32.2 million TERP shares as collateral.

19.     By the time of entry into the Margin Loan and the issuance of the Exchangeable Notes, or shortly thereafter, liquidity had become a problem at SunEdison.  As SunEdison's counsel admitted to the Bankruptcy Court on April 22, 2016, SunEdison began to experience a "liquidity challenge" by no later than the spring of 2015.  Notwithstanding this "liquidity challenge," after the close of the First Wind acquisition, SunEdison announced an array of large-scale project acquisitions in order to drop down the projects to TERP or Global.  For example, on July 20, 2015, SunEdison and TERP announced the acquisition of the residential rooftop solar company Vivint Solar ("Vivint") for $2.2 billion in cash and stock.  In order to obtain the cash needed for its portion of the transaction, SunEdison had to turn to Goldman Sachs Bank USA ("Goldman Sachs Bank") for a $500 million loan.  The description of the financing required to acquire Vivint, among other things, caused a negative market reaction, with some investors questioning SunEdison's capital-raising abilities going forward.  Accordingly, the price of both SunEdison and TERP shares declined significantly after the July 20, 2015 announcement of the deal.

20.     Unknown to investors, TERP's stock price decline posed an imminent risk of triggering a margin call on the Margin Loan, which had previously been publicly mis-characterized

- 9 -

by SunEdison as "non-recourse."[6] Thus, with TERP's stock price declining, SunEdison had to find

the funds to either prepay the Margin Loan in full or provide additional collateral.  As a result,

SunEdison began negotiating with Goldman Sachs Bank to borrow a second lien loan of $169

million (the "Goldman Sachs Loan").  This loan would allegedly have an effective interest rate of

15%, meaning that SunEdison was so cash-poor that it would agree to pay Goldman Sachs Bank $25

million over the one-year life of the loan in fees and interest just to have access to the loan principle

up front.  It was also a second lien loan because SunEdison did not have any assets that did not

already have a first lien loan against them.  The loan was finalized on August 11, 2015, less than two

weeks after the IPO, but was not disclosed until November, 2015.

21.      Beginning on August 6, 2015, just two days after the IPO closing, Global's stock

price began to decline based on negative news about SunEdison.  On August 6, 2015, SunEdison

reported troubling 2Q 2015 financial results, including a loss of $263 million on $455 million of

revenue and an outstanding debt of approximately $11 billion largely accumulated from several

then-recent multi-billion dollar acquisitions.  As an article in *The Motley Fool* opined, "these results

highlight how tough it's going to be to build a renewable energy powerhouse with nearly $11 billion

in debt and negative cash flow from operations."

22.      On August 7, 2015, TERP's stock price decreased to $25.24 per share, activating the

Loan-To-Value Trigger under the Margin Loan.  SunEdison ended up posting additional collateral to

---

[6] Both the Margin Loan and the Exchangeable Notes were misclassified in SunEdison's public filings and statements as "non-recourse" to SunEdison.  Given the fact that its non-recourse debt was twice the amount of its recourse debt, including the non-recourse debt in that ratio may have had a significant negative impact on SunEdison's ability to access liquidity through its credit facilities and fund its YieldCo projects.  It was not until November 9, 2015—or more than three months after the IPO—that the Margin Loan and the Exchangeable Notes began to be revealed as recourse obligations.

the Margin Loan in the amount of $152 million, allegedly using the Goldman Sachs Loan to meet the requirement.

23.     On August 11, 2015, an article titled "SunEdison Gets Caught in Energy Downdraft" in the *St. Louis Post-Dispatch* discussed SunEdison's second quarter loss, noted that SunEdison's acquisition-heavy business model was at risk given the already large debt it held, and reported that, after TERP's stock price declined, SunEdison had to finance the Vivint acquisition with debt, instead of issuing TERP shares to pay for the deal as previously announced.

24.     On August 24, 2015, a follow up article in *The Motley Fool* noted that SunEdison "doesn't have the balance sheet to build projects" because it had significantly more debt than uncommitted cash.  On August 25, 2015, UBS issued an analyst report disclosing that a margin call had been made on the Margin Loan, which caused UBS to downgrade SunEdison stock.

25.     Negative news about SunEdison continued to be revealed and on October 7, 2015, within two months of the IPO, SunEdison was forced to admit that it did not expect to sell any projects at all to Global through 2016 and, instead, SunEdison would "pivot to third-party sales" because there was "a disconnect between the value of these underlying assets and what people are willing to pay for them in a YieldCo."  The previous day, it was reported that SunEdison failed to make a required $400 million upfront payment for a Latin America power project ("LAP"), and LAP then walked away from the deal.  When the above information and other disclosures about SunEdison's financial position were disclosed, Global's stock price declined materially, decreasing by double digits several times allegedly on the disclosures of negative news.  Over the remainder of 2015 and into the spring of 2016, SunEdison continued its downward spiral, leading it to file for bankruptcy on April 21, 2016, only nine months after the IPO.  Global was left with no functioning sponsor to feed it the necessary energy projects to sustain its growth.

26.     As a result of the false and misleading portrayal of the financial condition of Global's sponsor and the viability of the YieldCo strategy in the Offering Documents, Plaintiffs and other purchasers of Global common stock suffered significant losses and damages.

## III.    PROCEDURAL HISTORY

### A.     The Litigation Commences

27.     On October 29, 2015, an initial complaint was filed asserting class actions claims regarding the IPO in the United States District Court for the Northern District of California (the "NDCA").   *See Beltran v. TerraForm Global, Inc. et al.,* 15-cv-04981-WHO (N.D. Cal.) ("*Beltran*").   On November 5, 2015, Pyramid Holdings filed a class action complaint against Global and others in connection with its alleged violations of the Securities Act in the NDCA in the case originally styled as *Pyramid Holdings, Inc. v. Terraform Global, Inc., et al.,* No. 5:15-cv-05068-BLF (N.D. Cal) ("*Pyramid*") (ECF No. 1).[7]

28.     On December 28, 2015, Pyramid Holdings filed a motion for appointment as Lead Plaintiff pursuant to Section 27(a)(3)(B) of the Securities Act, as amended by the PSLRA, 15 U.S.C. § 77z-1(a)(3)(B), and that Pyramid Holding's counsel, Abraham, Fruchter & Twersky, LLP ("AF&T") be appointed Lead Counsel.   ECF No. 6.   On that same day, Furia Investment Limited ("Furia") made a competing motion to be appointed lead plaintiff in *Beltran*, and to have its selection of counsel be named lead counsel.

29.     On January 8, 2016, Pyramid Holdings and Furia each filed a stipulation and proposed order seeking to consolidate the two cases.   ECF No. 37.   On January 11, 2016, the proposed order was entered, consolidating *Pyramid* and *Beltran*.   ECF No. 41.   Also on January 11,

---

[7] The *Pyramid* docket entries in the NDCA were incorporated into this Action's docket in the SDNY (Case No.1:16-cv-07981-PKC), upon its transfer as detailed below.

2016, Pyramid Holdings responded to Furia's motion, maintaining that Furia should not be appointed lead plaintiff because it had irreconcilable conflicts of interest with BTG,[8] one of the underwriters of the IPO and an entity that is a Defendant in this Action.  ECF No. 44.  Specifically, Pyramid Holdings argued that this conflict of interest existed because Emmanuel Hermann ("Hermann"), Furia's sole owner and signer of Furia's PSLRA certification in this Action, (i) was also the former head of proprietary trading at BTG; (ii) sat on BTG's Board of Directors for nearly two decades; and (iii) was recognized by BTG, at the time of the lead plaintiff motions, as a member of the bank's global board of management committees and was one of BTG's highest ranked executives.  It was further argued that Furia effectively controlled and managed BTG, BTG was virtually indistinguishable from Furia and Furia was one of BTG's largest shareholders.  Accordingly, Pyramid Holdings argued that Furia failed to establish its adequacy and typicality, as required to be appointed as lead plaintiff.  ECF No. 44.[9]

   30.   On April 7, 2016, oral argument was held on the lead plaintiff motions, and on April 11, 2016, Judge Freeman found that Pyramid Holdings had raised substantial questions regarding

---

[8] As referenced herein, "BTG" refers to BTG Pactual Holdings and its related entities, including BTG US, which is the entity that served as an underwriter for the IPO.

[9] Pyramid Holdings also moved for this Action to be consolidated with five other actions against Defendants, all of which arose under the Securities Act in connection with the IPO.  On January 20, 2016, Judge William H. Orrick issued an order relating the following actions to *Beltran*: (i) *Oklahoma Firefighters Pension and Retirement System v. SunEdison, Inc., et al.*, 16-cv-02267-THE (N.D. Cal.) ("*Oklahoma Firefighters*"); (ii) *Anton S. Badri v. TerraForm Global, Inc., et al.*, Case No. 3:16-cv-02269-WHO (N.D. Cal.) ("*Badri*"*)*; (iii) *Iron Workers Mid-South Pension Fund v. TerraForm Global, Inc., et al.*, 16-cv-02270-EMC (N.D. Cal.) ("*Iron Workers*"); (iv) *Mitesh Patel v. TerraForm Global, Inc., et al.*, Case No. 16-cv-02272-WHA (N.D. Cal.) ("*Patel*"); and (v) *Simon Fraser v. TerraForm Global, Inc., et al.*, 16-cv-02273-LHK (N.D. Cal.) ("*Fraser*").  The latter four cases (i.e., not *Oklahoma Firefighters*), together with this Action and *Beltran*, are collectively referred to herein as the "Global IPO Actions."  On February 3, 2016, the case was reassigned to Judge Beth Labson Freeman.  ECF No. 53.

Furia's adequacy and typicality to represent the Class and ordered limited discovery on the issue of Furia's conflict, with further briefing to be submitted by April 21, 2016.  ECF Nos. 60-61.

31.     Throughout April 2016, Pyramid Holdings and Furia conducted several meet and confers and negotiated the scope of discovery on the issue of Furia's potential conflict of interest with BTG.  For example, on April 13, 2016, Pyramid Holdings sent to Furia its initial set of document requests.  On April 18, 2016, Pyramid Holdings and Furia discussed those requests and, on that same day and pursuant to that meet and confer, Pyramid Holdings sent Furia its revised document requests, all of which concerned Hermann's relationship with BTG, including (i) his investments in that entity, (ii) his formal and informal relationships with it, (iii) the nature of Hermann's documents and communications, and (iv) a list of key individuals who may have had contact with Hermann regarding, among other things, BTG and the IPO.  *Beltran* ECF Nos. 97, 98-1.  Additional meet and confers were held between April 18 and April 21, 2016 regarding a joint discovery plan and the scheduling of Hermann's deposition.  Also on April 21, 2016, Furia sent Pyramid Holdings its responses and objections to those revised document requests.

32.     On April 21, 2016, Pyramid Holdings filed its brief in support of its discovery plan in connection with its motion for appointment of lead plaintiff, arguing that (i) the relevant time period for which it had requested documents (April 1, 2015 up to the time of the filing of the brief) was reasonable, (ii) the sources of the documents were easily identifiable and searchable, and  (iii) the documents sought were all relevant to the conflict of interest arising out of the Hermann-BTG relationship.  *Beltran* ECF No. 97.  On that same day, Furia filed its competing discovery motion. *Beltran* ECF No. 99.

33.     On April 28, 2016, Judge Freeman ordered Furia to produce to Pyramid Holdings substantively all of the documents sought on the conflict issue, which were to be fully produced by

May 13, 2016.  ECF No. 65.  Judge Freeman also ordered that Hermann be deposed in Miami, Florida between May 17, 2016 and June 10, 2016, and that Pyramid Holdings and Furia file supplemental briefing on this issue within 10 days of Hermann's deposition.  ECF No.  65.

34.     Pursuant to Judge Freeman's April 28, 2016 Order, Furia produced the documents requested by Pyramid Holdings.  On May 19, 2016, Pyramid Holdings and Furia scheduled a deposition of Hermann to be held on June 2, 2016 in Miami, Florida.  However, just one day before that deposition, on June 1, 2016, Furia withdrew its motion for appointment as lead plaintiff.

35.     Accordingly, on June 2, 2016, the Court appointed Pyramid Holdings as Interim Lead Plaintiff and AF&T as Interim Lead Counsel. ECF No. 80.  Judge Freeman designated the appointments as interim because of the then-pending motions to remand and the motions to transfer. *Id.*

**B.     Proceedings in the Southern District of New York**

36.     While this Action was pending in the NDCA, on April 21, 2016, SunEdison and its affiliated entities (the "SunEdison Debtors") filed a voluntary petition for bankruptcy under chapter 11 of title 11, 11 U.S.C. §§ 101 *et seq.*, in the United States Bankruptcy Court for the Southern District of New York.  *See SunEdison, Inc., et al.,* No. 16-10992-SMB.  Actions relating to SunEdison and its finances and related entities were filed in several different jurisdictions.  After SunEdison's Bankruptcy Court filing, on June 2, 2016, Defendants filed a motion to transfer this Action to the United States District Court for the Southern District of New York because it was related to SunEdison's bankruptcy action.  ECF No. 79.  On July 27, 2016, Municipal Employees' Retirement System of Michigan ("MERS"), the plaintiff in one of those SunEdison-related cases, *Horowitz, et al. v. SunEdison, Inc. et al.,* 4:15-cv-01769-RWS (E.D. Mo.), filed a motion before the Judicial Panel on Multidistrict Litigation (the "JPML") pursuant to 28 U.S.C. § 1407(a), seeking to centralize all related and overlapping actions, including this Action, arising from the events

- 15 -

surrounding the bankruptcy of SunEdison, by transferring actions pending in various federal district courts to the United States District Court for the Southern District of New York (the "SDNY") for consolidated or coordinated pretrial proceedings.  MDL ECF No. 1-1.[10]

37.     Pyramid Holdings and AF&T participated in the JPML proceedings with respect to the motion to transfer (MDL ECF No. 63), and attended the hearing conducted by the JPML on September 29, 2016 in Washington, D.C.

38.     On October 4, 2016, the JPML issued a Conditional Transfer Order (the "Transfer Order"), directing that this Action, as well as 14 other actions (including all Global IPO Actions) be transferred to the Southern District of New York and centralized into a single consolidated MDL styled as *In re: SunEdison, Inc., Securities Litigation*, 16-MD-2742, pending in the Southern District of New York (the "SunEdison Securities MDL")[11] before the Honorable P. Kevin Castel.  On October 6, 2016, the Northern District of California transferred this Action to the Southern District of New York. ECF No. 106.  This Action was later restyled *In re TerraForm Global, Inc. Securities Litigation*, 1:16-cv-07967-PKC (S.D.N.Y.).

39.     On October 26, 2016, this Court issued an Order setting an Initial Conference on December 19, 2016 for all actions related to the SunEdison Securities Litigation MDL. MDL ECF No. 16.  That Order also directed counsel for plaintiffs in the securities class actions, including this Action, to provide additional information such as statements of existing deadlines, a brief description

---

[10] A list of those various actions sought by MERS to be related and transferred to the SDNY is provided in MDL ECF No. 1-1 and they are referred to as the "Related Actions."

[11] Between October 2016 and August 2017, the JPML associated over twenty-five actions into the SunEdison Securities Litigation MDL, including securities class actions, ERISA actions, and individual shareholder actions filed against Global, TERP and SunEdison.  References to "MDL ECF" refer to filings in the consolidated SunEdison Securities Litigation MDL.

of outstanding motions, a brief description of any discovery that had taken place, and a list of all prior settlement discussions.  MDL ECF No. 16.

40.     On November 17, 2016, responding to the October 26, 2016 Order, counsel for the plaintiffs in the five securities cases and one ERISA class action case pending before this Court, including Lead Plaintiff here, informed the Court that the Official Committee of Unsecured Creditors in SunEdison's bankruptcy proceeding (the "Creditors' Committee") might ask the Court to direct the parties in the SunEdison Securities Litigation MDL into early mediation and to stay all of the litigation, and that, while not opposing the mediation, the plaintiffs opposed the stay, as in their view it would be counterproductive to the settlement process.  MDL ECF No. 41.  In their joint letter to the Court, these plaintiffs also proposed finalizing the appointment of Pyramid Holdings as Lead Plaintiff in the Global IPO Actions and AF&T as Lead Counsel, and that lead plaintiff would file a consolidated securities class action complaint 21 days after the order of such appointments. MDL ECF No. 41.

41.     On December 15, 2016, in response to plaintiffs' November 17, 2016 joint letter, Global and TERP submitted a letter to the Court stating that they would support a global mediation as well as a stay of all actions.  MDL ECF No. 84.  On December 19, 2016, upon holding an initial conference, the Court directed all parties in the various actions, including this Action, to participate in private global mediation and instituted a limited stay as to all of the actions that would expire on March 31, 2017.  MDL ECF No. 94.  The Court also directed AF&T to submit the lead plaintiff motion papers it previously filed in the NDCA, which was done.  On December 22, 2016, this Court appointed Pyramid Holdings as Lead Plaintiff and AF&T as Lead Counsel in this Action[12] and

---

[12] These consolidated securities class actions included: (i) *Pyramid*; (ii) *Beltran*; (iii) *Badri*; (iv) *Iron Workers*; and (v) *Fraser*.  Prior to Judge Castel's December 22, 2016 Order appointing Pyramid

ordered a consolidated securities class action complaint (the "CAC") to be filed by January 16, 2017.
MDL ECF No. 103.

42.     On January 16, 2017, Plaintiffs filed the CAC, alleging claims under Sections 11,
12(a)(2) and 15 of the Securities Act against Defendants.  MDL ECF No. 119.  On February 6, 2017,
pursuant to the Court's instructions, Defendants submitted a pre-motion letter, setting forth their
reasons why Plaintiffs' claims in the CAC were purportedly not actionable.  MDL ECF No. 133.
Specifically, Defendants maintained that (i) no misrepresentations were made in the Offering
Documents as SunEdison's debt was disclosed and known by the market, (ii) the CAC's claims were
based on events that occurred after the time of the IPO and could not have been disclosed in the
Offering Documents, and (iii) in any event, the alleged actionable disclosures in the Offering
Documents concerned not Global, but SunEdison, a different company, and therefore were not a
basis for the alleged claims.  MDL ECF No. 133.  Defendants also argued that the alleged
misstatements either were inactionable opinions, were historical facts and not false, and/or were
forward-looking and accompanied by meaningful cautionary language.  MDL ECF No. 133.

43.     Although disagreeing with Defendants' arguments, Lead Plaintiff, out of an
abundance of caution and its duty to the Class, filed the Consolidated Second Amended Class Action
Complaint (the "SAC") on April 21, 2017, in part, to address the arguments in Defendants' pre-
motion letter and cure any purported deficiencies.  MDL ECF No. 188.  The SAC asserts (i) a claim
for violation of Section 11 of the Securities Act against all Defendants, (ii) a claim for violation of

Holdings Lead Plaintiff and consolidating these five cases into the Global IPO Actions, on
November 3, 2016, plaintiff in *Patel*, previously related to the cases in the Global IPO Actions in the
Northern District of California, voluntarily dismissed that case.  *Oklahoma Firefighters*, also
previously related to the cases in the Global IPO Actions, was not consolidated into the Global IPO
Actions because it was filed by an individual investor not bringing claims on behalf of a putative
class of investors.

Section 12(a)(2) of the Securities Act against the Individual Defendants and Underwriter Defendants and (iii) a claim for violation of Section 15 of the Securities Act against the Individual Defendants.

44.     On June 9, 2017, Defendants filed their Motion to Dismiss the SAC. ECF No.152. Lead Plaintiff filed its Opposition to Defendants' Motion to Dismiss on July 21, 2017. ECF No. 157. Defendants submitted their Reply on August 18, 2017. ECF No. 158. Despite the filing of the SAC, which sought to address many of the arguments Defendants raised in their pre-motion letter, Defendants made many of the same, or similar, arguments in their motion to dismiss that they made in the pre-motion letter, which were previously noted. In addition, Defendants argued that Plaintiffs' claim based on Regulation S-K, Item 303 ("Item 303") regarding trends as to SunEdison's liquidity and capital resources was not actionable because, among other things, disclosure of those trends only applied to the issuer of the stock, not a separate public company that had its own finances and made its own disclosures in filings with the SEC.

**C.     AF&T Protects the Class' Interests by Participating in SunEdison's Bankruptcy Proceeding**

45.     While the parties were engaged in litigating and mediating this Action, SunEdison's bankruptcy was proceeding, which AF&T monitored, and in which, AF&T, along with its bankruptcy counsel, participated.

46.     On or about June 7, 2017, the SunEdison Debtors, the Creditors' Committee and the individual defendants in bankruptcy filed with the Bankruptcy Court a motion for approval of a settlement agreement, which provided, inter alia, the release of certain claims against those individual defendants (the "D&O Insurance Cooperation Agreement"). SunEdison Bankruptcy ECF No. 3297. AF&T and its bankruptcy counsel analyzed the filings and considered submitting an objection to this proposed motion, but decided that an objection was not necessary because the

release language did not apply to the Class' claims, and any indemnification claims that the Global directors and officers had were not excluded by this agreement.

47.     On or about July 18, 2017, the SunEdison Debtors filed a motion for Confirmation of the First Amended Joint Plan of Reorganization of SunEdison, Inc and its Debtor Affiliates (the "Plan") with the Bankruptcy Court.  SunEdison Bankruptcy ECF No. 3649.

48.     On or about July 13, 2017, AF&T and its bankruptcy counsel filed a limited objection to the Plan on behalf of Lead Plaintiff and the other members of the Class, to the extent any terms of the Plan, including without limitation, the exculpation provisions, third party releases and injunction provisions, may be construed as: (a) exculpating the individual defendants named therein from any claims asserted against them in this Action;  (b) releasing any of the claims asserted in this Action; and (c) enjoining prosecution of any of the claims in this Action.  SunEdison Bankruptcy ECF No. 3573.

49.     Specifically, while Lead Plaintiff believed that the exculpation protections were intended to apply to the individual defendants' conduct during the Debtors' bankruptcy and not to their prior conduct as directors and officers of Global, Lead Plaintiff objected to the exculpatory clause because the breadth of the language in the exculpation provisions may have been interpreted to cover conduct prior to the filing of Debtors' bankruptcy.  Moreover, Lead Plaintiff did not believe that either the release or the injunction provisions applied, but to the extent they were argued or determined to apply, Lead Plaintiff sought to reserve all rights to object, including without limitation, to argue that it was not bound by any such exculpation, release or injunction, and any such exculpation, release or injunction would be impermissible.

50.     Also on July 13, 2017, AF&T and its bankruptcy counsel filed a further limited objection to the Plan on behalf of Lead Plaintiff and the other members of the Class to clarify and

confirm that Lead Plaintiff was not a "Releasing Party" as that term was defined in the Plan and to make it clear that Lead Plaintiff and the members of the Class were not Releasing Parties under the Plan with respect to any claim asserted in this Action and objected to any contrary interpretations. SunEdison Bankruptcy ECF No. 3584.

51.     On July 18, 2017, in response to Lead Plaintiff's Objection and Further Limited Objection (as well as objections filed by others), the Plan was amended to clarify and specifically exempt the claims asserted in this Action.  AF&T and its bankruptcy counsel suggested changes to the amendment to the Plan proposed by the SunEdison's Debtors' counsel and the Plan was amended as suggested (the "Second Amended Plan").  The amended language made it clear that nothing in the Plan would impede the prosecution of this Action.  SunEdison Bankruptcy ECF No. 3735, Exhibit A.

52.     On or about July 28, 2017, the Bankruptcy Court approved the Second Amended Plan, which included the language agreed to by AF&T and its bankruptcy counsel regarding the fact that Lead Plaintiff and the Class' ability to prosecute the claims they asserted in this Action were not impeded by the Plan. SunEdison Bankruptcy ECF No. 3735.

53.     On or about August 31, 2017, SunEdison and the Debtors filed a motion to approve a directors and officers allocation agreement which they had reached with others to allocate, among other things, the remaining insurance proceeds from SunEdison's $150 million insurance tower, among various potential claimants, which was to be used to litigate or attempt to settle the remaining litigations (the "D&O Allocation Agreement").  SunEdison Bankruptcy ECF No. 3979.

54.     On or about September 21, 2017, AF&T and its bankruptcy counsel filed a reservation of rights as to the D&O Allocation Agreement if an amount less than $20 million was allocated to Global to resolve the claims filed against the Global directors and officers, or if the

rights of Lead Plaintiff and the Class were prejudiced in any way by the D&O Allocation Agreement. SunEdison Bankruptcy ECF No. 4043.

55.     On September 28, 2017, the Bankruptcy Court held a hearing during which it considered the D&O Allocation Agreement, and adjourned determination of that motion to allow the parties and objectors to revise the agreement to ensure, inter alia, that the allocated funds would be used for Global's directors and officers and not another purpose. SunEdison Bankruptcy ECF No. 4097.

56.     On or about October 3, 2017, the D&O Allocation Agreement, as amended to ensure that the allocated funds would be used, inter alia, for Global's directors and officers for litigation purposes, and providing for a carve out of those proceeds from the estate if Global filed for bankruptcy, was approved by the Bankruptcy Court. SunEdison Bankruptcy ECF No. 4096.

## D.     The Parties Engage in Mediation and Subsequent Negotiations

57.     The Settling Parties attended three initial mediation sessions with Judge Phillips and Gregory Lindstrom on February 10, 2017, February 27, 2017 and March 2, 2017. Prior to the first session, each party submitted comprehensive mediation statements with supporting exhibits setting forth the strengths and weaknesses of their case and, thereafter, submitted further mediation statements responding to one another's arguments. The parties disputed issues as to liability and damages, and debated those issues during the mediations. The parties' positions on the issues were repeatedly challenged by the opposing side during those sessions and thereafter. No settlement was reached at any of these sessions. In April 2017, the Settling Parties began having separate discussions with Gregory Lindstrom, who relayed back-and-forth the various proposals the parties made. These subsequent negotiations lasted until September 2017 and, while some progress was made towards narrowing the wide gap between the parties, they were still far apart when each accepted a proposal to conduct another face-to-face mediation session. Throughout this process,

Lead Counsel zealously advanced the Class' positions and was fully prepared to continue to litigate rather than accept a settlement that was not in the best interests of the Class. On October 31, 2017, with Defendants' Motion to Dismiss pending, the Settling Parties conducted that mediation session and reached a settlement in principle. They informed the Court of the proposed agreement by letter on November 1, 2017 (MDL ECF No. 252).

58.     Consistent with the parties' hard-fought and aggressive litigation of this Action, there were no productive settlement discussions until Lead Counsel had a thorough understanding of the strengths and weaknesses of the case. The mediation and settlement process included reviewing and analyzing: (i) documents filed publicly by Global with the SEC; (ii) documents filed in the SunEdison bankruptcy proceedings; (iii) publicly available information, including press releases, news articles, analyst reports and other public statements issued by or concerning Defendants as well as SunEdison; (iv) filings in other litigations involving SunEdison, Global and related entities, including other securities actions, whistleblower actions, ERISA actions and derivative actions; (v) information and advice provided by experts; (vi) analysis of potential damages and loss causation issues; and (vii) the applicable law governing liability for the claims and potential defenses. This analysis, in the Plaintiffs' judgment, has provided an adequate and satisfactory basis for the evaluation of an agreement to settle, as described herein. Moreover, as part of the agreement in principle, Plaintiffs' Counsel insisted that Global produce documents and allow for confirmatory discovery. The parties negotiated back-and-forth on this provision before Global agreed to provide discovery.

59.     On December 15, 2017, Plaintiffs filed with the Court the: (i) Stipulation and Agreement of Settlement with attached exhibits (ECF No. 161); (ii) Notice of Unopposed Motion For Preliminary Approval of Class Action Settlement (ECF No. 162); and (iii) Memorandum of Law

in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (ECF No. 163).   That same day, Defendants requested via a letter that the Court give prompt consideration to Plaintiffs' Unopposed Motion.  MDL ECF No. 268.  As a result of these filings, on December 19, 2017, the Court approved in all substantive terms Lead Plaintiff's Unopposed Motion for Preliminary Approval of the Class Action Settlement and scheduled a hearing on the Settlement for April 27, 2018.  MDL ECF No. 269.

60.     The $57 million cash Settlement Fund has been paid into an interest-bearing escrow account for the benefit of the Class.  This Settlement consideration and interest, after the deduction of attorneys' fees and expenses awarded by the Court, notice and administration expenses, and taxes and related expenses (the "Net Settlement Fund"), will be distributed among all Class Members who submit timely and valid Proofs of Claim ("Authorized Claimants"), in accordance with the Plan of Allocation described in the Notice.  The compromise embodied in the Settlement represents an excellent recovery for the Class.  The proposed $57,000,000 will provide Class Members a benefit now and without risk of no recovery sometime in the future if the litigation continued.

## IV.     MAILING AND PUBLICATION OF NOTICE OF SETTLEMENT

61.     In the Notice Order, the Court set a schedule for mailing the Settlement Notice and the Proof of Claim and Release ("Proof of Claim") to Class Members who could be identified with reasonable effort, and for publishing the Summary Notice in *Investor's Business Daily*, and for issuing it over *PR Newswire*.

62.     Submitted herewith is the Affidavit of Jose C. Fraga of Garden City Group ("GCG"), the Claims Administrator, regarding: a) mailing of the Settlement Notice and the Proof of Claim, and b) publication of the Summary Notice, which attests that a total of more than 18,759 Settlement Notices have been mailed to Class Members or representatives, and that the Summary Notice was

published in *Investor's Business Daily* on January 15, 2018 and that it was issued over *PR Newswire* on January15, 2018.

63.     The Settlement Notice states that objections to any aspect of the Settlement, the Plan of Allocation or the application for attorneys' fees and reimbursement of expenses must be filed by March 30, 2018.  To date, no objection by any Class Member has been received by Lead Counsel or been filed with the Court to any aspect of the Settlement or Plan of Allocation or request for attorneys' fees and reimbursement of expenses.  This fact supports Plaintiffs' Counsel's conclusion that they obtained an outstanding result for the Class.

## V.     FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

### A.     The Settlement Was Fairly and Aggressively Negotiated by Counsel

64.     As set forth above, the terms of the Settlement were negotiated by the Parties at arm's-length.  The Settlement was reached only after extensive protracted settlement negotiations with the substantial assistance of Judge Phillips and Greg Lindstrom.  Consistent with the Parties' hard-fought and aggressive litigation of this Action, Plaintiffs' Counsel spent many hours investigating the allegations of wrongdoing and assessing Plaintiffs' claims, while at the same time pursuing settlement discussions.  Once settlement discussions commenced, it took nine months for the Parties to reach agreement, during which time, after an initial stay, litigation continued.  The Parties had multiple mediation sessions and numerous telephone negotiations conducted by the mediators before an agreement was reached.

65.     The volume and substance of Plaintiffs' Counsel's knowledge of the merits and potential weaknesses of Plaintiffs' claims are unquestionably adequate to support the Settlement. This knowledge is based, first and foremost, on Plaintiffs' Counsel's extensive investigation prior to and during the prosecution of this Action, including, *inter alia*: (i) review of Global's IPO filings; (ii) review of Global's and SunEdison's press releases, public statements, SEC filings, regulatory

filings and reports, and securities analysts' reports and advisories about the Company and about SunEdison; (iii) review of media reports about the Company and about SunEdison; (iv) review of court filings in the litigation involving SunEdison and related entities; (v) review of filings in SunEdison's bankruptcy proceeding; (vi) consultation with a damages and loss causation expert and bankruptcy counsel; and (vii) research of the applicable law with respect to the claims asserted in the Action and the potential defenses thereto, including the viability of claims based on an IPO that arise from the actions of a different company rather than the issuer, and negative causation issues. This information, as well as the extensive mediation statements and responses, permitted Plaintiffs' Counsel to be well-informed about the strengths and weaknesses of their case and to engage in an effective mediation. In addition, Plaintiffs' Counsel reviewed and analyzed more than 420,000 pages of documents produced by Global, including the documents Global prepared in connection with its IPO and its filings to the SEC in connection with the IPO.

**B.    Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt**

66.    Another factor considered in assessing the merits of class action settlements - whether serious questions of law and fact exist – supports the conclusion that the Settlement is fair, reasonable and adequate to the Class.

67.    Throughout the course of the litigation, Defendants asserted that they possessed defenses to Plaintiffs' claims, including, but not limited to, that they did not make any material misstatements or omissions, negative causation, and that Plaintiffs' damages were dramatically lower than Plaintiffs claimed, if Plaintiffs were somehow able to prove liability. Moreover, Global insisted that even if Plaintiffs were able to prevail on their claims, Global's resources were limited and Plaintiffs would not be able to collect any substantial judgment given the limited insurance, which was wasting away and subject to competing claims, and Global's precarious financial

condition.  The Individual Defendants claimed they had sufficient defenses and, in any event, did not have any substantial assets to satisfy a judgment, and the Underwriter Defendants claimed they performed sufficient due diligence and would not be liable.  If the case continued, Defendants' motion to dismiss would be ruled on, and then, if necessary, Defendants would have moved for summary judgment to defeat the claims completely or significantly limit the scope of the Class' potential damages.  Thus, the Settlement is unquestionably better than another distinct possibility – no recovery for the Class.

> **1.     Defendants Would Argue that Plaintiffs Could Not Prevail on Their Claims**

68.     Without this Settlement, Defendants would have continued to argue that Plaintiffs could not prevail on their claims.  Defendants would have claimed that they did not make any materially false or misleading statements in the Registration Statement/Prospectus, and that Plaintiffs' claims were not actionable.  They would have contended that they made all necessary disclosures in the Offering Documents and that Plaintiffs' allegations concerned SunEdison, a separate company, which disclosed its own financial information in its own SEC filings.  Defendants further would have claimed that Plaintiffs did not challenge any of SunEdison's financials as being false and contended that information about SunEdison's liquidity was well-known to the market.  Moreover, Defendants would have claimed that any risks were thoroughly explained in the Offering Documents, including risks relating to SunEdison.

69.     Defendants would also have claimed that to the extent Plaintiffs alleged additional information about SunEdison's financial situation should have been disclosed in the Offering Documents, the events that gave rise to the alleged information that Plaintiffs claimed should have been disclosed all occurred after the date of the IPO, and thus could not have been included in the Offering Documents.  Besides these factual disputes, Defendants also would have continued to claim

that Plaintiffs' allegations were not actionable because the alleged misstatements were inactionable opinions, that some of the alleged misstatements were historical facts and not false, and that some of the alleged misstatements were forward-looking and accompanied by meaningful cautionary language.

70.     Had the Action continued, Defendants would also have argued that Plaintiffs claim alleging a Item 303 violation could not succeed because Global was not required to disclose a trend about SunEdison.  Defendants would have argued that there was no support for the claim that another company's trends needed to be disclosed instead of the issuer's trends.  In addition, Defendants would have argued that the facts purportedly supporting those trends did not exist at the time of the IPO and that Plaintiffs' allegations did not concern historical facts, which is what Item 303 requires to be disclosed, but instead concerned future events.

71.     While Plaintiffs believe that they could counter Defendants' claims, Plaintiffs understood that the they could have lost on any of the legal issues as there are not many cases that even address the specific type of situation in this Action, much less rule clearly in Plaintiffs' favor, where it is another company's financial situation that needed to be disclosed.  The Item 303 claim is also one that does not appear to have been addressed in this context.  Moreover, even if the motion to dismiss was defeated, Plaintiffs may not have been able to defeat a summary judgment motion on the issue of the timing of events relevant to the IPO.  Defendants are correct that Plaintiffs were not challenging the accuracy of SunEdison's financials, and that SunEdison disclosed its debt level every quarter.  Moreover, Defendants also had viable arguments about the Margin Loan and the Goldman Sachs Loan.  They claimed that at the time of the IPO, TERP's stock price would have needed to decrease approximately 15% in one week's time for the Margin Loan Trigger to occur when it did, and that such an event could not have been prophesized by Defendants.  As to the

Goldman Sachs Loan, Defendants claimed that it was not entered into until after the IPO, and based on the documents reviewed by Plaintiffs, it appears that it originally was not intended to be used to satisfy the margin call for the Margin Loan as Plaintiffs alleged.  In any event, any summary judgment motion would have been hard-fought and extensive, and Plaintiffs would have had no guarantee of success.  Even if such motions were denied, Plaintiffs' Counsel recognize that a finding of liability by a jury is never assured, and that Defendants would renew these arguments at trial.

72.     Even more concerning to Plaintiffs was that they might not have been able to collect on any judgment.  Global was in a precarious financial position with its future in doubt.  Its insurance coverage was shared, to some extent, by other defendants in the SunEdison-related actions and there existed other competing litigations against Global for which the insurance proceeds might be used to satisfy.  The insurance proceeds were also being used to litigate the various actions in which Global was involved.  Thus, it was questionable as to how much, if any, of those insurance proceeds would have been available if this Action had been litigated to summary judgment and trial.  While Global was operational, it was not profitable.  There was a possible acquisition of Global that came about during the pendency of this Action, which was eventually consummated after the Settlement was agreed upon, but the acquirer made it known that it would not participate in the mediation and there was no indication that it would be a possible source to contribute to any settlement.  In any event, if this Action was not resolved, the possible acquisition of Global may have resulted in continued hard-fought, protracted litigation for additional years with the complete depletion of insurance and unknown prospects for the viability of Global.  As to the other Defendants, the Individual Defendants did not appear to have significant assets, and the Underwriter Defendants had defenses that would have been difficult to overcome, including that they performed due diligence and acted in good faith in connection with the IPO.  Although Plaintiffs had counter-

arguments, there were no documents or other evidence indicating that liability against the Underwriters would be readily established.

73.     In addition, the risks of establishing liability posed by conflicting testimony and evidence would be exacerbated by risks inherent in all shareholder litigation, including the unpredictability of a lengthy and complex jury trial, the risk that the jury would react to evidence in unforeseen ways, the risk that a jury would find that some or all of the alleged misrepresentations were not material and the risk that the jury would find that no damages were caused by Defendants' actions.

74.     Among other things, this case also involved a number of complex issues, such as SunEdison's finances, including its debt levels, its purchases of energy projects for Global and TERP and the terms of loan agreements, including collateral and interest rates.  Assuming Plaintiffs survived Defendants' motion to dismiss and anticipated motions for summary judgment, presenting these complex issues to a jury would pose a particular risk to Plaintiffs' hopes for success at trial. Plaintiffs could not be certain that the jury would be able to understand these matters well enough to reach a factual determination in Plaintiffs' favor.  Thus, Plaintiffs faced the risk that Defendants' arguments may find favor with a jury and result in the Class losing at trial.

> **2.     Defendants Would Argue Negative Causation and that Plaintiffs Could Not Establish Loss Causation or Significant Damages**

75.     Plaintiffs also faced the risk that they would not be able to prove damages even if liability was established.  According to Defendants, negative causation existed and Plaintiffs would not be able to prove loss causation or damages because there were no disclosures made that led to a statistically significant stock price decline.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  Instead, the Defendants would contend that the market already knew about SunEdison's liquidity issues and any decline in Global's stock price and the resulting losses incurred by

shareholders were due primarily to the overall market decline and also industry-wide declines rather than any alleged misstatements in the Offering Documents.  Defendants would also have argued that even if Plaintiffs were able to establish their liability, damages were much lower than Plaintiffs estimated because, among other things, on the days in which Global's stock price decreased, there was no new information correcting a prior misrepresentation, and thus no recoverable damages.

76.     The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting expert opinions.  Moreover, the reaction of a jury to such complex expert testimony is highly unpredictable.  Expert testimony about damages could rest on many subjective assumptions, any one of which could be rejected by a jury as speculative or unreliable.  Conceivably, a jury could find that there were no damages or that damages were only a fraction of the amount that Plaintiffs sought.

77.     Although Plaintiffs' Counsel believe that they would be able to provide convincing expert testimony as to damages, and establish damages, we also realize that in the "battle of the experts," a jury might disagree with Plaintiffs' experts.  Accordingly, the risk of proving damages could not be eliminated until after a successful trial and the exhaustion of all appeals.  Thus, even if Plaintiffs prevailed in establishing liability, additional risks would remain in establishing both loss causation and the existence or amount of damages.

### C.     The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement

78.     Another factor in considering whether to approve class action settlements is the judgment of the parties that the settlement is fair and reasonable.  As outlined above, the Settlement is the product of arm's-length negotiations lasting over many months between adversaries with significant experience in securities class action litigation.

79.    Plaintiffs' Counsel strongly believe that the Settlement represents an excellent resolution for the Class under the circumstances.  As outlined above, the Settlement is fair, reasonable and adequate in all respects and should be approved by the Court.  Attached hereto are declarations by each of the Plaintiffs in support of the Settlement and also a Declaration by Judge Phillips.  *See* Exhibits 5, 6, 7 & 8.

80.    Furthermore, copies of the Settlement Notice have been mailed to more than 18,759 potential Class Members.  The date for objection is March 30, 2018, but at present, Lead Counsel is not aware of any objections to the Settlement or the Plan of Allocation that have been submitted by a Class Member.  Should any be timely filed between the date of this Declaration and the final approval hearing, we will address them in a supplemental memorandum to be filed no later than April 13, 2018.

## VI.    THE PLAN OF ALLOCATION

81.    Pursuant to the Notice Order and as set forth in the Settlement Notice, all Class Members who wish to participate in the distribution of the Settlement Fund must submit a proper Proof of Claim form.  As provided in the Stipulation, after deducing all appropriate taxes, administrative costs, attorneys' fees and expenses, the Settlement Fund (the "Net Settlement Fund") shall be distributed among Authorized Claimants, who will have their loss determined by the Claims Administrator based on their Global transactions (the "Recognized Loss").

82.    The Settlement Fund will be distributed in accordance with the proposed Plan of Allocation.  Each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's Recognized Loss bears to the total of the Recognized Losses of all Authorized Claimants.  Payment in this manner shall be deemed conclusive against all Authorized Claimants.  The proposed Plan of Allocation was prepared in consultation with Plaintiffs' financial

expert, who was familiar with the factual and legal issues in the Action.  There have been no objections filed to the Plan of Allocation to date.

83.     The Plan of Allocation reflects the allegations in the Complaint that Defendants made materially untrue and misleading statements and omissions resulting in violations of the Securities Act, and opinions of Plaintiffs' expert on the damages that were caused by the alleged disclosures and omissions of Defendants.  The objective of the Plan of Allocation is to equitably distribute the net Settlement proceeds to Class Members who suffered losses caused by the alleged violations of the federal securities laws, as opposed to losses caused by factors unrelated to the alleged violations of law.  The Plan of Allocation is based on Plaintiffs' damage theory as well as existing law.

84.     The Plan of Allocation is consistent with Plaintiffs' allegations and Plaintiffs' expert's findings that investors who purchased shares of Global common stock during the Class Period were damaged by Defendants' false and misleading statements.  An Authorized Claimant's Recognized Loss will be based upon the dates of purchase and sale in correspondence with the decline in the stock price of Global that was found to be reasonably attributable to the misstatements alleged in the SAC.  The Recognized Loss formula is not intended to be an estimate of the amount that will be paid to Authorized Claimants pursuant to the Settlement.  The Recognized Loss formula is simply the basis upon which the Net Settlement Fund will be proportionately allocated to Authorized Claimants.

85.     Lead Counsel respectfully submit that the Plan of Allocation is fair, reasonable and adequate, and should be approved by the Court.

## VII.     FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

86.     Despite working on this matter since October 2015, Plaintiffs' Counsel have not received any payment for their services in prosecuting this litigation, nor have they been reimbursed

for their out-of-pocket expenses incurred in the prosecution of the litigation.  The Settlement Notice provides that Plaintiffs' Counsel may apply for an award of attorneys' fees equal to twenty-five percent of the proceeds of the Settlement, plus expenses of up to $350,000, which were incurred in the litigation, plus interest thereon.  As set forth in Plaintiffs' Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, Plaintiffs' Counsel are requesting attorneys' fees of twenty-five percent of the proceeds from the Settlement, plus expenses of $209,650.28, plus interest earned thereon at the same rate that was earned on the Settlement Fund. The requested fee award of twenty-five percent is well within the range of fees awarded by Courts in this District and in courts throughout the country, and is, in fact, the benchmark in the Ninth Circuit for attorney fee awards, where this Action was originally filed and litigated.

87.     Plaintiffs' Counsel achieved this excellent result for the Class at great risk and substantial expense to themselves.  We were unwavering in our dedication to the interests of the Class and our investment of the time and resources necessary to bring this litigation to a successful conclusion as against the Defendants.  Plaintiffs' Counsel's compensation for the services rendered has always been wholly contingent.  The requested fee is reasonable based on the quality of Plaintiffs' Counsel's work and the substantial benefit obtained for Class.

88.     Indeed, the results obtained by Plaintiffs' Counsel for the Class are truly extraordinary given the obstacles that existed to obtaining a recovery of this amount.  Defendants have maintained throughout this litigation that they had no liability, that damages were far less than claimed and that even if a judgment were obtained, Plaintiffs would be unable to collect on it.  They insisted they made no material misstatements or omissions in the Offering Documents and that the claims asserted were not actionable.  Had the case proceeded, their motion to dismiss would have gone forward, and if any claims continued thereafter, Defendants would have moved for summary

judgment, on which they insisted they would have prevailed. Moreover, Global's sponsor, SunEdison, was in bankruptcy and Global was not receiving the energy projects it expected in order to grow its business, its insurance coverage was subject to many competing claims and was dwindling rapidly and Global's finances were precarious, at best. Thus, even if the litigation had continued, collection of a larger amount than the Settlement amount was doubtful.

89.     In addition, Defendants maintained that negative causation existed and loss causation did not exist. They claimed that any decline in the Company's stock price was not related to any misstatements or omissions that they made, but was caused by other factors that impacted the market and industry as a whole and was not a basis for recovery by the Plaintiffs. As such, Defendants contended that necessary causation did not exist and Plaintiffs would not be able to obtain a significant recovery. Defendants further claimed that even if some amount of the decline in the Company's price could be attributable to their actions, those damages would be small and any recovery by Plaintiffs would be much lower than the amounts being sought.

90.     Plaintiffs' Counsel's compensation for the services rendered was wholly contingent on their success. Demonstrating Plaintiffs' Counsel's tremendous commitment to this litigation, we have devoted more than 6,500 hours litigating this Action. The expenses incurred in the prosecution of the litigation are set forth in the accompanying declarations from Lead Counsel and the other Plaintiffs' Counsel, who contributed to the successful prosecution of the litigation. Each firm requesting reimbursement of expenses has declared that the expenses are reflected in the books and records maintained by the firm, and are an accurate recordation of the expenses incurred. In total, Plaintiffs' Counsel have incurred reimbursable expenses in the amount of $209,650.28. *See* Exhibits 2, 3 and 4 attached hereto, and Exhibit B to each of those Exhibits. These costs and expenses have been reasonably incurred and should be approved by the Court.

A.      Extent of Litigation

91.      As described above, this case was thoroughly investigated and litigated and settled only after extensive settlement negotiations, including four mediation sessions before Judge Phillips and numerous telephone negotiating sessions conducted by Gregory Lindstrom.  Plaintiffs' Counsel: thoroughly researched the law applicable to the Class' claims and Defendants' defenses, including whether Offering Documents must disclose information about a company other than the issuer, particularly where that non-issuer company files its own financial statements with the SEC, which were not being challenged as inaccurate, and whether a non-issuer company's trends could be a basis for an Item 303 claim based on future events rather than historical facts; consulted with an expert regarding damages and loss causation; drafted an initial complaint, a consolidated and amended complaint and a second amended complaint; drafted a lead plaintiff motion and opposition papers to a competing movant, who allegedly had a disabling conflict of interest because of its relation to one of the Underwriter Defendants, sought and obtained discovery from that movant and successfully opposed that movant when its representative cancelled a court-ordered deposition; drafted opposition papers to Defendants' motion to dismiss, responded to Defendants' pre-motion letters to the Court and drafted extensive mediation statements and responded to Defendants' mediation statement; consulted with bankruptcy counsel and drafted filings in SunEdison's bankruptcy proceeding to protect the interests of the Class, including filings to ensure that the Class' claims were not being released and that a portion of SunEdison's insurance coverage would remain available to Global to resolve litigations against it, including this Action; participated in the mediation sessions; reviewed and analyzed over 420,000 pages of internal documents produced by Global; and engaged in extensive settlement negotiations over many months with the Defendants.  In total, the 6,537.60 hours thus far devoted by Plaintiffs' Counsel in the prosecution of this case represents a total lodestar of $3,849,318.25.  *See* Exhibits 2, 3 and 4 attached hereto and Exhibit A to each of those

Exhibits.  Plaintiffs' Counsel's work in this case will not cease after final approval of the Settlement, however.   We anticipate spending significant time assisting Class Members with claims administration issues and in working with the Claims Administrator to ensure a prompt distribution of the Net Settlement Fund to the Class.

> **B.      Standing and Expertise of Plaintiffs' Counsel**

92.      Plaintiffs' Counsel are among the most experienced and skilled practitioners in the securities litigation field.   The attorneys at each of Plaintiffs' Counsel's firms have years of experience litigating securities class actions, and have been involved in cases that have recovered hundreds of millions of dollars for shareholders. *See* Exhibits 2, 3 and 4 attached hereto and Exhibit C to each of those Exhibits.

> **C.      Standing and Caliber of Opposition Counsel**

93.      Defendants are represented by outstanding law firms.   Defendants' law firms vigorously defended their clients, insisted they had no liability and gave every indication they were ready to proceed with the litigation, including to trial if necessary, if a settlement was not reached. In the face of this opposition, Plaintiffs' Counsel developed arguments so as to persuade Defendants to settle the case on a basis that is very favorable to the Class under the circumstances.

> **D.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases**

94.      This litigation was undertaken by Plaintiffs' Counsel on a wholly-contingent basis. From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require.  In undertaking that responsibility, Plaintiffs' Counsel were obligated to assure that sufficient resources were dedicated to the prosecution of this litigation and

that funds were available to compensate staff and for the considerable out-of-pocket costs which a case such as this entails.

95.     Because of the nature of a contingent practice in the area of securities litigation, where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also have to advance the expenses of the litigation. With an average lag time of three to four years for these cases to conclude, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis.

96.     The foregoing does not even take into consideration the possibility of no recovery. As discussed above, from the outset, this litigation presented a number of unique risks and uncertainties which could have prevented any recovery whatsoever.  It is wrong to assume that a law firm handling complex contingent litigation such as this one always wins.  Tens of thousands of hours have been expanded in losing efforts.  The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

97.     There are numerous cases where Plaintiffs' counsel in contingent cases, after the expenditure of thousands of hours, have received no compensation.  It is only the knowledge by Defendants and their counsel that the leading members of the Plaintiffs' securities bar are actually prepared to, and will, force a resolution on the merits and go to trial that permits meaningful settlements in actions such as this.

98.     There have been many hard fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

99.    For example, although a motion to dismiss was filed, but not decided, in this Action, there has been a recent trend toward dismissal of actions with prejudice at the pleading stage. Indeed, federal appellate reports are filled with opinions affirming dismissals with prejudice in securities cases.  *See, e.g., Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *Banker v. Gold Res. Corp. (In re Gold Res. Corp. Sec. Litig.)*, 776 F.3d 1103 (10th Cir. 2015); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014); *Deka Int'l S.A. v. Genzyme Corp. (In re Genzyme Corp. Sec. Litig.)*, 754 F.3d 31 (1st Cir. 2014); *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263 (3d Cir. 2013) (affirming dismissal of Securities Act claims as untimely); *In re Level 3 Communs. Sec. Litig.*, 667 F.3d 1331 (10th Cir. 2012); *Karpov v. Insight Enters., Inc.*, 471 F. App'x 607 (9th Cir. 2012); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011); *Campo v. Sears Holdings Corp.*, 371 F. App'x 212 (2d Cir. 2010); *Dronsejko v. Thornton*, 632 F.3d 658 (10th Cir. 2011); *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783 (11th Cir. 2010); *Fannon v. Guidant Corp.*, 583 F.3d 995 (7th Cir. 2009); *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009); *Stark Trading v. Falconbridge Limited*, 552 F.3d 568 (7th Cir. 2009); *Public Employees' Retirement Association of Colorado v. Deloitte & Touche LLP*, 551 F.3d 305 (4th Cir. 2009); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125 (9th Cir. 2004); *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir. 2003); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Schiller v. Physicians Res. Group, Inc.*, 342 F.3d 563 (5th Cir. 2003); *Gompper v. VISX, Inc.*, 296 F.3d 893 (9th Cir. 2002); *Wilkes v. Versant Object Tech.*

*Corp.*, 56 Fed. Appx. 322 (9th Cir. 2003); *Zishka v. Am. Pad & Paper Co.*, 72 Fed. Appx. 130 (5th Cir. 2003); *Romine v. Acxiom Corp.*, 296 F.3d 701 (8th Cir. 2002); *Seinfeld v. Bartz*, 322 F.3d 693 (9th Cir. 2003); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002); *ABC Arbitrage v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002); *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002); *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001); *Phila v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001); *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *Yourish v. Cal. Amplifier*, 191 F.3d 983 (9th Cir. 1999); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999).

100.     The many appellate decisions affirming summary judgments and directed verdicts for defendants show that even surviving a motion to dismiss is no guarantee of recovery.  *See In re Williams Sec. Litig. – WCG Subclass*, No. 07-5119, 2009 U.S. App. LEXIS 3032 (10th Cir. Feb. 18, 2009); *Shuster v. Symmetricom, Inc.*, 35 Fed. Appx. 705 (9th Cir. 2002); *Gross v. Nuveen Advisory Corp.*, 295 F.3d 738 (7th Cir. 2002); *In re Digi Int'l, Inc. Sec Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997).  Moreover, even plaintiffs who succeed at trial may find their judgment overturned on appeal.  *See, e.g., Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (*en banc*) (reversing

plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (same).

101.    The foregoing refutes the argument that the commencement of a class action is a guarantee of a settlement and payment of a fee.  Here, there was a demonstrable risk that the Class and its counsel would receive nothing.  It took hard and diligent work by skilled counsel, to develop facts and theories which persuaded the Defendants to enter into serious settlement negotiations.  If Defendants believe they will prevail, experience shows that they will litigate to the end.  The risk factor is real.

102.    Losses such as those described above are exceedingly expensive.  The fees that are awarded are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state and local authorities.  Moreover, changes in the law through legislation or judicial decree can be catastrophic, frequently affecting contingent counsel's entire inventory of pending cases.  These are real threats.

103.    Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  Vigorous private enforcement of the securities and corporation laws can only occur if the private plaintiffs can obtain parity in representation with that available to large institutional interests.  If this important public policy is to be carried out, the courts should award fees which will adequately compensate private plaintiffs' counsel, taking into account the risks undertaken with a clear view of the economies of a securities class action.

104.    When we undertook to act for the Plaintiffs in this matter, it was with the knowledge that we would spend many hours of hard work against some of the best defense lawyers in the

United States with no assurance of ever obtaining any compensation for our efforts.  The benefits conferred on the Class by this Settlement is particularly noteworthy in that a Settlement Fund worth more than $57 million was obtained for the Class despite the existence of substantial risks of no recovery in light of the vigorous defense mounted by Defendants.

      E.      **Plaintiffs' Counsels' Request for Payment of Expenses Incurred Is Reasonable and Should Be Approved**

105.    Plaintiffs' Counsel have submitted declarations setting forth the amounts of the expenses incurred over the course of the litigation.  These declarations are filed herewith.  *See* Exhibits 2, 3 and 4 attached hereto and Exhibit B to each of those Exhibits.  These expenses were necessarily incurred for the successful prosecution of this litigation and are reasonable in amount.

## VIII.  CONCLUSION

106.    For the reasons set forth above and in the accompanying Plaintiffs' Memorandum of Law in Support of Motion For Final Approval of Settlement and the Plan of Allocation and Plaintiffs' Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, we respectfully submit that: (a) the Settlement is fair, reasonable and adequate and should be finally approved; (b) the Plan of Allocation represents a fair method for the distribution of the Net Settlement Fund among Class Members and should also be approved; and (c) the application for attorneys' fees of twenty-five of the proceeds of the Settlement and expenses in the amount of $209,650.28, plus interest earned on both amounts, should be granted .

    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of our knowledge, information and belief.

    Executed on March 16, 2018.

                                            LAWRENCE D. LEVIT

- 42 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 16, 2018, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


                                                        s/ Lawrence D. Levit
                                                   LAWRENCE D. LEVIT

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone:  212/279-5050
Fax:        212/279-3655
E-mail:  llevit@aftlaw.com