UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CARLOS DOMENECH ZORNOZA,

                    Plaintiffs,

          -against-

TERRAFORM GLOBAL, INC., TERRAFORM
POWER, INC., AHMAD CHATILA, BRIAN
WUEBBELS, EMMANUEL HERNANDEZ and
PETER BLACKMORE,

                Defendants.
------------------------------------------------------------x

16-md-2742 (PKC)
18-cv-11617 (PKC)

OPINION
AND ORDER

CASTEL, U.S.D.J.

        Plaintiff Carlos Domenech Zornoza alleges that he was terminated because he

disclosed what he believed were material misrepresentations about the liquidity of non-party

SunEdison, Inc. ("SunEdison," or the "Company"). He brings a claim of whistleblower

retaliation under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, and claims for breach of

the implied covenant of good faith and fair dealing against defendants Terraform Global, Inc.

("Global") and Terraform Power, Inc. ("TERP").

        Defendants Ahmad Chatila and Brian Wuebbels move to dismiss the retaliation

claim against them for lack of personal jurisdiction under Rule 12(b)(2). They urge that the

Complaint does not make out a prima facie case that the claim arises out of their activities in

Maryland, where this case was originally filed prior to transfer by the Judicial Panel on

Multidistrict Litigation.

        Defendants TERP, Global, Wuebbels, Peter Blackmore and Emmanuel

Hernandez separately move to dismiss the Complaint for failure to state a claim pursuant to Rule

12(b)(6), Fed. R. Civ. P.  Blackmore and Hernandez argue that the text of section 1514A lists specific categories of persons who may be liable on a claim of whistleblower retaliation, and that because corporate directors are omitted from the list, Domenech fails to plausibly allege a claim against them.  Wuebbels likewise urges that he cannot be liable in his capacity as a director, and also argues that any claim against him in his capacity as a SunEdison officer should be dismissed because he was a "peer" of Domenech.  Separately, TERP and Global contend that due to certain contractual language, the Complaint does not plausibly allege causation and damages against them for the retaliation claim.  They also urge that because the express terms of certain stock agreements govern Domenech's compensation in the event of termination, he has failed to plausibly allege claims for the breach of the implied covenant of good faith and fair dealing.

For the reasons that will be explained, the Rule 12(b)(2) motion will be denied. The Rule 12(b)(6) motion is granted as to the Sarbanes-Oxley claims against Hernandez and Blackmore and the claims asserting breaches of the covenant of good faith and fair dealing against TERP and Global.  The remainder of the Rule 12(b)(6) motion is denied.

BACKGROUND.

A.  SunEdison's Formation of TERP and Global, and Domenech's Position at the Two "Yieldcos."

Around 2013, non-party SunEdison transitioned from the manufacture of semiconductors toward a business model centered on developing renewable-energy projects. (Compl't ¶¶ 31-32.)  It relied on short-term financing to develop renewable energy-power plants. (Compl't ¶ 32.)  As part of this model, SunEdison sponsored "yieldcos" that purchased SunEdison's finished energy plants and then operated the plants to produce cash dividends to yieldco investors.  (Compl't ¶ 33.)

Global and TERP were both formed by SunEdison to operate as yieldcos. (Compl't ¶¶ 34-35.) TERP bought and operated renewable energy projects in North America, Chile and the United Kingdom, whereas Global bought and operated renewable energy products in emerging markets. (Compl't ¶¶ 34-35.) SunEdison maintained "significant equity stakes" in Global and TERP, and held voting control over both. (Compl't ¶ 36.)

Domenech is the former President and CEO of Global and TERP, a former member of the boards of both companies, and a former executive vice-president of SunEdison. (Compl't ¶ 17.) In late 2013, Chatila, who was President and CEO of SunEdison and a member of its board, asked Domenech to act as CEO and president of TERP, with compensation to include specified grants of TERP shares. (Compl't ¶¶ 20, 38-39.) Under the arrangement, which was memorialized in a Restricted Stock Agreement of February 24, 2014, if Domenech's employment was terminated without cause, 50 percent of his unvested shares would immediately vest. (Compl't ¶ 40.) According to the Complaint, Chatila orally told Domenech multiple times that he would "ensure" that the SunEdison board would accelerate vesting 100% of Domenech's shares in the event Domenech was terminated for any reason. (Compl't ¶ 40.)

Domenech agreed to take the position. (Compl't ¶ 41.) He alleges that TERP's initial public offering was "a tremendous success" and the company thrived under his leadership. (Compl't ¶ 42.)

According to the Complaint, in light of TERP's success, SunEdison planned to launch Global, the second yieldco. (Compl't ¶ 43.) Chatila asked Domenech to sit on Global's board of directors and later asked him to be Global's president and CEO. (Compl't ¶¶ 44-45.) Chatila offered Domenech two grants of shares in Global through a long-term incentive plan. (Compl't ¶ 46.) The shares were to vest in tranches annually over a four-year period, but the

committee overseeing Global's long-term incentive plan had authority to accelerate vesting at any time for any reason.  (Compl't ¶ 47.)  Chatila told Domenech that Global's board could accelerate vesting if his employment was terminated without cause, or if there was reason to believe that termination was being considered.  (Compl't ¶ 48.)  Domenech asserts that in light of Chatila's statements, he agreed to be Global's president and CEO.  (Compl't ¶ 49.)

B.  Domenech's Growing Alarm over Public Statements Concerning SunEdison's Liquidity.

The crux of Domenech's complaint is that, as SunEdison struggled to maintain adequate liquidity over the course of 2015, he became increasingly alarmed about the Company's public statements and internal understanding of a growing liquidity crisis.  As described by Domenech, his concern was well-known within SunEdison, including by defendants Blackmore, Chatila, Hernandez and Wuebbels.  Domenech alleges that instead of attempting to address the growing liquidity problem, defendants orchestrated a scheme to terminate him from his positions at the two yieldcos.

According to the Complaint, in mid-September 2015, Domenech first raised concerns with Chatila about the "coherence and transparency" of Chatila's recent presentations about SunEdison's liquidity, including a public statement predicting imminent positive cash flows, which was made shortly after internal reports predicted that SunEdison would lose $425 million in the fourth quarter of 2015 and $32 million in the first quarter of 2016.  (Compl't ¶¶ 51-53.)

Chatila agreed that Domenech would "co-lead" a working group with defendant Wuebbels, which was to examine the "end-to-end cash cycle" to assess SunEdison's cash position and financing needs.  (Compl't ¶ 54.)  At that time, Wuebbels was SunEdison's CFO and executive vice president, as well as a director of both TERP and Global.  (Compl't ¶ 21.)  On

October 5, 2015, Domenech told Chatila that SunEdison had an estimated $342 million in available, unrestricted cash, but cautioned that the figure was an approximation. (Compl't ¶ 56.)

According to Domenech, on the following day, Chatila and Wubbels made presentations to banks claiming that SunEdison had $1.38 billion in available cash. (Compl't ¶ 57.) He immediately told Chatila and Wuebbels that this was a misrepresentation, one that could potentially violate securities laws. (Compl't ¶ 58.) The Complaint alleges that on October 7, Wuebbels publicly stated that SunEdison had $1.4 billion in available cash. (Compl't ¶ 59.)

That same day, Domenech met with non-party Steve Tesoriere, who sat on the boards of SunEdison, TERP and Global. (Compl't ¶ 60.) Domenech alleges that he told Tesoriere that Chatila and Wuebbels were publicly misrepresenting SunEdison's liquidity, potentially in violation of securities law, and suggested that the SunEdison board should begin an independent review of company liquidity and the statements of Chatila and Wuebbels. (Compl't ¶ 60.) The next day, Domenech convened a call with Tesoriere, defendant Hernandez (then the chairman of the SunEdison board) and non-party Francisco Perez Gundin, the Chief Operating Officer of SunEdison, in which Domenech restated concerns about SunEdison's liquidity and public statements. (Compl't ¶¶ 61-62.)

According to the Complaint, the SunEdison board then directed Chatila and Wuebbels to make a presentation to the board about SunEdison's liquidity, but did not take other steps, like hiring independent financial and accounting advisors. (Compl't ¶¶ 62-64.) Domenech alleges that he continued to raise his concerns, but that no other actions were taken. (Compl't ¶¶ 64-65.)

The Complaint alleges that in mid-October 2015, Chatila and Wuebbels proposed a transaction wherein a Global subsidiary would purchase the project of a SunEdison subsidiary

for $49 million.  (Compl't ¶ 66.)  Domenech alleges that he opposed the transaction for business reasons, including that the project would not have a high enough rate of return, was in early development and did not fit into Global's geographic criteria.  (Compl't ¶ 67.)  At the time, Domenech explained that in light of SunEdison's liquidity position, Global should not pre-pay it for projects that were in early development.  (Compl't ¶ 67.)  He urged that a fairness assessment be made by a qualified financial advisor before the transaction proceeded.  (Compl't ¶ 67.)

The Complaint alleges that on October 19, 2015, Chatila and Wuebbels presented preliminary financial forecasts to SunEdison senior management, which showed cash-burn rates of $801 million and $521 million for the next two financial quarters.  (Compl't ¶ 68.)  It alleges that around this time, Chatila met with senior executives to "coerce" them into changing revenue forecasts so that he could reduce the projected cash-burn rate.  (Compl't ¶ 69.)  Chatila then delayed a presentation to the SunEdison board about the company's cash position.  (Compl't ¶¶ 70-71, 75.)  Around the same time, Domenech had discussions with SunEdison directors, including defendant Hernandez, in which he questioned the truthfulness of Chatila and Wuebbels's internal and public statements.  (Compl't ¶¶ 71-72.)

Domenech alleges that he and three other senior executives were then disinvited from Chatila's planned presentation to the SunEdison board, and that defendant Hernandez told him he did not want face-to-face confrontations to occur at the meeting; instead, Domenech and others participated by phone for the portion of the meeting relating to SunEdison's cash position.  (Compl't ¶¶ 73-74.)  The Complaint alleges that Chatila and Wuebbels presented a cash forecast that "was starkly at odds" with the forecast given to management a week earlier, projecting a fourth-quarter burn rate of $256 million, a $394 million burn rate in the first quarter of 2016, and a net total burn of $643 million in cash for the next six quarters.  (Compl't ¶ 75.)  According to

the Complaint, Domenech and other executives were asked to comment on the forecasts. (Compl't ¶ 76.)  Domenech and three other executives allegedly shared strong reservations and disagreements with the forecasts.  (Compl't ¶¶ 77-80.)  Domenech stated that the assumptions underlying the forecasts were unclear, appeared to be inaccurate, were unduly optimistic and potentially misleading.  (Compl't ¶ 78.)

In a subsequent face-to-face meeting with two non-party SunEdison directors, Domenech repeated his concerns and suggested possible actions to remedy the company's liquidity problems.  (Compl't ¶ 82.)  Domenech alleges that in that same conversation, he expressed concern that he might face retaliation from Chatila, Wuebbels or the full SunEdison board.  (Compl't ¶ 83.)  The two board members thanked Domenech for "stepping up," asked him to trust the board to address the situation, and advised him to maintain focus on TERP and Global.  (Compl't ¶ 83.)

Domenech alleges that he also had several telephone calls with members of the TERP and Global boards.  (Compl't ¶¶ 85-86.)  Domenech told the yieldco boards that SunEdison may have violated securities laws by misrepresenting its cash position in public statements.  (Compl't ¶¶ 85-86.)

According to the Complaint, in SunEdison's 10-Q statement of November 9, 2015, and in subsequent earnings calls, SunEdison and Wuebbels continued to misrepresent the company's liquidity.  (Compl't ¶¶ 87-89.)  SunEdison claimed $1.4 billion in cash and cash equivalents, when it actually held about $497 million in unrestricted cash.  (Compl't ¶¶ 87-88.) The Complaint alleges that by November 18, 2015, SunEdison and its subsidiaries had only about $74 million in unrestricted cash; by November 20, it had approximately $700,000, when all subsidiaries were excluded from the calculation.  (Compl't ¶¶ 91, 93.)

Domenech further alleges that in order to "address its liquidity crisis and mask its prior misrepresentations," SunEdison attempted to force Global and TERP to engage in transactions that were against those companies' interests. (Compl't ¶¶ 94-103.) Wuebbels and Chatila allegedly urged expedited approval by TERP of a transaction wherein TERP would pay SunEdison $922 million to acquire assets of Vivint Solar, Inc., without providing financial information necessary for TERP's decisionmakers to evaluate the deal. (Compl't ¶¶ 95-99.) SunEdison also requested TERP to buy $104 million in TERP shares held by SunEdison. (Compl't ¶ 100.) The Complaint alleges that TERP's Conflicts Committee rejected SunEdison's proposals based on SunEdison's financial position and the risk the transactions posted to TERP and its shareholders. (Compl't ¶ 101.)

C. Domenech's Termination.

According to the Complaint, SunEdison, through the individual defendants, then retaliated against Domenech by terminating him for having exposed potential violations of the federal securities laws. (Compl't ¶¶ 104-14.) As described in the Complaint, SunEdison engineered a takeover of the boards of directors and conflicts committees of TERP and Global, replacing directors with SunEdison loyalists. (Compl't ¶¶ 105-09.)

With the new boards in place, on November 20, 2015, Domenech was terminated without cause from his position as president and CEO of the two yieldcos, effective immediately, and was replaced by defendant Wuebbels. (Compl't ¶¶ 111-12.) The Complaint alleges that these changes in personnel were made for the purpose of using Global and TERP to further the interests of SunEdison. (Compl't ¶¶ 113-14.) As characterized in the Complaint, the re-constituted boards and conflicts committees of the two yieldcos "immediately approved self-

dealing transactions" that diverted hundreds of millions of dollars to SunEdison from Global and TERP. (Compl't ¶¶ 115-21.)

Following delays to the filing of its annual 10-K, and an announcement that the SEC was investigating SunEdison, the Company filed for chapter 11 bankruptcy protection. (Compl't ¶¶ 122-27.)

D. Overview of Domenech's Claims.

Domenech originally filed his complaint in the District of Maryland, where he "resides" and where TERP and Global maintain their principal places of business. (Docket # 1; Compl't ¶¶ 17-19.) The Judicial Panel on Multidistrict Litigation transferred this case to the undersigned pursuant to 28 U.S.C. § 1407 for coordination and consolidation as part of the In re: SunEdison, Inc., Securities Litigation, MDL No. 2742. (Docket # 15.)

Count One of the Complaint brings a claim of retaliation against all defendants under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A. (Compl't ¶¶ 128-37.) Domenech alleges that he made disclosures to the boards of SunEdison, TERP and Global that were required or protected under Sarbanes-Oxley and the federal securities laws. (Compl't ¶ 130.) Domenech alleges that he had an objectively reasonable belief that that he had reported misconduct that violated a covered law, rule or regulation, and that his actions constituted protected activity. (Compl't ¶¶ 131-32.) He alleges that this protected activity was known to all defendants, and that it was the reason for his termination. (Compl't ¶¶ 133-37.)

Count Two alleges that Global breached the implied covenant of good faith and fair dealing contained in Domenech's stock agreements with Global. (Compl't ¶¶ 138-43.) Domenech alleges that he performed under the Global stock agreements and that Global acted in bad faith by unfairly interfering with his right to receive the agreements' benefits when it

terminated him without cause for engaging in protected activity. (Compl't ¶¶ 140-43.) Count Three alleges that TERP breached the implied covenant of good faith and fair dealing contained in Domenech's stock agreement with TERP, on the same bases alleged against Global. (Compl't ¶¶ 144-50.)

THE RULE 12(b)(2) MOTION IS DENIED.

I.  Rule 12(b)(2) Standard.

On a motion to dismiss for lack of personal jurisdiction, plaintiff bears the burden of demonstrating the court's personal jurisdiction over the defendant. Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 34-35 (2d Cir. 2010). The complaint's allegations are assumed to be true, and plaintiff need only make a prima facie showing of personal jurisdiction. Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 85 (2d Cir. 2013) (per curiam).

The court construes any pleadings and affidavits in the light most favorable to the plaintiff and resolves all doubts in plaintiff's favor. Id. at 85. However, courts should "not draw argumentative inferences in the plaintiff's favor" or "accept as true a legal conclusion couched as a factual allegation." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673 (2d Cir. 2013) (quotation marks omitted). A court has "considerable procedural leeway" on a Rule 12(b)(2) motion, and may decide it on the basis of affidavits alone, permit discovery in aid of the motion, or conduct an evidentiary hearing. Dorchester, 722 F.3d at 84.

In this case, neither side has submitted affidavits or documentary evidence in connection with the Rule 12(b)(2) motion, or urged that the Court should hold an evidentiary hearing. No party contends that jurisdictional discovery is required. The Court therefore decides the Rule 12(b)(2) motion based on the text of the Complaint.

Personal jurisdiction may be exercised over any defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  Rule 4(k)(1)(A), Fed. R. Civ. P.  Domenech brought this action in the District of Maryland, and it was subsequently transferred to this District by the Judicial Panel on Multidistrict Litigation.  (JPML Case No. 2742, Docket # 224.)  When a challenge to personal jurisdiction is raised in a case transferred by the JPML pursuant to 28 U.S.C. § 1407, personal jurisdiction is decided under the law of the transferor state.  See, e.g., In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 163 (2d Cir. 1987) ("'Transfers under Section 1407 are simply not encumbered by considerations of in personam jurisdiction and venue.  . . .  Following a transfer, the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer.'") (quoting In re FMC Corp. Patent Litig., 422 F. Supp. 1163, 1165 (J.P.M.L. 1976)).  Because this case was filed in the District of Maryland, specific personal jurisdiction is governed by Maryland's long-arm statute, Md. Code Cts. & Jud. Pro. § 6-103.

If plaintiff establishes a factual predicate for jurisdiction under the law of Maryland, then the court must then consider whether the exercise of jurisdiction is consistent with due process.  Walden v. Fiore, 571 U.S. 277, 283 (2014).

II.     Discussion.

    A.  Overview of Maryland's Long-Arm Statute.

Domenech urges that Chatila and Wuebbels are subject to specific personal jurisdiction under Maryland's long-arm statute, which states in relevant part: "A court may exercise personal jurisdiction over a person, who directly or by an agent: . . . (3) Causes tortious injury in the State by an act or omission in the State."  Md. Code, Cts. & Jud. Pro. § 6-103(b)(1),

(3).  "If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section."  Id. § 6-103(a).  The long-arm statute therefore provides for personal jurisdiction over Chatila and Wuebbels if the claims against them arise from a tortious injury that they caused in Maryland "by an act or omission in the State," whether by them directly or through an agent.  Domenech does not urge that Chatila or Wuebbels are subject to general personal jurisdiction in Maryland.

"In determining whether specific jurisdiction exists, [courts] consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable."  Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC, 388 Md. 1, 26 (2005); see also Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 61 (4th Cir. 1993) ("The purpose of the Maryland long-arm statute is to give the courts of the state personal jurisdiction over all out-of-state defendants who purposefully avail themselves of the privilege of conducting activities in Maryland, thus invoking the benefits and protections of Maryland law.  The statute permits the Maryland courts to assert personal jurisdiction over (1) persons who directly conduct activities in Maryland; and (2) persons who conduct activities in Maryland through an agent.") (citing Novack v. National Hot Rod Ass'n, 247 Md. 350, 353-57 (1967)).  "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts."  MaryCLE, LLC v. First Choice Internet, Inc., 890 A.2d 818, 832 (Md. Ct. Spec. App. 2006) (quotation marks omitted).

Retaliation under the Sarbanes-Oxley Act is the only claim against Chatila and Wuebbels.  (Compl't ¶¶ 128-37.)  The Complaint alleges that they knew or suspected that

Domenech had engaged in a protected activity, and that they "had a material role in the adverse action taken against Mr. Domenech." (Compl't ¶¶ 133, 136.)

B.  The Complaint Makes Out a Prima Facie Case of Long-Arm Jurisdiction Under Section 6-103(b)(3).

Domenech urges that Chatila and Wuebbels are subject to long-arm jurisdiction under section 6-103(b)(3), which allows for "personal jurisdiction over a person, who directly or by an agent . . . [c]auses tortious injury in the State by an act or omission in the State . . . ."

Section 6-103(b)(3) allows for jurisdiction when a federal statutory violation causes the plaintiff to suffer a tort-like injury. See, e.g., Planet Techs., Inc. v. Planit Tech. Grp., LLC, 735 F. Supp. 2d 397, 403-04 (D. Md. 2010) (applying subsection (b)(3) to Lanham Act claim). "To state a prima facie claim of retaliation under 18 U.S.C. § 1514A, an employee must show that: (1) he engaged in a protected activity or conduct; (2) the employer knew of that activity or conduct; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." Galinsky v. U.S. Dep't of Labor, Admin. Review Bd., 556 Fed. App'x 31, 32 (2d Cir. 2014) (summary order) (citing Bechtel v. Admin. Review Bd., 710 F.3d 443, 447 (2d Cir. 2013)). Therefore, in order for Maryland to have personal jurisdiction over Chatila and Wuebbels, the Complaint must make a prima facie case that they caused tortious injury to Domenech in Maryland by taking an unfavorable personnel action in Maryland as retaliation for engaging in a protected activity that was known to them.

Domenech urges that Chatila and Wuebbels committed a tortious act in Maryland when they directed Stephen Cerrone, SunEdison's director of human resources, to travel to Maryland "in their stead" to terminate him from TERP, Global and SunEdison. (Opp. Mem. 16-17.) Chatila and Wuebbels argue that the Complaint does not allege that Cerrone specifically

acted as an agent of Chatila and Wuebbels, as opposed to SunEdison, and note that the Complaint's allegations regarding Cerrone do not mention Chatila or Wuebbels by name. (Def Mem. 11; Compl't ¶ 111.)

The Court concludes that the Complaint makes out a prima facie case that Chatila and Wuebbels caused a tortious injury in Maryland when they participated in his retaliatory discharge. Fairly read, the Complaint alleges that when Cerrone effected Domenech's termination in Maryland, he was acting on behalf of Chatila and Wuebbels. Because the Complaint adequately alleges injury in Maryland based on Maryland conduct directed by Chatila and Wuebbels, Domenech has made out a prima facie case of personal jurisdiction.

First, the Complaint includes several allegations concerning the knowledge of Chatila and Wuebbels that Domenech was engaging in protected activity under Sarbanes-Oxley, including one conversation in which he directly told them that he believed they were misrepresenting SunEdison's liquidity and that their statements could violate securities laws. (Compl't ¶ 58.) The Complaint also alleges that on November 19, 2015 – one day before Domenech's termination – TERP's "Maryland-based" conflicts committee, with Domenech in attendance, declined a SunEdison request to release restrictions on TERP shares owned by SunEdison, and that Chatila called the decision an "act of war." (Compl't ¶ 102.)

The Complaint describes the roles played by Chatila and Wuebbels in changing the composition of the yieldcos' boards and senior management to effect Domenech's termination. Both yieldcos maintain their principal places of business in Maryland. (Compl't ¶¶ 18-19.) On November 20, 2015, Chatila resigned as chairman of the boards of TERP and Global but remained on both boards, with Blackmore succeeding him as chairman. (Compl't ¶¶ 106-07.) SunEdison, acting through its "loyalists" on the TERP and Global boards, then terminated

Domenech from his employment as president and CEO of the both TERP and Global, and removed him from the boards of both yieldcos. (Compl't ¶ 111.) Domenech learned of his termination in Maryland, where he was informed through Cerrone. (Compl't ¶ 111.) Wuebbels "immediately replaced" Domenech as president and CEO of TERP and Global. (Compl't ¶ 112.) The Complaint alleges that on a November 23, 2015 call with the executive leadership teams of the yieldcos, Chatila stated that the events of November 20 demonstrated that if executives were not "rowing in the same direction, the whole organization is going to reject them and eat them alive." (Compl't ¶ 114.)

These allegations describe a retaliatory termination that was communicated by Cerrone, face to face with Domenech at the direction of Chatila and Wuebbels. As defendants note, the Complaint's allegations concerning Cerrone's status as an agent do not describe the particulars of his relationship to Chatila and Wuebbels. (Compl't ¶ 111.) Fairly read, however, the allegations place Chatila and Wuebbels at the center of a scheme to cause injury in Maryland, with Cerrone carrying out the injury. The particulars concerning Cerrone's instructions related to Domenech are exclusively within the knowledge of the defendants. At the pleading stage, the allegations raise the inference that Cerrone was acting at the behest of Chatila and Wuebbels, i.e., in practical terms, he was their agent. This is not, as defendants suggest, an instance in which a plaintiff attempts to invoke personal jurisdiction over a corporate officer based on the corporation's business activities within the state. See, e.g., Birrane v. Master Collectors, Inc., 738 F. Supp. 167, 169 (D. Md. 1990).

Because the Complaint alleges a Maryland injury arising out of the Maryland contacts of Chatila and Wuebbels, it makes out a prima facie case of personal jurisdiction under

section 6-103(b)(3). The Court therefore need not reach the alternative grounds for exercising specific jurisdiction under 6-103(b)(1).

      C.   The Exercise of Personal Jurisdiction over Chatila and Wuebbels Is Consistent with Due Process.

In addition to satisfying the long-arm statute, any exercise of personal jurisdiction must be consistent with due process. Walden, 571 U.S. at 283. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." Id. at 286 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).

"The due process analysis proceeds in two steps. First, courts evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test. Where the claim arises out of, or relates to, the defendant's contacts with the forum – i.e., specific jurisdiction is asserted – minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 82 (2d Cir. 2018) (quotation marks omitted); see also U.S. Bank Nat'l Ass'n v. Bank of Am. N.A., 916 F.3d 143, 150 (2d Cir. 2019) ("At the first step, the minimum contacts inquiry is 'satisfied if the defendant has purposefully directed his activities at residents of the forum.'") (quoting Burger King, 471 U.S. at 472).

"A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." Walden, 571 U.S. at 286. The inquiry does not focus on a defendant's connection to the plaintiff in isolation, and looks to contacts that the defendant created with the

- 16 -

forum related to the cause of action.  Id. at 287-88; see also Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty., 137 S. Ct. 1773, 1781 (2017) (where defendant's ties with the forum are unrelated to the cause of action, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State."); Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 169-70 (2d Cir. 2013) ("Where, as in this case, the plaintiffs ask the district court to assert specific jurisdiction over the defendants, the jurisdictional inquiry focuses on the 'affiliation between the forum and the underlying controversy.'") (quoting Goodyear Dunlop Tires Operations S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011)).

On the second step of the due process analysis, "once minimum contacts are established, a court considers those contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." Charles Schwab Corp., 883 F.3d at 82.  Courts may consider the burden on the defendant and the forum state's interest in adjudicating the dispute, among other factors.  Burger King Corp., 471 U.S. at 476-77.

The Court concludes that Chatila and Wuebbels each had contacts with Maryland sufficient to satisfy the first step of the due process analysis.  First, as already discussed, the Complaint alleges that they both directed a tortious injury in Maryland when they participated in Domenech's retaliatory discharge in Maryland and effectuated that discharge in Maryland through an agent.  This was "intentional conduct by the defendant[s] that creates the necessary contacts with the forum," sufficient that each could anticipate being haled into court in Maryland.  Walden, 571 U.S. at 286.

While these intentional Maryland contacts satisfy due process, Chatila and Wuebbels each had additional Maryland contacts that relate to the cause of action. While not elements of the section 1514A claim, they are Maryland contacts that are relevant to the underlying controversy, specifically including defendants' supervisory authority over Domenech and their disputes with him leading up to his termination.

Chatila was the chairman of the boards of both TERP and Global prior to November 20, 2015, after which, he was a director of the two yieldcos. (Compl't ¶ 20.) The Complaint alleges that Chatila personally exerted pressure on TERP's "Maryland-based" conflicts committee to approve SunEdison-favorable transactions, including prepayments for assets and extending an unsecured loan, and that Chatila made unfavorable comments about the committee when it declined to do so. (Compl't ¶¶ 99, 101-02.) Separately, Wuebbels was a director of both yieldcos, and immediately succeeded Domenech as their president and CEO. (Compl't ¶ 21.) The Complaint alleges that in November 2015, Wuebbels asked TERP's "Maryland-based" conflicts committee to approve a "self-dealing transaction" that would result in $922 million in aggregate cash being transferred from TERP to SunEdison. (Compl't ¶¶ 95, 97, 102.) These intentional contacts with Maryland are facts relevant to Domenech's cause of action and support the exercise of jurisdiction consistent with due process.

On the second step of the due process analysis, Chatila and Wuebbels argue that subjecting them to Maryland's personal jurisdiction does not comport with fair play and substantial justice. They argue that Maryland's exercise of jurisdiction would be unreasonable and unduly burdensome because Chatila resides in California and Wuebbels resides in Illinois, and that Maryland's interest are not implicated in this case. (Def. Mem. 15-16.) They have not demonstrated why Maryland's jurisdiction would be unduly burdensome, aside from the fact that

they reside in different states.  The Court also concludes that Maryland has an interest in adjudicating alleged retaliatory conduct carried out in the state.

The Court concludes that Chatila and Wuebbels each had intentional contacts with Maryland sufficient that they could anticipate being haled into a Maryland court, and that these contacts relate to Domenech's retaliation claim against them.  Maryland jurisdiction over them is therefore consistent with due process.

The Rule 12(b)(2) motion of Chatila and Wuebbels is therefore denied.

THE RULE 12(b)(6) MOTION IS GRANTED IN PART AND DENIED IN PART.

I.   Rule 12(b)(6) Standard.

Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth.  Id.  Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

A complaint is "'deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.'"  Cohen v. Rosicki, Rosicki & Assocs., P.C., 897 F.3d 75, 80 (2d Cir. 2018) (quoting L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d

Cir. 2011)).  The Court may therefore consider such documents, including those submitted by a defendant, as part of a Rule 12(b)(6) motion without converting the motion into one for summary judgment.  Holowecki v. Fed. Exp. Corp., 440 F.3d 558, 565-66 (2d Cir. 2006).

II. Discussion.

A.  Section 1514A Does Not Provide for Director Liability.

Hernandez and Blackmore urge that Domenech's retaliation claim against them should be dismissed because the Sarbanes-Oxley Act does not provide for director liability on a claim of retaliation.  Wuebbels, who was a director of the yieldcos and an officer of SunEdison, urges that the retaliation claim should be dismissed against him as to any actions taken in his capacity as a director.  They note that the anti-retaliation statute lists specific categories of persons who may be liable for retaliation, but does not include directors.  They urge that, applying the plain language of the statute, Domenech's claims against them must be dismissed.

The anti-retaliation provision of the Sarbanes-Oxley Act states that "[n]o company . . . or any officer, employee, contractor, subcontractor, or agent of such company . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act" related to informing authorities or supervisors of suspected violations of the securities laws.  18 U.S.C. § 1514A(a).  Notably, a member of a corporation's board of directors is not expressly mentioned.

Blackmore and Hernandez urge that they are not proper defendants under section 1514A because neither of them was an "officer, employee, contractor, subcontractor, or agent" of SunEdison or the yieldcos at the time of Domenech's termination.  Hernandez was chairman of SunEdison's board until November 20, 2015, after which he held the title of Executive Chairman.  (Compl't ¶ 22.)  Blackmore was a director of SunEdison until November 20, 2015,

after which he was chairman of the boards of TERP and Global and a member of their conflicts committees. (Compl't ¶ 23.) Wuebbels, who was a director of TERP and Global, urges that he cannot be sued in his capacity as director, though he does not dispute that he is eligible under the statute to be sued in his capacity as a SunEdison officer.

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." Food Mktg. Inst. v. Argus Leader Media, 139 S. Ct. 2356, 2364 (2019); accord Dobrova v. Holder, 607 F.3d 297, 301 (2d Cir. 2010) ("'Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there.'") (quotation marks omitted). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (quotation marks omitted); see also John Wiley & Sons, Inc. v. DRK Photo, 882 F.3d 394, 405 (2d Cir. 2018) ("the interpretive canon of expressio unius est exclusio alterius instructs that Congress's expression of one or several items in an enumerated list typically reflects an intent to 'exclude[ ] another left unmentioned.'") (quoting N.L.R.B. v. SW Gen., Inc., 137 S. Ct. 929, 940 (2017)). "Courts are required to give effect to Congress' express inclusions and exclusions, not disregard them." Nat'l Ass'n of Mfrs. v. Dep't of Def., 138 S. Ct. 617, 631 (2018).

Domenech notes that judicial application of the expression unius interpretative rule should be applied with caution, and that the omission of directors from the statutory text should not be read to preclude a plaintiff from bringing claims against them. See, e.g., Marx v. Gen. Revenue Corp., 568 U.S. 371, 381 (2013) ("We have long held that the expressio unius canon does not apply unless it is fair to suppose that Congress considered the unnamed

possibility and meant to say no to it, and that the canon can be overcome by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion.") (internal citations and quotation marks omitted). However, other Sarbanes-Oxley provisions expressly allow for director liability, which strongly suggests that Congress considered and rejected extending liability to directors on a claim of retaliation. <u>See</u> 15 U.S.C. § 7244(a)(1) (making it unlawful for "any director or executive officer of an issuer" to transact in securities during blackout periods); <u>id.</u> § 7242(a) (making it unlawful for "any officer or director . . . to take any action to fraudulently influence . . . any independent public or certified accountant . . . ."). The statute also uses the terms "directors" and "agents" to distinguish different categories of individuals. <u>See</u> 15 U.S.C. § 78u-3(c)(3)(A)(i) (authorizing temporary relief against "directors, officers, partners, controlling persons, agents, or employees . . . .").

Simply put, in drafting Sarbanes-Oxley, lawmakers used the word "director" when they meant director, "agent" when they meant agent and "directors . . . [or] agents" when they meant either. With language so plain, the Court need not endeavor to discern whether the omission of directors from section 1514A was the product of a wise policy choice, political compromise or inadvertence.

The Court is aware of one decision addressing whether a director can be liable under section 1514A, and it answered in the affirmative. In <u>Wadler v. Bio-Rad Labs., Inc.</u>, 141 F. Supp. 3d 1005, 1017-18 (N.D. Cal. 2015), the court concluded that section 1514A was ambiguous as to "the meaning of the word 'agent'" and observed that the term "may or may not encompass directors . . . ."[1] Because it considered the word "agent" to be ambiguous, the district

---

[1] The <u>Wadler</u> case proceeded to a plaintiff's verdict at trial; the Ninth Circuit vacated judgment and remanded the case based on an error in the jury instructions and did not discuss director liability under section 1514A. <u>Wadler v. Bio-Rad Labs., Inc.</u>, 916 F.3d 1176 (9th Cir. 2019). Separately, <u>Buchanan v. Sterling Constr. Co., Inc.</u>, 2017 WL

judge looked to Congress's intent in drafting the anti-retaliation provision.  Id. at 1018-19.  It explained that Congress intended to give heightened protection to corporate whistleblowers in light of the Enron corporate scandals, and "that purpose would be significantly undermined were the Court to construe the term 'agent' in Sarbanes-Oxley as excluding directors."  Id. at 1018.  The decision quoted and summarized statements from lawmakers and regulators explaining the law's purpose, and noted that other statutes, such as the Fair Labor Standards Act, broadly defined terms such as "employer."  Id. at 1018-19.  Wadler concluded that Congress intended the term "agent" to encompass directors, given "the context and broad purpose of Sarbanes-Oxley . . . ."  Id. at 1019.

This Court respectfully disagrees with the reasoning of Wadler.  The Court does not discern ambiguity in the text of section 1514A(a).  The statute expressly identifies categories of persons who may be liable for retaliation.  Had Congress intended to impose liability on directors, it could have listed them with "any officer, employee, contractor, subcontractor, or agent . . . ."  18 U.S.C. § 1514A(a).  Alternatively, Congress could have drafted broader language directed to persons with decision-making or hiring-and-firing authority, or indicated that the list of potentially-liable positions was illustrative or non-exhaustive.  It did not do so.

The Court similarly does not discern an ambiguity as to the statute's use of the word "agent."  As mentioned, a different provision of Sarbanes Oxley uses the terms "directors" and "agents" to describe separate categories of persons.  See 15 U.S.C. § 78u-3(c)(3)(A)(i) (noting possible violations of "directors, officers, partners, controlling persons, agents, or employees . . . .").  "[A] statute is to be considered in all its parts when construing any one of

---

6888308, at *4 (S.D. Tex. July 26, 2017), declined to reach the issue of director liability at the pleading stage because the defendant was separately sued in his capacity as a corporate officer.

them." Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 36 (1998). "[T]he 'normal rule of statutory construction'" is that "'identical words used in different parts of the same act are intended to have the same meaning.'" Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995) (quoting Department of Revenue of Ore. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994)). The distinction between a corporation's "directors" and "agents" used elsewhere in the statute is inconsistent with broadly defining "agent" to include a corporate director.

Further, corporate directors generally are not understood to function as agents: "Neither the board of directors nor an individual director of a business is, as such, an agent of the corporation or of its members." Restatement (Second) of Agency § 14C (1958); see also Arnold v. Soc'y for Sav. Bancorp, Inc., 678 A.2d 533, 539-40 (Del. 1996) ("Directors, in the ordinary course of their service as directors, do not act as agents of the corporation . . . . A board of directors, in fulfilling its fiduciary duty, controls the corporation, not vice versa."). "An individual director, as such, has still less resemblance to an agent than has the board as a body. He has no power of his own to act on the corporation's behalf, but only as one of the body of directors acting as a board." Restatement (Second) of Agency § 14C, cmt. b. Wadler accurately noted that "'[s]ome corporation statutes treat directors as agents for specific purposes.'" 141 F. Supp. 3d at 1017 (quoting Restatement (Third) of Agency § 1.01, cmt. f(2) (2006)). But Domenech does not point to any such statute that treats directors as agents for the purposes of his claim.

Finally, because section 1514A(a) expressly provides that "[n]o company" may retaliate against a whistleblower for protected activity, Congress could reasonably have concluded that liability for the retaliatory actions of a board should lie with the company itself, as opposed to allocating liability among the individual directors. The statute's omission of

directors from its list of potentially-liable persons is consistent with a legislative decision to attribute responsibility to the company as a whole, as opposed to its directors individually.

The Court concludes that the plain text of section 1514A does not provide for director liability. The retaliation claim against Hernandez and Blackmore will therefore be dismissed.

### B. The Complaint Does Not Otherwise Allege that Blackmore or Hernandez Were Officers or Agents of SunEdison.

In the alternative, Domenech argues that the Complaint plausibly alleges Hernandez and Blackmore functioned as "agents" or "officers" of SunEdison, separate from their performance as directors. (Opp. Mem. at 16-19.) Domenech therefore urges that they fall within the category of persons who may be subject to liability under section 1514A. The Court concludes, however, that the Complaint describes them as functioning as directors, not as corporate officers or agents.

The Complaint identifies Blackmore as a nine-year director of SunEdison and chairman of the board's corporate governance committee. (Compl't ¶ 3, 23.) It does not identify him as an officer. The Complaint alleges that Blackmore failed to seek an independent, external review of SunEdison's liquidity situation; that he knew about the Company's low cash reserves; that he attended board meetings that where presentations were made on SunEdison liquidity; and that he continued to support Chatila during his tenure. (Compl't ¶¶ 63, 71, 76-79, 84.) Just before the yieldcos terminated Domenech, Blackmore resigned from the SunEdison board and was appointed chairman of both yieldcos' boards. (Compl't ¶¶ 6, 23, 107.) As an alleged SunEdison "loyalist[]" and "surrogate," he voted in favor of transactions that were allegedly detrimental to the yieldcos and favorable to SunEdison. (Compl't ¶¶ 108-09, 115-21.) While the on the yieldcos' boards, he allegedly "retaliate[d] against Mr. Domenech by terminating him

without cause from his employment as President and CEO of GLBL and TERP and removing him from the GLBL and TERP Boards." (Compl't ¶ 111.)

These allegations do not plausibly allege that Blackmore functioned as an "officer" or "agent" of SunEdison. Domenech attributes various acts of bad faith and/or mismanagement to Blackmore, but, accepting the truth of the Complaint's allegations, they occurred in his capacity as a director of SunEdison, and, thereafter, the yieldcos. The Complaint does not allege that Blackmore formally acted in the capacity of an agent or officer, nor does it describe conduct that is the functional equivalent of an agent or officer.

As to Hernandez, the Complaint alleges that he was chairman of SunEdison's board, and held the title of Executive Chairman after November 20, 2015. (Compl't ¶ 22.) It alleges that Hernandez was aware of SunEdison's liquidity problems, including through multiple direct conversations with Domenech. (Compl't ¶¶ 61-65, 71, 73.) Domenech alleges that he told Hernandez that he believed Chatila and Wuebbels may have violated federal securities laws. (Compl't ¶ 64.) The Complaint alleges that Hernandez then asked Domenech to "trust" the SunEdison board, and told him that the board "needs to go through a process" given the serious nature of Domenech's concerns. (Compl't ¶ 65.) The Complaint also alleges that Hernandez was a longtime mentor and friend to Chatila. (Compl't ¶ 63.)

As with Blackmore, these allegations do not plausibly allege that Hernandez functioned as an "officer" or "agent" of SunEdison. The allegations principally relate to Hernandez's knowledge of SunEdison's liquidity problems and conversations where Domenech directly relayed his concerns about liquidity-related statements made by Chatila and Wuebbels. Hernandez's actions or inactions related to the Company's liquidity, and his conversations with

Domenech about Chatila and Wuebbels, were consistent with his position as a director, and not with the responsibilities of a corporate officer or agent.

Because the Complaint does not plausibly allege that Blackmore or Hernandez functioned as officers or agents of SunEdison, as opposed to directors, it does not plausibly allege that they fall within the category of persons who may be liable under section 1514A. [2]

### C.  Wuebbels's Motion to Dismiss the Section 1514A Claim Against Him in His Capacity as a SunEdison Officer Is Denied.

Wuebbels urges that the Sarbanes-Oxley claim against him in his capacity as a SunEdison officer should be dismissed because he was a "peer" of Domenech and therefore incapable of taking retaliatory action against him.  For the reasons that will be explained, the motion is denied.

As previously discussed, Domenech repeatedly vocalized his concerns that Wuebbels may have violated federal securities laws by publicly misrepresenting SunEdison's liquidity, and directly expressed this view to Wuebbels.  (E.g., Compl't ¶¶ 58, 61, 64.)  The Complaint alleges that Wuebbels knew Domenech had engaged in protected activity and plausibly describes why Wuebbels would have had a retaliatory motivation toward Domenech. See, e.g., Galinsky, 556 Fed. App'x at 32 (listing elements of section 1514A retaliation claim). It also alleges Wuebbels's participation in the November 20, 2015 changes to the boards and leadership of the two yieldcos, specifically including his succession to Domenech's former positions at TERP and Global.  (Compl't ¶ 112.)

---

[2] By contrast, as previously discussed in connection with the Rule 12(b)(2) motion, Stephen Cerrone was alleged to have acted at the behest of Chatila and Wuebbels, and therefore is plausibly alleged to have been an agent for section 6-103(b)(3) purposes.  Blackmore and Hernandez, by contrast, are not alleged to have taken specific actions at the instruction of SunEdison or any person, and are described as functioning as directors.

Whether Wuebbels was actually a "peer" of Domenech, with no actual authority to retaliate against him, goes beyond the face of the Complaint and is not properly resolved on a Rule 12(b)(6) motion. Wuebbels emphasizes that the two co-chaired a working group concerning the Company's "end-to-end cash cycle." (Def. Mem. 8-10; Compl't ¶ 54-56.) But their joint participation in an internal working group does not go toward whether Wuebbels had the ability or authority to take retaliatory action against Domenech, including to "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against" him. 18 U.S.C. § 1514A(a). To the extent that the issue of whether the two were "peers" is relevant, it cannot be resolved at the pleading stage.

Wuebbels's motion to dismiss the retaliation claim brought against him in his capacity as a SunEdison officer will be denied.

### D. TERP and Global's Motion to Dismiss the Section 1514A Claim Is Denied.

TERP and Global urge that the Complaint fails to allege that they have a causal connection to the alleged retaliatory termination of Domenech and to any resulting damages. They argue that Domenech has alleged damages in the form of lost compensation, including salary, benefits and stock grants owed to him by SunEdison for his performance as a SunEdison employee, and not for his work at the yieldcos.

The motion of TERP and Global will be denied.

As an initial matter, TERP and Global rely on the terms of three stock agreements. While it is not immediately apparent that these agreements are incorporated by reference in the Complaint, the Court is satisfied that, based on the parties' memoranda, the agreements form the basis of certain of Domenech's claims, and they are properly considered on a motion to dismiss. Exhibits A, B and C to the Perla Declaration are stock agreements executed

by Domenech and two entities: SunEdison yieldco, Inc. and SunEdison Emerging Markets Yield, Inc. In a footnote, defendants indicate that SunEdison yieldco, Inc. was TERP's predecessor and SunEdison Emerging Markets Yield, Inc. was Global's predecessor. (Def. Mem. at 16 n.4.) The Complaint expressly references a TERP Stock Agreement of February 24, 2014 (Compl't ¶¶ 40, 145), but the three agreements offered by defendants are dated February 20, 2014, September 26, 2014 and March 31, 2015. (Perla Dec. ¶¶ 3-5 & Exs. A-C.) However, Domenech does not dispute that Exhibits A through C are the relevant stock agreements, does not urge that they may not be appropriately considered on a Rule 12(b)(6) motion, and cites to their contents in opposition to the motion. Similarly, Domenech does not dispute that the long-term incentive plans of TERP and Global are properly considered in connection with this motion. (Perla Dec. Exs. D, E.) Because there is no dispute that the Complaint incorporates these agreements by reference, the Court will consider them as part of this Rule 12(b)(6) motion.

However, defendants have not directed the Court to language in the agreements demonstrating that, as a matter of law, Domenech's compensation was based solely on his employment with SunEdison and not his employment with the two yieldcos. Defendants broadly cite to certain paragraphs of the three agreements and the long-term incentive plans of TERP and Global. (Def. Mem. 16; Perla Dec. Exs. A-E.) But they do not point to specific language that allows the Court to meaningfully construe and interpret the contracts and thus conclude as a matter of law that Domenech's compensation package was conditioned on employment with SunEdison and not the two yieldcos. Defendants would have the Court pore through the five agreements to determine how their provisions are incorporated into one another, which entities are properly defined as an "Affiliate" and the construction of the word "Termination." (See Def. Mem. 16.) Domenech, for his part, points to language in one agreement that refers to his

"continued service with the Company or any of its Affiliates or Subsidies" as support that his termination from the yieldcos resulted in lost compensation. (Perla Dec. Ex. A § 3(a).)  While an integrated and unambiguous contract is appropriately considered on a Rule 12(b)(6) motion, see, e.g., Keiler v. Harlequin Enter. Ltd., 751 F.3d 64, 69 (2d Cir. 2014), defendants' discussion of the agreements is cursory and superficial, and does not demonstrate that the Complaint fails to plausibly allege a claim for relief against the two yieldcos.

Further, in addition to any wages, benefits or shares that Domenech claims were lost due to his termination, there is authority for the proposition that section 1514A provides for "noneconomic compensatory damages, including emotional distress and reputational harm." Halliburton, Inc. v. Admin. Review Bd., 771 F.3d 254, 264-67 (5th Cir. 2014); see also Jones v. Southpeak Interactive Corp. of Delaware, 777 F.3d 658, 672 (4th Cir. 2015) ("[T]he Sarbanes–Oxley Act whistleblower protection provisions proscribe a wide range of retaliatory actions, including threats and harassment.  There will be times when the primary harm will be noneconomic.") (internal citation omitted); Feldman-Boland v. Stanley, 2016 WL 3826285, at *6 (S.D.N.Y. July 13, 2016) ("With respect to damages for emotional distress, every circuit court to address the issue holds that such damages may be recoverable pursuant to SOX's language stating that a prevailing employee 'shall be entitled to all relief necessary to make the employee whole.'") (Pauley, J.) (quoting 18 U.S.C. § 1514A(c)(1)).  The prayer for relief seeks compensatory damages for anguish and emotional distress.  (Compl't at 44.)  It is possible that, even if Domenech's compensation turned entirely on his employment with SunEdison and not the yieldcos, he could still be entitled to non-economic damages for retaliatory acts of the yieldcos.

For the foregoing reasons, the motion of TERP and Global to dismiss the Sarbanes-Oxley retaliation claim against them is denied.

### E. The Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing Are Dismissed.

Count Two of the Complaint asserts that Global breached the implied covenant of good faith and fair dealing contained in Domenech's stock agreements with Global. (Compl't ¶¶ 138-43.) Count Three brings the same claim as to TERP. (Compl't ¶¶ 144-50.) Both claims allege that Domenech performed as promised, but that TERP and Global deprived him of benefits under their respective agreements by retaliating against him for protected whistleblowing activities. (Compl't ¶¶ 140-41, 146-47.) He alleges that as a result of his termination, "he suffered the loss of benefits, equity award vesting, and other money that he would have received" had TERP and Global fully performed. (Compl't ¶¶ 143, 149.)

The parties agree that the relevant stock agreements contain a Delaware choice-of-law provision and are therefore governed by Delaware law. Under Delaware law, "[a] duty of good faith and fair dealing is implied in every contract." Connelly v. State Farm Mut. Auto. Ins. Co., 135 A.3d 1271, 1274 (Del. 2016). It "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 888 (Del. Ch. 2009) (quotation marks omitted). It "is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions," but it is also "a limited and extraordinary legal remedy." Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC, 202 A.3d 482, 507 (Del. 2019) (quotation marks omitted). It "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected

one party to a contract." <u>Id.</u> (quotation marks omitted). "[T]he implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand." <u>Id.</u> (quotation marks omitted).

Here, the agreements were "not truly silent" about the shares owed to Domenech in the event of his termination, and included provisions expressly governing the issue. The TERP agreement provided that if Domenech was terminated "for any reason," fifty percent of his unvested TERP shares "shall immediately vest" and the other fifty percent would be forfeited. (Perla Dec. § 3(e).) The Global agreements provided that all of Domenech's shares in Global would be forfeited in the event of his termination "for any reason." (Perla Dec Ex. B § 3(e), Ex. C § 3(e).) All three agreements gave a board committee discretion to accelerate vesting "at any time and for any reason." (Perla Dec. Ex. A § 3(b); Ex. B § 3(b); Ex. C § 3(b).) The Complaint's allegations about these provisions are consistent with the language of the agreements. (Compl't ¶¶ 40, 47.)

In opposition to the motion, Domenech urges that the yieldcos acted in bad faith by not exercising their discretion to accelerate the vesting of his shares pursuant to section 3(b) of each agreement. He points out that "when a contract confers discretionary rights on a party, the implied covenant requires that party to exercise its discretion reasonably." <u>In re Encore Energy Partners LP Unitholder Litig.</u>, 2012 WL 3792997, at *12 (Del. Ch. Aug. 31, 2012). However, that same decision proceeded to observe: "And what is 'arbitrary' or 'unreasonable' – or conversely 'reasonable' – depends on the parties' original contractual obligations and reasonable expectations at the time of contracting. Fundamentally, therefore, the implied covenant cannot be invoked to override the express terms of the contract." <u>Id.</u> (quotation marks and bracket omitted).

Here, each agreement granted broad discretion to accelerate the vesting of Domenech's shares, but each agreement separately included an express provision governing the vesting of shares in the event of his termination for any reason. Domenech was not solely at the mercy of committee discretion as to the vesting of shares, and instead agreed to specific vesting arrangements with each yieldco in the event of his termination. None of the three agreements was "truly silent" about the matter, and there is no "gap[]" to fill with the implied covenant of good faith and fair dealing. <u>See</u> <u>Oxbow</u>, 202 A.3d at 507.

Counts Two and Three of the Complaint will therefore be dismissed.

CONCLUSION.

The Rule 12(b)(2) motion of Chatila and Wuebbels is DENIED. The Rule 12(b)(6) motion is GRANTED as to Blackmore and Hernandez; DENIED as to Wuebbels; and GRANTED as to TERP and Global on Counts Two and Three. Therefore, the surviving claims are brought against Chatila, Wuebbels, TERP and Global on Count One.

The Clerk is directed to terminate the motions and the related letter-motions. (18 Civ. 11617, Docket # 50, 52, 53, 56, 59, 60.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
December 9, 2019

- 33 -