UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CARLOS DOMENECH ZORNOZA,

                    Plaintiff,                      16-md-2742 (PKC)
                                              18-cv-11617 (PKC)

        -against-

                                     <u>OPINION AND ORDER</u>

TERRAFORM GLOBAL, INC., TERRAFORM
POWER, INC., AHMAD CHATILA and BRIAN
WUEBBELS,

                    Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

          Plaintiff Carlos Domenech Zornoza asserts that he was terminated in retaliation for raising concerns that material misrepresentations had been made to investors about the liquidity and cashflow of non-party SunEdison, Inc. ("SunEdison"). Domenech alleges that about a month after alerting directors of SunEdison to these concerns, he was terminated as CEO and president of Terraform Global, Inc. ("Global") and Terraform Power, Inc. ("TERP"), both of which were controlled by SunEdison.

          Domenech brings a claim of retaliation under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("Sarbanes-Oxley"). Discovery in this action has concluded. Defendants TERP, Global, Ahmad Chatila and Brian Wuebbels jointly move for summary judgment in their favor under Rule 56, Fed. R. Civ. P. (ECF 115.) Defendant Wuebbels separately moves for summary judgment in his favor. (ECF 119.) Domenech also seeks summary judgment in his favor against TERP and Global. (ECF 118.)

Because the summary judgment record would permit a reasonable jury to find that retaliatory motivation was a contributing factor to Domenech's termination, defendants' joint summary judgment motion will be denied as to the claim against TERP and Global. But Domenech has not pointed to evidence that would permit a reasonable jury to find that individual defendants Chatila or Wuebbels have liability under Sarbanes-Oxley for his termination. Summary judgment will therefore be granted dismissing the claims against Chatila and Wuebbels. Domenech's motion for summary judgment in his favor will be denied because a reasonable inference could be drawn by a reasonable fact finder either in his favor or against him on evidence material to his claim. The end result of the Court's rulings on the various motions is that only Domenech's claims against TERP and Global survive.

BACKGROUND.

    A. <u>Overview of the Parties.</u>

The relationship between non-party SunEdison and defendants TERP and Global is important to understanding much of defendants' motions. Before it declared bankruptcy on April 21, 2016, SunEdison was a publicly traded renewable-energy company. (Wuebbels 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1; Def. 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 17.)[1] SunEdison was the majority shareholder of TERP and Global and sponsored their initial public offerings in 2014 and 2015. (Wuebbels 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2; Def. 56.1 ¶¶ 3, 5, 8; Pl. 56.1 Resp. ¶¶ 3, 5, 8.)[2]

---

[1] Citations to the parties' Local Civil Rule 56.1 Statements are intended as a reference to the evidence cited in those statements. Citation to exhibits in the summary judgment record is not intended to imply that the Court has relied exclusively on that portion of the record.

[2] Between their three summary judgment motions, the parties have submitted 289 paragraphs of purportedly undisputed material facts under Local Civil Rule 56.1. This does not include the additional paragraphs each party has submitted in their Rule 56.1 Counterstatements, which, by the Court's count, total an additional 187 paragraphs. Nearly every paragraph is disputed, often on points such as characterization, completeness and materiality. For example, defendants repeatedly dispute the notion that Domenech was "terminated" from employment at the Yieldcos and assert that he was "removed" instead. (See, e.g., Def. 56.1 Resp. ¶¶ 1, 81.)

TERP and Global are commonly described as "Yieldcos." (Id.) As Yieldcos, TERP and Global were conceived by SunEdison to acquire renewable-energy facilities developed by SunEdison or third parties and to manage those facilities' long-term operations. (Wuebbels 56.1 ¶ 3; Pl. 56.1 ¶ 3.) The Yieldcos were to receive cash earnings from the facilities and pay dividends to their shareholders, including SunEdison. (Def. 56.1 ¶ 84; Pl. 56.1 Resp. ¶ 84; Pl. 56.1 ¶ 5 & Def. 56.1 Resp. ¶ 5.) TERP developed projects in the United States, Canada, the United Kingdom and Chile, while Global's business focused on developing markets. (Pl. 56.1 ¶¶ 2, 5; Def. 56.1 Resp. ¶¶ 2, 5.) Before their initial public offerings in 2014 and 2015, TERP and Global were wholly owned subsidiaries of SunEdison. (Def. 56.1 ¶¶ 2-3, 5-6; Pl. 56.1 Resp. ¶¶ 2-3, 5-6.)

After the Yieldcos became publicly traded companies, SunEdison held majority voting power on the boards of both TERP and Global. (Wuebbels 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4.) Defendant Chatila was a director of the two Yieldcos' boards and also their chairman. (Def. 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.) Chatila was also the CEO of SunEdison. (Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11.) Defendant Wuebbels was the CFO of SunEdison and also a director of the two Yieldcos. (Def. 56.1 ¶¶ 13-14; Pl. 56.1 Resp. ¶¶ 13-14.) Because of the close relationship between the Yieldcos and SunEdison, the Yieldcos' transactions with SunEdison required approval from a conflicts committee consisting of independent directors who had no relationship to SunEdison. (Pl. 56.1 ¶ 4; Def. 56.1 Resp. ¶ 4.)

Before his termination on November 20, 2015, Domenech was the president and CEO of TERP and Global. (Pl. 56.1 ¶ 1; Def. 56.1 Resp. ¶ 1.) Domenech also was an executive vice president of SunEdison. (Def. 56.1 ¶ 81; Pl. 56.1 Resp. ¶ 81.) As will be discussed in greater detail, Domenech's salary was paid by a SunEdison subsidiary named NVT, LLC

("NVT"), but certain agreements expressly provided that Domenech's performance at the Yieldcos would be supervised by independent committees of the two companies' directors, and that the Yieldcos' boards had authority to terminate officers.  (Def. 56.1 ¶¶ 16, 32; ECF 122-36 at 11, 122-38 at 10.)  Defendants TERP and Global urge that summary judgment should be granted in their favor because Domenech was technically an employee of SunEdison and not the Yieldcos, but there is no dispute that he acted as president and CEO of TERP and Global and was terminated (or removed) from those positions.

      B.  <u>The Circumstances of Domenech's Termination.</u>

Domenech was terminated as president and CEO of TERP and Global on November 20, 2015, after a series of steps were taken to alter the composition of the two Yieldcos' boards.  Domenech asserts that his termination was an act of retaliation for alerting SunEdison's directors that Chatila and Wuebbels were publicly misrepresenting the value of SunEdison's liquidity and cashflow.  Defendants assert that there was no retaliatory motivation behind the termination, and that Domenech's professional rivalry with Chatila had become so destructive that the best interests of SunEdison and the Yieldcos were under threat.

In defendants' telling, over the course of 2015, Domenech took a series of actions with the intention of undermining Chatila.  In July 2015, SunEdison and TERP agreed to purchase Vivint, Inc.  (Def. 56.1 ¶ 80.)  According to defendants, when the TERP conflicts committee raised concerns about the Vivint acquisition, Domenech did not adequately advance the transaction, which caused the deal to stall and ultimately fail.  (Def. 56.1 ¶¶ 85-86; Def. Mem. at 20.)  In a separate incident, defendants assert that in late October or November 2015, Domenech and the Yieldcos' CFO Alex Hernandez met with Bank of America Merrill Lynch ("BofA").  (Def. 56.1 ¶ 88.)  The SunEdison board later learned that Domenech and Hernandez

"leaked" negative, confidential information about SunEdison's finances to BofA, causing BofA to cancel financing for SunEdison projects in Hawaii.  (Def. 56.1 ¶ 89.)  In a deposition, SunEdison director Steven Tesoriere testified that the "leak" was a "significant issue" behind Domenech's termination.  (Def. 56.1 ¶ 90.)  According to defendants, several directors and executives at SunEdison believed that Domenech aspired to succeed Chatila as CEO of SunEdison, and that in the fall of 2015, SunEdison's directors began to observe that Domenech was not working cooperatively with SunEdison leadership, "prioritizing himself over the team's needs."  (Def. 56.1 ¶ 72-75.)

Domenech points to a very different set of circumstances surrounding his termination.  Domenech asserts that in August 2015, internal SunEdison records showed that the company was suffering a "liquidity crisis as it burned through cash."  (Pl. 56.1 ¶ 38.)  He identifies a series of alleged misstatements that Chatila and Wuebbels made to SunEdison's board and to members of the public that dramatically overstated SunEdison's available cash and the strength of the company's liquidity.  (Pl. 56.1 ¶¶ 38-40, 44-48.)  Domenech asserts that the statements were knowingly false, pointing to a text message from Chatila instructing senior SunEdison executive not to admit that "we have cash flow issues."  (Pl. 56.1 ¶ 42; Def. 56.1 Resp. ¶ 42.)  As recounted by Domenech, Chatila and Wuebbels were publicly claiming that SunEdison had approximately $1.4 billion in unrestricted cash when the actual number was closer to $342 million.  (Pl. 56.1 ¶¶ 43-48.)

In October 2015, Domenech and non-party Francisco Perez, who was then COO of TERP and Global, contacted Steve Tesoriere, a board member of TERP, Global and SunEdison, and stated that Wuebbels and Chatila had misrepresented the value of SunEdison's liquidity.  (Pl. 56.1 ¶¶ 50-51; Def. 56.1 Resp. ¶¶ 50-51.)  Tesoriere suggested that Domenech

relay his concerns to Emanuel Hernandez, the chairman of SunEdison's board.  (Pl. 56.1 ¶ 52; Def. 56.1 Resp. ¶ 52.)  As will be discussed in greater detail, following his communications with Domenech, Hernandez quickly instructed an internal review of SunEdison's liquidity and learned that the company's available cash was far lower than previously represented by Chatila and Wuebbels.  Hernandez then authored a script for his use in an October 23, 2015 meeting of SunEdison's independent directors.  (ECF 122-45.)  The script included a detailed description of Hernandez's discussions with Domenech and others who raised similar concerns, described his follow-up conversations with Chatila and Wuebbels, and described the dire status of SunEdison's liquidity.  (Id.)  The script concluded with four action items, including the following: "What do to [sic] with the 'civil war' we have on our hands which essentially challenges the leadership of the CEO and CFO – with Carlos [Domenech], Pancho [e.g., Francisco Perez], PaulG [e.g., Paul Gaynor] reaching out to the Board for assistance/action."  (Id. at 6.)

On November 20, 2015, Domenech was terminated as president and CEO of TERP and Global.  (Pl. 56.1 ¶ 74; Def. 56.1 Resp. ¶ 74.)  Defendants assert that Domenech was not technically terminated from the Yieldcos, but was instead "removed."  (See, e.g., Def. 56.1 Resp. ¶ 102.)  At a special board meeting held that day, TERP appointed three new directors, all of whom were named to TERP's conflicts committee, and voted to terminate Domenech.  (Pl. 56.1 ¶¶ 76-83; Def. 56.1 Resp. ¶¶ 76-83.)  Global also appointed new directors to its conflicts committee and voted to terminate Domenech.  (Pl. 56.1 ¶¶ 85-89; Def. 56.1 Resp. ¶¶ 85-89.)  Later that day, SunEdison's human resources director met Domenech and terminated his employment at SunEdison.  (Def. 56.1 ¶ 106; Pl. 56.1 Resp. ¶ 106.)   The reconstituted boards

voted to appoint Wuebbels as the president and CEO of the two Yieldcos.  (Wuebbels 56.1 ¶ 28; Pl. 56.1 Resp. ¶ 28.)

SUMMARY JUDGMENT STANDARD.

"The role of the district court on summary judgment is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  McKinney v. City of Middletown, 49 F.4th 730, 738 (2d Cir. 2022) (quotation marks omitted).  Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A genuine factual dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Truitt v. Salisbury Bank & Tr. Co., 52 F.4th 80, 85 (2d Cir. 2022) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant."  Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than

some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

"When both parties have moved for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Dish Network Corp. v. Ace Am. Ins. Co., 21 F.4th 207, 212 (2d Cir. 2021) (quoting Coutard v. Mun. Credit Union, 848 F.3d 102, 114 (2d Cir. 2017)).

DISCUSSION.

I.      Defendants' Motion Directed toward Domenech's
        Status as an Employee Will Be Denied.

A.  The Definition of an Employee under Section 1514A.

TERP and Global urge that they are not proper defendants to Domenech's Sarbanes-Oxley claim, which, they argue, should have been brought against SunEdison only. According to defendants, Domenech was solely an employee of SunEdison and not either Yieldco.  They assert that because the Yieldcos were not Domenech's employer, they are improperly named as defendants, and summary judgment should be granted in their favor.

In opposition, Domenech has come forward with evidence that would permit a reasonable trier of fact to conclude that he was an employee of TERP and Global, including agreements that gave the Yieldcos' boards supervisory authority over Domenech and the power to terminate him.  Defendants' motion for summary judgment directed to Domenech's employee status will therefore be denied.

Congress enacted the Sarbanes-Oxley whistleblower protections out of concern that a "corporate code of silence" discouraged employees from internally reporting unlawful behavior, to the ultimate detriment of shareholders.  Lawson v. FMR LLC, 571 U.S. 429, 435 (2014).  The statute provides a right of action to an employee who suffers an adverse employment action as a result of reporting conduct that the employee reasonably believes violates the federal securities laws.  18 U.S.C.A. § 1514A(a).  Section 1514A states that no company with registered securities or that is otherwise a reporting company "may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee . . . ." Id.

An implementing regulation adopted by the Department of Labor defines "employee" as "an individual presently or formerly working for a covered person, an individual applying to work for a covered person, or an individual whose employment could be affected by a covered person." 29 C.F.R. § 1980.101(g).[3]  The Supreme Court has stated that the text and structure of section 1514A suggest "that Congress presumed an employer-employee relationship between the retaliator and the whistleblower."  Lawson, 571 U.S. at 442.

Generally, the factors used to determine whether an individual is an "employee" varies with the text of a statute.  "[W]hen Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."  Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739-40 (1989); see also Nationwide Mut. Ins. Co. v.

---

[3] A "covered person" includes any company with securities registered under section 12 of the Securities Exchange Act of 1934 or any company required to file reports under section 15(d) of that Act, as well as its officers and employees.  29 C.F.R. §§ 1980.101(f), (d).  There is no dispute that TERP and Global fall within this definition of a "covered person."

Darden, 503 U.S. 318, 323 (1992) (using agency principles to define an employee under

ERISA); Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 422 (2d Cir. 2016) (discussing

economic-reality test used to define an employee under the Family Medical Leave Act and the

Fair Labor Standards Act).  These factors typically come into play when a court must distinguish

whether an individual is most properly classified as an employee or an independent contractor.

See, e.g., Reid, 490 U.S. at 739-40.

       The Labor Department regulation, which all parties rely upon, takes an expansive

view of who is to be considered an employee for section 1514A purposes.  It includes not only

"an individual presently or formerly working for a covered person," but also "an individual

whose employment could be affected by a covered person."  29 C.F.R. § 1980.101(g) (emphasis

added).  Lawson, which issued a year before the regulation went into effect, held that section

1514A applies when a private contractor of a public company retaliates against one of its own

employees for protected activity, and rejected a narrower interpretation that would have limited

the statute's reach to a contractor's retaliatory acts against an employee of the public company

that retained it.  571 U.S. at 440-45.  Lawson observed: "The prohibited retaliatory measures

enumerated in § 1514A(a) – discharge, demotion, suspension, threats, harassment, or

discrimination in the terms and conditions of employment – are commonly actions an employer

takes against its own employees."  Id. at 441 (emphasis in original).

       In urging that Domenech was an employee of SunEdison and not the Yieldcos,

defendants rely principally on the text of section 1514A and the implementing regulation.

Domenech points to the principal-agent analysis that Reid used to distinguish an employee from

an independent contractor, 490 U.S. at 751, and urges that these factors weigh in favor of

identifying him as an employee of the Yieldcos.  But in defining an employee to include a person

"whose employment could be affected by a covered person," the regulation appears to take a more expansive view of employment than the employer/independent contractor distinction used in <u>Reid</u> and similar authorities.  <u>See</u> 29 C.F.R. § 1980.101(g).[4]

For the purposes of this motion, the Court principally looks to evidence of whether SunEdison and the Yieldcos had the power to carry out the retaliatory conduct against Domenech that is identified in section 1514A and highlighted by <u>Lawson</u> – that is, whether the defendant was in a position to "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee . . . ."  18 U.S.C. § 1514A(a); 571 U.S. at 441.

    B.  A Reasonable Trier of Fact Could Find that
       <u>Domenech Was Employed by the Yieldcos.</u>

In support of their motion, defendants point to evidence that, they contend, shows that Domenech was solely an employee of SunEdison and not either Yieldco.  In July 2014 and August 2015, SunEdison executed Management Services Agreements ("MSAs") with each of TERP and Global.  Each MSA provided that SunEdison "shall arrange . . . for such qualified personnel and support staff" to the two Yieldcos.  (ECF 122-36 at 13, Art. 5.1; ECF 122-38 at 12, Art. 5.1.)  From September 4, 2007 through November 20, 2015, Domenech received a single salary paid by the SunEdison subsidiary NVT.  (Def. 56.1 ¶ 43; ECF 122-74 (Domenech's 2015 W-2 form); ECF 122-35 at 134 (Domenech deposition testimony stating that SunEdison paid his salary).)

---

[4] <u>Reid</u> also weighs factors that are difficult to apply to the wide-ranging responsibilities and benefits typically associated with the role of a corporate CEO, such as the person's skills, the source of instrumentalities and tools, the location of work, discretion over working hours, whether the person can be assigned additional projects and the hired party's role in hiring assistants.  <u>See</u> 490 U.S. at 751.

The two Yieldcos stated in SEC filings that they did not have employees.  TERP's

Amended Form S-1 Registration Statement of July 16, 2014 stated: "We do not have any

employees.  The personnel that carry out these activities are employees of our Sponsor [e.g.,

SunEdison], and their services are provided to us or for our benefit under the [MSA]."  (ECF

122-1 at 170; see also ECF 122-53 at 160 (S-1 Statement of May 28, 2014 containing same

language).)  Under the heading "Compensation of our Executive Officers," the S-1 stated, "We

do not and will not directly employ any of the persons responsible for managing our

business . . . ."  (ECF 122-1 at 185; see also ECF 122-53 at 173.)  TERP's 10-K filing for the

2014 fiscal year stated: "[TERP] does not have any employees.  The personnel that manage our

operations are employees of SunEdison and their services are provided to the Company's [sic]

under the [MSA]."  (ECF 122-17 at 40.)  Global's forms S-1 and S-1A contained similar

language.  (ECF 122-2 at 218; 122-71 at 191.)  The Global 10-K for fiscal year 2015 stated that

Global "did not employ any of our named executive officers" and that "[e]ach of our named

executive officers was employed and compensated by SunEdison or a subsidiary of SunEdison."

(ECF 122-18 at 111.)

In opposition, Domenech points to evidence that he reported to the directors of

TERP and Global and that the Yieldcos' boards had ultimate responsibility for his termination.

The MSA for TERP states that an officer of TERP "shall only be terminated with the approval of

the Independent Committee," which is defined as "a committee of the [board of directors] of

TERP . . . made up of directors that are 'independent' of [SunEdison] and its Affiliates."  (ECF

122-36 at p. 13, Art 5.1, p. 4 Art. 1.1.21 and p. 3 Art. 1.1.16.)  The TERP MSA also provides

that "any entity or individual" assigned to TERP by SunEdison "shall, at all times, be subject to

the supervision of the Independent Committee . . . ."  (Id. at p. 11 Art. 3.2, p. 6 Art. 1.1.40.)

- 12 -

Global's MSA includes similar language, and provides for "the supervision . . . by the Independent Committee" of individuals assigned to work to Global by TERP.  (ECF 122-38 at p. 8 Art. 2.1.1.)  Following their appointment to Global by SunEdison, all personnel, including executives, "shall, at all times, be subject to the supervision of the Independent Committee . . . ." (Id. at Art. 3.2.)

Domenech points to other evidence reflecting that the boards of the two Yieldcos had supervisory authority over him as CEO and president.  (See, e.g., TERP Amended and Restated Bylaws, ECF 128-7 at 13-14 § 7  ("Subject to the powers of the Board of Directors, the chief executive officer shall be in the general and active charge of the entire business and affairs of the Corporation, and shall be its chief policy making officer.") (emphasis added); TERP Corporate Governance Guidelines, ECF 128-8 at 1 ("The Board monitors the performance of senior management; selects, evaluates and compensates the [CEO] . . . ."); Bylaws of SunEdison Emerging Markets Growth and Yield, Inc, ECF 128-11 at 5 Art. IV § 1 ("The officers of the Corporation shall be elected by the Board of Directors . . . .").)  In public statements and filings made to the SEC, Domenech was held out to the public as the CEO of TERP and Global.  (See, e.g., ECF 128-10 (TERP press release announcing quarterly results); 122-1 at 179 (TERP S-1 filing); 122-2 (Global S-1 filing); 122-7 (TERP annual report and shareholder letter signed by Domenech as president and CEO).)

TERP also entered into an agreement with Domenech that granted him restricted shares of TERP and recognized its authority to terminate him.  A February 20, 2014 agreement between Domenech and TERP (then known as SunEdison Yieldco, Inc.), executed by the corporate secretary of TERP, granted him approximately 14,117 restricted shares of TERP. (ECF 121-1.)  The agreement provided that TERP could terminate Domenech's employment

with or without cause and that any "questions" as to termination "shall be determined in the sole discretion of the Committee . . . ."[5]  (Id. § 16.)

On November 20, 2015, the boards of both TERP and Global voted to terminate Domenech as president and CEO and to replace him with Wuebbels.  (ECF 128-32, 128-33.)  A draft separation agreement and general release proposed to Domenech stated that the agreement would be made by Domenech "on one hand, and SunEdison, Inc. . . . and [TERP] and [Global], on the other."  (ECF 128-44 at 1.)

Domenech has come forward with evidence sufficient to permit a reasonable trier of fact to find that he was an employee of TERP and/or Global. [6]  This includes evidence that Domenech reported to the Yieldcos' boards, was supervised by those boards, that the boards had the authority to terminate him, and that they ultimately exercised that authority.  In the case of TERP, the board agreed to his partial compensation in the form of a grant of restricted shares.  While Domenech's salary was paid by the SunEdison subsidiary NVT, there is no suggestion that he had responsibilities to NVT or reported to NVT in any way.  Cf. Meyenhofer v. Larsen & Toubro Infotech Ltd., 503 F. Supp. 3d 39, 47 (S.D.N.Y. 2020) ("[Defendant] may choose to outsource its recruitment and payroll functions, but that does not mean that as a matter of law that [defendant] is not an employer.  To hold otherwise would allow employers to insulate themselves from Title VII liability simply by using a flow-through entity to pay employees.") (Nathan, J.) (internal citation and quotation omitted).  A trier of fact could conclude from this evidence that TERP and Global were Domenech's employers, and that, under section 1514A,

---

[5] This agreement does not appear to define the capitalized word "Committee."
[6] The Court need not reach Domenech's alternate theories as to why the Yieldcos could be found to be his employer under Sarbanes-Oxley, including the single integrated enterprise theory and his argument that the Yieldcos could be liable as agents of SunEdison.

they had the power to discharge, demote, suspend or otherwise take adverse actions against him in retaliation for engaging in protected activities.

To the extent that defendants move for summary judgment on the grounds that Domenech was not an employee of TERP or Global, the motion will be denied.

II.     Because a Reasonable Trier of Fact Could Conclude
        that Domenech's Termination Was Motivated by
        Retaliation, Defendants' Motion Will Be Denied.

Defendants assert that there is no evidence that would permit a reasonable trier of fact to find that any protected activity by Domenech was a contributing factor in his termination. They point to evidence that the ongoing internal tensions between Domenech and Chatila had become so severe that SunEdison's directors viewed it as a "civil war." Defendants state that Domenech was terminated because he was "lobbying" for Chatila's job and engaging in activities that harmed SunEdison's interests. Some of this same evidence cited by defendants would permit a reasonable trier of fact to conclude that Domenech's actions related to claimed misstatements about SunEdison's liquidity were negatively viewed as a salvo in his "civil war" with Chatila, and thus a contributing factor to his termination.

To prove retaliation under section 1514A, "'an employee must prove by a preponderance of the evidence that (1) [he] engaged in protected activity; (2) the employer knew that [he] engaged in the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.'" Murray v. UBS Sec., LLC, 43 F.4th 254, 259 (2d Cir. 2022) (brackets in original; quoting Bechtel v. Administrative Review Board, U.S. Dep't of Labor, 710 F.3d 443, 447 (2d Cir. 2013)). "If the employee establishes these four elements, the employer may avoid liability if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in

the absence of that protected behavior." <u>Bechtel</u>, 710 F.3d at 447 (quotation marks and brackets omitted).  "Thus, the defendant's burden under [section 1514A] is notably more than under other federal employee protection statutes, thereby making summary judgment against plaintiffs in Sarbanes-Oxley retaliation cases a more difficult proposition." <u>Leshinsky v. Telvent GIT, S.A.</u>, 942 F. Supp. 2d 432, 441 (S.D.N.Y. 2013) (Oetken, J.); <u>see also</u> <u>Rasmy v. Marriott Int'l, Inc.</u>, 952 F.3d 379, 392 (2d Cir. 2020) (in the Title VII context, "the question of what motivated an employer's desire to fire a worker is a quintessential jury function.").

"[T]o prevail on the 'contributing factor' element of a SOX antiretaliation claim, a whistleblower-employee must prove that the employer took the adverse employment action against the whistleblower-employee with retaliatory intent – <u>i.e.</u>, an intent to discriminate against an employee because of lawful whistleblowing activity." <u>Murray</u>, 43 F.4th at 259-60 (quotation marks and ellipsis omitted).  "[T]he whistleblower-employee need not show that retaliatory intent was the sole factor affecting the discipline or that the employer acted only with retaliatory motive.  There must, however, be more than a temporal connection between the protected conduct and the adverse employment action." <u>Id.</u> at 261.  While temporal connection alone is not enough to defeat summary judgment, it may be weighed among other facts.  <u>See</u>, <u>e.g.</u>, <u>Yang v. Navigators Grp., Inc.</u>, 674 Fed. App'x 13, 15 (2d Cir. 2016) (summary order).

According to defendants, Domenech hoped to become CEO of SunEdison and openly lobbied for the position, while simultaneously acting against SunEdison's interests in an effort to undermine Chatila.  Defendants assert that the summary judgment record does not contain evidence of a retaliatory motivation against Domenech, and instead demonstrates that he was terminated solely for performance-based reasons.

Defendants point to Domenech's role in two episodes that, they argue, harmed SunEdison and the Yieldcos.  First, in July 2015, SunEdison and the Yieldcos agreed to purchase Vivint Solar, Inc., but according to defendants, when approval of the transaction stalled before the Yieldcos' conflicts committees, Domenech "abandoned – and even obstructed and opposed" the transaction.[7]  (Def. Mem. 19, 20; Def. 56.1 ¶¶ 80-87.)  Second, defendants assert that Domenech "engaged in subversion" by leaking negative information about SunEdison's finances to Bank of America Merrill Lynch, which then withdrew financing from SunEdison developments in Hawaii.  (Def. Mem. 4, 19, 20; Def. 56.1 ¶¶ 88-91.)

But some of the evidence cited by defendants would permit a reasonable trier of fact to conclude that a retaliatory intent was a contributing factor in Domenech's termination. Defendants rely on a script written by Emmanuel "Manny" Hernandez, who was the chairman of SunEdison's board of directors, for use in an October 23, 2015 meeting of SunEdison's independent directors.  (ECF 122-45.)  In the script, Hernandez stated that on October 7, he was "surprised to receive a call from [Domenech]" who was "reaching out to me to alert me on a potential liquidity crisis."  (Id. at 2.)  Domenech informed Hernandez "[t]hat the cash and liquidity position of the company is worse than has been represented to the Board."  (Id. a 2.) Domenech attributed the liquidity misstatements to lack of transparency, misrepresentation, incompetence, or some combination thereof.  (Id. at 2.)  According to the script, Hernandez then asked Chatila and Wuebbels to prepare a more detailed report on liquidity and "made the request generic enough that they would not connect the dots to potential insider source."  (Id.)  Chatila and Wuebbels reported back with dire updates.  (Id. at 3-4.)  Hernandez's meeting script, which

---

[7] Domenech asserts that the Vivint transaction was not approved by TERP's conflicts committee because Chatila and Wuebbels failed to comply with information requests, and that defendants' reliance on the failed Vivint transaction is an after-the-fact justification for his termination.  (See Pl. Opp. Mem. at 20.)

is focused almost entirely on Domenech's initial report and the subsequent scrutiny of company liquidity, lists four action items, including: "What do to [sic] with the 'civil war' we have on our hands which essentially challenges the leadership of the CEO and CFO – with Carlos [Domenech], Pancho [e.g., Francisco Perez], PaulG [e.g., Paul Gaynor] reaching out to the Board for assistance/action."  (Id. at 6.)[8]

The script suggests that Hernandez took Domenech's concerns seriously, directed further investigation, and found the concerns to have some merit.  But Hernandez's reference to a "civil war" that "essentially challenges the leadership" of Chatila and Wuebbels also implies that he negatively perceived Domenech's actions as a challenge to SunEdison's leadership and stability.  A reasonable trier of fact could view the Hernandez script as evidence that Domenech's protected activity was considered problematic, and that it contributed to his termination less than a month after the script was drafted.

The significance of certain directors' deposition testimony is more appropriately weighed by a trier of fact.  At his deposition, Hernandez was asked, "And this civil war that you referred to involves these individuals coming to you over the head of the CEO and CFO, correct?"  (ECF 148-1 at 306-07.)  Hernandez answered, "Yes."  (Id. at 307.)  He explained:

> And I quite honestly regret having used that word but when three
> senior members of management essentially come to the chairman
> with certain inputs, allegations, it – I have a divided management.
> That's all I was trying to portray, is that was part of the issue that
> we also need to collectively solve as a board.  Truly my intention
> was how do I put the pieces all back together.

---

[8] The script references communications that Hernandez had with Yieldco COO Francisco Perez Gundin and SunEdison Executive Vice President Paul Gaynor, both of whom also contacted him with concerns about SunEdison's liquidity.  (ECF 122-45.)  Domenech points to evidence that Perez and Gaynor were each terminated in January 2016 and has submitted the complaints that each filed in federal court asserting that their respective terminations violated Sarbanes-Oxley whistleblower-protection provisions.  (ECF 155-80, -81.)  Defendants maintain that Gundin and Gaynor voluntarily resigned their positions.

(Id.)  Hernandez testified that it was "proper" for Domenech and others to raise the concerns

described in his October 23 script, stating, "And like I said, I'm actually glad they did.  That

gave the board an opportunity to get to the bottom of it. . . .  The termination of Mr. Domenech

had nothing to do with the complaints he raised early October." (Id. at 319, 320.)  Hernandez

emphasized the failed Vivint transaction as the main reason for Domenech's termination.  (Id. at

320-22.)

   Steve Tesoriere, who was a director of TERP, Global and SunEdison, testified

that "civil war" was an accurate characterization of the tensions between Domenech and Chatila.

(ECF 122-42 at 102.)  He later testified, "If you want to stick with the term 'war,' then, yes, the

two generals, yes.  There were certainly members of each faction."  (ECF 122-42 at 135.)

Tesoriere testified that Chatila persuaded "the board" to terminate Domenech because Domenech

provided confidential information about SunEdison's finances to Bank of America.  (Id. at 104-

06, 127-28.)  He testified that the Bank of America issue was "one of many items that were part

of the mix of information that the board was basing its decision on," and that directors were

broadly concerned that the conflict between Domenech and Chatila was jeopardizing the

business models of SunEdison and the Yieldcos.  (Id. at 138-40.)

   Peter Blackmore, a director of SunEdison, was appointed to the boards of TERP

and Global on November 20, 2015, and voted in favor of Domenech's termination.  (Pl. 56.1 ¶¶

79, 86.)  Testifying about Domenech's "open lobbying" for Chatila's termination, Blackmore

testified that "civil war is not a bad adjective to describe it because the company obviously had

challenges.  We needed everybody to work together to solve that challenge.  You can't have

public debate about the rights and wrongs of individuals.  It's not the right way of running a

company."  (ECF 122-34 at 137.)  Blackmore testified that he was aware that Domenech had

raised concerns about public misrepresentations of SunEdison finances, but that he was terminated "for different reasons."  (Id. at 141-42.)

Two independent directors of the Yieldcos voted against Domenech's termination.  In their depositions, they described their surprise at the move to terminate him. Mark Florian stated that Domenech was "trying to do a good job on behalf of the company." (ECF 128-1 at 160.)  Florian testified: "This was just presented to us as resolutions and things that were happening.  There was no -- I had no knowledge in terms of how exactly these decisions were made."  (Id. at 161.)  Florian said that he remains uncertain why Domenech was terminated and that "this was all just a big surprise to me that this was happening in the first place."  (Id. at 168.)  Yieldco director Mark Lerdal testified that he considered Domenech competent and thought that he "was doing a good job given the circumstances . . . ."  (ECF 129-3 at 36-37, 106.)  When asked whether he believed Domenech suffered retaliation for identifying possible securities laws violations, Lerdal answered, "I have no basis in which to have an opinion on that."  (Id. at 114.)  He also stated, "I believed that Mr. Chatila didn't get his way, so he decided to remove the obstacles . . .  I believe Mr. Domenech was an obstacle . . . ."  (Id. at 115.)

A reasonable trier of fact could weigh this evidence and conclude that Domenech's protected activity compounded some directors' alarm about his tensions with Chatila, and that it was a contributing factor to his termination.  It is a trier of fact's role to weigh the significance of the Hernandez script and its suggestion that a "civil war" was being fought by Domenech and others by "reaching out to the Board for assistance/action."  It is also the trier of fact's role to weigh the credibility and implications of the directors' testimony that they were alarmed by the conflict between Chatila and Domenech to such an extent that Domenech's

termination was warranted, but that, at the same time, Domenech's report of the purported liquidity misstatements of Chatila and Wuebbels did not factor into the decision.  Such testimony is in some tension with the views of the Yieldco independent directors who described their surprise at the vote to terminate Domenech, their belief that he was performing well, and Lerdal's view that Domenech was terminated because he was "an obstacle" to Chatila.

The summary judgment record contains evidence that would permit a reasonable trier of fact to find that Domenech's protected activity was a contributing factor to his termination.  Domenech has made out a prima facie case of retaliation under section 1514A.

As noted, if an employee has made out a prima facie case of retaliation, "the employer may avoid liability if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior."  Bechtel, 710 F.3d at 447 (quotation marks and brackets omitted); see also Yang, 674 Fed. App'x at 14 ("the defendant employer can still secure a favorable judgment by showing no genuine dispute that the record clearly and convincingly demonstrates that the employer's adverse action would have been taken even in the absence of protected activity.") (summary order).

Based on the entirety of the summary judgment record discussed above, a reasonable jury could conclude that defendants have failed to clearly and convincingly prove that Domenech would have been terminated in the absence of his protected activity.  Defendants' summary judgment motion will therefore be denied.

III.    Domenech's Motion for Summary Judgment Will Be Denied.

Domenech also moves for summary judgment in his favor.  He points to evidence that, he argues, makes out a prima facie case of retaliation, and argues that no reasonable trier of fact could find that he was terminated solely for non-retaliatory reasons.

As with the defendants, Domenech's motion turns largely on an interpretation of the "civil war" language used in the Manny Hernandez script of October 2015.  (Pl. Mem. at 10-12; Pl. 56.1 ¶ 59.)  Domenech urges that no reasonable trier of fact could fail to find an intention to retaliate against him for engaging in protected activity.  (See id.)  Domenech argues that the Yieldcos cannot rebut his prima facie case with clear and convincing evidence that he was terminated for reasons that were independent of his protected activity.

For the reasons largely explained, Domenech's motion for summary judgment will be denied.  A reasonable fact-finder would be required to interpret the Hernandez script and determine its weight alongside other evidence tending to show non-retaliatory reasons for his termination, including his "leak" of information to BofA and his purported mismanagement of the Vivint transaction.  The credibility of the witnesses' stated reasons for terminating Domenech also must be evaluated by a trier of fact.

Domenech's motion for summary judgment will therefore be denied.

IV.    Chatila's Motion for Summary Judgment Will Be Granted.

Chatila moves for summary judgment in his favor on the ground that he cannot be held individually liable for Domenech's termination.  (Def. Mem. at 12-14.)  He points to the Court's Opinion and Order on defendants' motion to dismiss, which held that the text of section 1514A does not provide for an individual director's liability.  See Zornoza v. Terraform Glob., Inc., 419 F. Supp. 3d 715, 731-34 (S.D.N.Y. 2019).  As the Court explained, section 1514A expressly provides that "[n]o company . . . or any officer, employee, contractor, subcontractor, or agent of such company" may engage in retaliatory conduct.  Id. at 732 (quoting 18 U.S.C. § 1514A(a)).  Directors are not included among these categories of persons, whereas other Sarbanes-Oxley provisions expressly allow for director liability.  Id. at 732-33.  The Court

observed that "Congress could reasonably have concluded that liability for the retaliatory actions of a board should lie with the company itself, as opposed to allocating liability among the individual directors." Id. at 734.

Chatila urges that, in light of the Court's decision on the motion to dismiss, he cannot be held personally liable for Domenech's termination in his capacity as a director of the Yieldcos, and that the record does not contain evidence that, in his capacity as CEO of SunEdison, he could be found liable for Domenech's termination from the Yieldcos.

In opposition to Chatila's motion, Domenech states that his claim against Chatila is not premised on Chatila's role as a director of any company. (Opp. Mem. at 13 n.9.) He asserts that as an officer of SunEdison, Chatila "provided" the authority to terminate him. (Id. at 14.) He points to an instant message sent from Chatila to Blackmore at 6:56 p.m. on November 20, 2015 that states, "On GLBL I will fire Carlos [Domenech] first then go the independence of each one of you." (ECF 155-58.) He also points to handwritten notes taken by Paul Gaynor during a conference call of November 23, 2015, which reads, "AC  The whole organization is going to reject them.  – eat you alive" (ECF 155-63.)  Gaynor said in his deposition that he believed the remark was directed toward him because he had informed the SunEdison board that he disagreed with its recent actions.  (ECF 155-103 at 129.)

Domenech has not pointed to evidence that would permit a reasonable trier of fact to find Chatila liable under section 1514A.  While the record suggests that Chatila and Domenech had an acrimonious rivalry, Domenech has not pointed to evidence that Chatila, in his capacity as on officer of SunEdison, retaliated against Domenech as a Yieldco officer.  Chatila's message to Blackmore referred only to Global, of which Chatila was a director, and does not suggest retaliatory actions taken through his authority at SunEdison.  His purported "eat you

alive" comment was made after Chatila's termination; Gaynor perceived the remark as a threat directed toward him personally, and, in any event, the comment does not go toward Chatila's authority or involvement in terminating Domenech.

Because Domenech has not come forward with evidence that would permit a reasonable trier of fact to find Chatila liable under section 1514A, Chatila's summary judgment motion will be granted.

V.      Wuebbels's Motion for Summary Judgment Will Be Granted.

Wuebbels separately moves for summary judgment in his favor on essentially the same grounds as those raised by Chatila:  He argues that section 1514A does not provide for a claim against him in his capacity as a director of the two Yieldcos, and that Domenech cannot point to evidence that Wuebbels otherwise had the authority to terminate him or participated in the decision to terminate him.

At the time of Domenech's termination, Wuebbels was CFO and executive vice president of SunEdison, as well as a director of TERP and Global.  (Wuebbels 56.1 ¶ 6.) Domenech also was an executive vice president of SunEdison, though Domenech asserts that his own title was "historical" and that he did not have active responsibilities at SunEdison during his tenure as CEO of the Yieldcos.  (Wuebbels 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.)  Wuebbels asserts that within SunEdison, he and Domenech were peers, and that he had no authority to affect the terms and conditions of Domenech's employment.  (Wuebbels 56.1 ¶¶ 7-13, 18-22.)

In opposition, Domenech raises a battery of detail about Wuebbels's tenure at SunEdison and the two Yieldcos.  Domenech's response to Wuebbels's Local Rule 56.1 statement recites an additional 110 paragraphs of factual assertions.  Domenech depicts

Wuebbels as desperate to force the Yieldcos to approve transactions that would have infused SunEdison with liquidity but were against the Yieldcos' best interests.

Accepting the version of events offered by Domenech and construing the record in the light most favorable to him as non-movant, he has not pointed to evidence that would permit a reasonable trier of fact to find Wuebbels liable under section 1514A.  It is true that in his capacity as a director of the Yieldcos, Wuebbels voted in favor of Domenech's termination from the two Yieldcos.  As discussed in relation to Chatila, and for the reasons set forth in this Court's Opinion and Order on the motion to dismiss, section 1514A does not provide for a claim against individual directors.  Domenech suggests that Wuebbels's frustrations as a SunEdison officer motivated his votes in favor of termination, but even if that were the case, it merely offers a possible motivation for actions that Wuebbels took in his capacity as a director.

Domenech does not point to evidence that goes toward Wuebbels's authority within SunEdison to commit acts of retaliation against Domenech in his executive role at the Yieldcos.  He cites an instant message that Wuebbels sent to Chatila that stated, "Carlos [Domenech] needs to be accountable to this in the same way we are holding the GMs accountable . . . .  There are many options to have both free up cash and that cash come our way."  (ECF 155-23; ellipsis in original.)  The message suggests an intent to punish Domenech for not transferring liquidity from the Yieldcos to SunEdison, as well as an intent to coerce the Yieldcos into doing the same.  But the motivation to infuse SunEdison with cash through coercive means is different from an act of retaliation for reporting a possible violation of the securities laws.  Based on this text message, a reasonable trier of fact could not find that Wuebbels had the authority or the intent to exercise his power as SunEdison's CFO to retaliate against Domenech for identifying a potential securities laws violation.

Construing the summary judgment record in the light most favorable to Domenech as the non-movant, he has not pointed to evidence that would permit a reasonable trier of fact to find that Wuebbels is liable for an act of retaliation under section 1514A. Wuebbels's motion for summary judgment will therefore be granted.

VI.   A Reasonable Trier of Fact Could Conclude that Domenech
Was Damaged When the Yieldcos Terminated Him.

Defendants also urge that Domenech cannot point to evidence that he suffered any damage when the Yieldcos terminated him because his salary was paid by the SunEdison subsidiary NVT.  According to defendants, Domenech was therefore damaged only by later actions of SunEdison and NVT, and summary judgment should therefore be granted in their favor.

In support, defendants point to Domenech's W-2 form from 2015, which identifies NVT as the source of his compensation.  (ECF 122-74.)  Defendants again assert that this is evidence that SunEdison, through NVT, employed defendant, and not the two Yieldcos. Defendants also point to stock agreements that Domenech entered with the Yieldcos, and points to language in them providing that his stock grants would continue to vest if he remained in "continuous service" with an "Affiliate" or subsidiary of the Yieldcos.  (ECF 122-57, 59-61.) These agreements identify SunEdison as an "Affiliate," which, defendants argue, means that Domenech was damaged when he was terminated as a SunEdison employee, not as an employee of the Yieldcos.

The evidence cited by defendants does not establish their entitlement to judgment as a matter of law on the issue of damages.  Even under defendants' interpretation of the evidence, Domenech's positions at the Yieldcos was closely intertwined with his compensation and salary.  It appears that Domenech's work for an "Affiliate" could have concluded but he still

- 26 -

would have been owed compensation for his work at a Yieldco.  Defendants point to a compensation arrangement that turned on Domenech receiving a salary from NVT, but there is no suggestion that Domenech's had responsibilities at NVT and that his compensation was based on duties other than his work for the Yieldcos.  A trier of fact is needed to weigh the evidence cited by defendants and determine whether and to what extent Domenech's termination by the Yieldcos damaged him.

In opposition, Domenech also points to evidence that would permit a reasonable trier to conclude that his termination by the Yieldcos resulted in economic loss caused by the Yieldcos.  In an email of July 29, 2020, Megha Shah, who had the job title of "VP Legal," wrote from a terraform.com email address instructing Computershare "to cancel the shares we discussed yesterday" because they "represent equity awards that were subject to vesting terms, and were forfeited because the vesting terms were not met."  (ECF 128-41.)  A response confirmed that the request was completed.  (Id.)  A letter from TERP's general counsel, written on Terraform Power letterhead and dated July 29, 2020, instructed Compushare to cancel 284,736 shares belonging to Domenech and to transfer them to TERP.  (ECF 128-42.)  As to Global, a document on Global letterhead lists 1,341,368 Global shares belonging to Domenech. (ECF 128-43.)  A column next to Domenech's name contains an "X" under the heading "Debit," and a column next to the phrase "2014 Incentive Plan" contains an "X" under the heading "Credit."  (ECF 128-43.)  The document appears to be signed by Yana Kravtsova, "VP/Legal Counsel" for Global.  (ECF 128-43.)  A reasonable trier of fact could consider this evidence and find that Domenech was damaged when TERP and Global canceled and/or rescinded shares granted to him as compensation for employment at the Yieldcos.

Defendants' motion for summary judgment premised upon the absence of any cognizable damage to Domenech caused by TERP and Global will be denied.

VII.    A Trier of Fact Must Weigh the Evidence
        on Domenech's Damages Mitigation.

Defendants argue that summary judgment should be granted in their favor because Domenech has not made reasonably diligent efforts to mitigate his damages by finding comparable employment.  In opposition, Domenech points to evidence of his entrepreneurial and investment activities, and asserts that his termination has been an obstacle to being hired as CEO of a public company comparable to the Yieldcos.  Because a reasonable trier of fact could find that Domenech attempted to mitigate his damages, defendants' motion will be denied.

"Employees discharged in violation of Sarbanes-Oxley have a duty to mitigate their damages.  Although this duty is not meant to be 'onerous,' it still requires the employee to act with a 'reasonable diligence' to obtain comparable employment."  Sharkey v. J.P. Morgan Chase & Co., 2018 WL 1229831, at *10 (S.D.N.Y. Mar. 5, 2018) (Cote, J.) (citing Dailey v. Societe Generale, 108 F.3d 451, 456 (2d Cir. 1998)); see also Trusz v. UBS Realty, 2016 WL 1559563, at *11 (D. Conn. Apr. 18, 2016) ("No provision of Sarbanes-Oxley specifically requires a victim of retaliation to mitigate his damages.  But the [Department of Labor Administrative Review Board] has consistently found such a requirement implicit in the statute, in keeping with the parallel body of damages law developed under other anti-discrimination statutes.") (quotation marks omitted).

"[A]n employer may prove that an employee failed to mitigate by establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it. An exception to this rule applies, however, when an employer can prove that the employee made no reasonable efforts to seek suitable employment."  Sharkey, 2018 WL 1229831, at *10

(quotation marks, citation and brackets omitted).  "The burden of proving a defense of failure to mitigate rests, on either theory, squarely on the defendant.  Accordingly, in the context of a motion for judgment as a matter of law, an employer must show that no reasonable juror could have failed to find in their favor on the defense."  Id. (internal citation omitted); see also Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1580 (2d Cir. 1994) ("Failure to mitigate damages is an affirmative defense . . . .").

Defendants point to Domenech's deposition testimony that he has never retained a headhunter or employment firm, has not attended job fairs and has not spoken to prospective employers.  (ECF 122-35 at 170, 182, 191-92.)  Defendants assert that peer companies of SunEdison have actively hired executives since Domenech's termination, and that Alex Hernandez, the Yieldcos' former CFO, obtained employment within months of his termination.  (Def. 56.1 ¶¶ 119-21.)

In response, Domenech asserts that since his termination from the Yieldcos he has worked principally as an entrepreneur.  He states that the reputational harm associated with his termination has made him a less-attractive candidate to serve as CEO of a publicly traded company, and that prior to his termination, he was frequently contacted by corporate headhunters.  (Pl. 56.1 Resp. ¶ 117; 2d Domenech Dec. ¶ 56 (ECF 146).)

Domenech states that after his termination, he became CEO of an LLC that he formed using his personal funds, and then "partnered with Morgan Stanley" in an unsuccessful attempt to acquire SunEdison's ownership stake in TERP.  (Id. ¶¶ 57-58.)  In 2017, that LLC unsuccessfully attempted to acquire Global in partnership with Lone Star Funds; Domenech asserts that SunEdison sold Global to a lower bidder because of his personal involvement.  (Id. ¶ 59.)  Domenech states that in 2017, he became managing partner of a firm called EverStream

Management, and in 2019 became CEO and chairman of a firm called Enfinity Global, which he describes as "a consolidation of EverStream assets." (Id. ¶¶ 61-62.)

A trier of fact is required to weigh the parties' evidence as to Domenech's mitigation efforts. Domenech points to entrepreneurial and investment activity that he undertook following his termination, as opposed to traditional employment opportunities. The employment prospects of a publicly traded company's former CEO are likely to involve different considerations than those of other executives or most salaried employees, and Domenech has pointed to post-termination activities that he undertook for financial gain, which a trier of fact could reasonably credit as an attempt to mitigate damages.

Defendants' motion for summary judgment on Domenech's mitigation of damages will be denied.

CONCLUSION.

Defendants' joint summary judgment motion is GRANTED as to plaintiff's claims against defendant Ahmad Chatila but is otherwise DENIED. The summary judgment motion of defendant Wuebbels is GRANTED. Plaintiff's summary judgment motion is DENIED. The Clerk is respectfully directed to terminate the motions and the related letter-motions. (ECF 115, 118, 119, 124, 131.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       April 7, 2023

- 30 -